Mark S. Miller & Jamileh Miller
19733 E Union Dr
Centennial, CO 80015
Phone: 303-358-1190

FILED
BRADFORD L. BOLTON, CLERK
SEP - 6 2012
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

Mark S. Miller & Jamileh Miller
**Debtor(s)**
vs
Deutsche Bank National Trust Company
**Respondent**

**Case No.** 10-25453 MER
DATE:
TIME: ☐am ☐pm
LOCATION: **721 19th Street, Denver, CO 80202-2508**

**CHAPTER 13**

# MOTION FOR SUMMARY JUDGMENT UNDER RULE 7056

**MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO RULE 7056 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**(WITH SUPPORTING STATEMENT OF UNDISPUTED MATERIAL FACT)**

## I. INTRODUCTION

NOW COMES Mark Stanley Miller and Jamileh Miller "Debtors" and respectfully moves the court for entry of Summary Judgment against Deutsche Bank National Trust Company pursuant to rule 7056 of the Federal Rules of Bankruptcy procedure on the grounds that there are no material issues in dispute, and debtors are entitled to Summary Judgment as a matter of law. This motion is based on the pleadings, answers to interrogatories, answer to request for productions, and affidavits on file.

## II. PRELIMINARY STATEMENT

In this case it is abundantly clear from the pleadings, evidence on record, answers to request for production of documents, answers to interrogatories, the affidavits, and other uncontroverted evidence that there are no material issues in dispute, and debtors are entitled to Summary Judgment as a Matter of Law. The evidence is clear that Deutsche Bank National Trust Company (("Deutsche Bank") is NOT a creditor and is NOT the holder in due course of any note connected to the subject property of the bankruptcy estate, and the "copy" of the note fails authentication as an original instrument. Moreover, there is simply no evidence to support any transfers made to Deutsche Bank which would establish Deutsche Bank as a valid transferee of any such note and the source of any purported note cannot be identified as plainly admitted by Deutsche in its answers to discovery. Deutsche Bank cannot clearly fulfill the UCC state requirements for establishing that it is the Current holder of the note and thus its claim has failed miserably and its claim must be dismissed with prejudice. Finally, even if Deutsche Bank could produce the Original Note in this case, such note is unenforceable as to Deutsche Bank because there are no valid assignments of such note to Deutsche Bank, and any purported conveyances by MERS to any trust is null and void under law.

## TABLE OF CONTENTS

I. Introduction....1

II. Preliminary Statement....1

III. Index Of Authorities - Table of Cases....3

IV. Rules & Statutes....3

V. Nature And Stage Of The Proceedings....4

VI. Grounds and Relief Sought....4

VII. Issues To Be Decided By The Court....5

VIII. Statement of Undisputed Material Fact....6

IX. Summary Of The Argument....7

DEUTSCHE BANK CANNOT ESTABLISH THAT IT IS A "HOLDER IN DUE COURSE", "PARTY IN INTEREST" OR "CREDITOR" ENTITLED TO SEEK AND OBTAIN RELIEF FROM THE STAY AS IT CANNOT MEET ITS BURDEN OF PROOF WITH ITS "COPY" OF THE NOTE WHEREAS SUCH COPY IS NOT AUTHENTICATED UNDER FEDERAL RULE OF EVIDENCE 901(a)....7

DEUTSCHE BANK LACKS STANDING BECAUSE THERE IS NO EVIDENCE THAT WOULD SUPPORT A VALID 'ASSIGNMENT" TO DEUTSCHE BANK AND MOVANT HAS FAILED TO PROVE ITS STATUS AS TRANSFEREE THROUGH A SERIES OF RECORDED ASSIGNMENT REQUIRED UNDER COLORADO STATE LAW....8

THE PURPORTED CONVEYANCE FROM INDYMAC TO DEUTSCHE BANK IS UNENFORCEABLE BECAUSE THE CONVEYANCE OF LAND UNDER COLORADO LAW IS SUBJECT TO STATUTORY REQUIREMENTS THAT MUST BE MET BEFORE A CONVEYANCE IS VALID....9

ANY TRANSFERS ORIGINATING FROM MORTGAGE ELECTRONICS REGISTRATION SYSTEMS (MERS) ULTIMATELY TO DEUTSCHE BANK IS NULL AND VOID....9

X. Points & Authorities....10-11

XI. Conclusion and Prayer....12

XII. Proof of Service....13

XIII. Proposed Order....14

XIV. Appendix of Exhibits....15

# III. INDEX OF AUTHORITIES

## FEDERAL CASES

Page No(s))

**Anderson v. Liberty Lobby, Inc** ........ 12
*477 U.S. 242, 248 (1986)*

***British Airways Board v. Boeing Co.,*** ........ 12
*585 F.2d 946, 951 (9th Cir. 1978). 12*

***Celotex Corp. v. Catrett*** ........ 12
*477 U.S. 317, 323 (1986). 12*

***George v. Metro Fixtures Contractors, Inc*** ........ 9
*178 P.3d 1209, 1213 (Colo. 2008) 9*

***LaSalle Bank Nat. Ass'n v.Lamy*** ........ 10
*824 N.Y.S.2d 769, 2006 WL 2251721 (Sup.2006) 10*

***Lujan v. Defenders of Wildlife*** ........ 12
*504 U.S. 555, 561 (1992)*

***Mortgage Electronic Registration Systems. Inc. v. Southwest Homes of Arkansas*** ...... 11
*2009 WL 723182 (Supreme Court of Arkansas, 2009 11*

***Progressive Exp. Ins. Co. v. McGrath Community Chiropractic*** ........ 13
*913 So.2d 1281 (Fla. 2nd DCA 2005). 13*

***United States v. Henry, 164 F.3d 1304*** ........ 8
*164 F.3d 1304, 1309 (10th Cir. 1999) 8*

***Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*** 12
*454 U.S. 464 (1982) 12*

# IV. RULES AND STATUTES

***Rule 7056*** ........ 1
*Federal Rules of Civil Procedure*

***RULE 901(a)*** ........ 4
***Federal Rules of Evidence***

*Colo. Rev. Stat. § 4-3-109(c).7 Section 4-3-205(b)* ........ 9

***Colo. Rev. Stat. § 4-3-109(c).7 Section 4-3-205(b)*** ........ 9

***Colo. Rev. Stat. § 4-3-203*** ........ 10

## V. NATURE & STAGE OF THE PROCEEDINGS

This is a Chapter 13 Bankruptcy case filed by Mark S. Miller and Jamileh Miller ("Debtors") on June 22, 2010. On October 10, 2010, Deutsche Bank filed its motion for Relief from stay case asserting that it is a "creditor" or other party in interest, entitled to relief from stay to continue a foreclosure action filed in state court. In its motion, Deutsche Bank recited that it was the current owner of the Note and Deed of Trust.

The debtors opposed the motion, and on November 3, 2012, the bankruptcy court entered an order lifting the automatic stay. The debtors appealed to the Bankruptcy Appellate Panel ("BAP") where the BAP affirmed the on. Debtors appealled the BAP's decision to the 10th Circuit Court of Appeal who ultimately remanded the case finding that INDYMAC's in blank indorsement to Deutshe Bank was insufficient to show Deutshe Bank's standing. On remand the debtor initiated discovery to Deutsche and this Discovery demonstrates clearly that Deutsche is NOT the holder in due course. Debtors now move for Summary Judgment.

## VI. GROUNDS AND RELIEF SOUGHT

**A. GROUNDS:**

The grounds of this Summary Judgment motions is that there are no material issues in dispute in this case, and the debtors Mark S. Miller and Jamilieh Miller are entitled to Summary Judgment as a matter of law. Deutsche Bank, nor its counsel has no evidenciary support, including the original note, or real proof of assignment to support its claim that it is a party in interest, or a person entitled to payment

**B. RELIEF SOUGHT:**

The relief sought is entry of Summary Judgment dismissing Deutsche Bank Trust Company's claim with prejudice, strike any proof of claim filed by Deutsche Bank, and vacate any future hearings set on this matter. This Court should also prohibited Deutsche Bank and its attorneys from filing any other claims against the estate.

## VII. ISSUES TO BE DECIDED BY THE COURT

The issues to be decided by this court relative to this motion are as follows:

***ISSUE NO 1:*** **DEUTSCHE BANK IS NOT THE HOLDER IN DUE COURSE OF THE NOTE & A COPY OF THE NOTE FAILS AUTHENTICATION UNDER FEDERAL RULE OF EVIDENCE 901(a)**

***ISSUE NO 2:*** **THERE IS NO EVIDENCE OF A VALID ASSIGNMENT TO DEUTSCHE BANK ORIGINATING FOR MERS THAT WOULD ESTABLISH ITS RIGHT AS A VALID TRANSFEREE**

***ISSUE NO 3:*** **DEUTSCHE BANK IS NOT A CREDITOR, NOR DOES IT HAVE A RIGHT TO PAYMENT IN THIS BANKRUPTCY CASE AS IT FAILED TO PROVE ITS STANDING UNDER STATE LAW**

***ISSUE NO 4:*** **THE SOURCE OF THE PURPORTED "NOTE" CANNOT BE IDENTIFIED EVEN BY DEUTSCHE BANK**

***ISSUE NO 5*** **DEUTSCHE BANK WAS CLEARLY NOT IN POSSESSION OF THE NOTE AT THE TIME THE MOTION FOR RELIEF WAS FILED**

***ISSUE NO 6:*** **UNDER THE U.C.C. REQUIREMENTS, DEUTSCHE BANK HAS FAILED TO SHOW THAT IT IS THE CURRENT HOLDER OF THE NOTE**

With respect to Issue 1 & Issue 2, Debtor's receipt of interrogatories of from Deutsche Bank indicates a mere copy or modified, tampered, or doctored version of the note, but is NOT the true and correct bonafide "blue ink" original promissory note or any valid assignment to Deutsche Bank.

With respect to Issues 3, 4, 5, and 6, it is clear in this case that Deutsche is NOT in possession of the actual note and is clearly not a creditor or a party in interest to this case. As will be shown herein, Deutsche Bank cannot even identify the "source" of its purported original note, is not in possession of the bona fide blue ink original note, and Deutshe Bank has failed to show that it is the current holder of the note, or that it was properly assigned to them by its predecessors, MERS, and INDYMAC BANK, which is bases its claims.

## VIII.  STATEMENT OF UNDISPUTED MATERIAL FACTS

The crux of this case is whether or not Deutsche Bank has standing in this bankruptcy case as a "creditor" or "party in interest" entitled to seek and obtain relief from the stay. The evidence of record suggest that it is not, and its claim must be dismissed with prejudice.

1. It is undisputed that the copy of the note obtained in discovery is a mere unenforceable copy of a modified instrument and does not comply with the Federal Rules of Evidence.

2.  It is undisputed that Deutsche Bank cannot present witnesses, nor does it even attempt to present witnesses that could testify to the authenticity of the purported note it claims to have in its possession, and this is obvious from its witness list.

3. It is undisputed that Deutsche Bank cannot even identify the "source" of the note that it claims it is in possession of, nor can it produce a single witness to identify to the authenticity of the purported not. Deutsche objected to the word source as being vague but the word "source" is well defined in Black Law Dictionary, Edition 9  (See Exhbit 9 - Urgent Letter dated 8/27/2012)

4. It is undisputed that INDYMAC Bank (Deutsche's) predecessor did not have the note and admittedly sent debtors letters clearly indicating that the note is not available. (See Exhibit 5)

5. It is undisputed that Deutsche Bank has filed no liens, nor any other instrument in the Colorado Property records establishing itself as a creditor or owner of the note. (Exhibit 8)

6. It is undisputed that Deutsche Bank has never reported late payments to any major credit bureau, including TransUnion. (Exhibit 6)

7.  It is undisputed that Deutsche Bank has on many occasions, falsely represented to courts and claimed that it is in possession of the note for foreclosure purposes, but after investigation by those Court, it was found that Deutsche Bank held no such notes to fulfill its legal requirements. (See Exhibit 7 - Opinion & Order by Judge Christopher A Boyko) dismissing at least fourteen (14) cases as a result of the misrepresentations.

8. It is undisputed that Deutsche Bank did not record its lien in Real Property Records according to State law, and the attached property record is true and correct. (Exhibit 8)

# IX. SUMMARY OF THE ARGUMENT

**In this case it is abundantly clear from the pleadings, evidence on record, answers to request for production of documents, answers to interrogatories, the affidavits, and other uncontroverted evidence that there are no material issues in dispute, and debtors are entitled to Summary Judgment as a Matter of Law. The evidence is clear that Deutsche Bank National Trust Company (("Deutsche Bank") is NOT a creditor and is NOT the holder in due course of any note connected to the subject property of the bankruptcy estate, and the "copy" of the note fails authentication as an original instrument. Moreover, there is simply no evidence to support any transfers made to Deutsche Bank which would establish Deutsche Bank as a valid transferee of any such note and the source of any purported note cannot be identified as plainly admitted by Deutsche in its answers to discovery. Deutsche Bank cannot clearly fulfill the UCC state requirements for establishing that it is the Current holder of the note and thus its claim has failed miserably and its claim must be dismissed with prejudice. Finally, even if Deutsche Bank could produce the Original Note in this case, such note is unenforceable as to Deutsche Bank because there are no valid assignments of such note to Deutsche Bank, and any purported conveyances by MERS to any trust is null and void under law.**

***ARGUMENT I*** **DEUTSCHE BANK CANNOT ESTABLISH THAT IT IS A "HOLDER IN DUE COURSE", "PARTY IN INTEREST" OR "CREDITOR" ENTITLED TO SEEK AND OBTAIN RELIEF FROM THE STAY AS IT CANNOT MEET ITS BURDEN OF PROOF WITH ITS "COPY" OF THE NOTE WHEREAS SUCH COPY IS NOT AUTHENTICATED UNDER FEDERAL RULE OF EVIDENCE 901(a)**

***ARGUMENT II*** **DEUTSCHE BANK LACKS STANDING BECAUSE THERE IS NO EVIDENCE THAT WOULD SUPPORT A VALID 'ASSIGNMENT" TO DEUTSCHE BANK AND MOVANT HAS FAILED TO PROVE ITS STATUS AS TRANSFEREE THROUGH A SERIES OF RECORDED ASSIGNMENT REQUIRED UNDER COLORADO STATE LAW**

***ARGUMENT III*** **THE PURPORTED CONVEYANCE FROM INDYMAC TO DEUTSCHE BANK IS UNENFORCEABLE BECAUSE THE CONVEYANCE OF LAND UNDER COLORADO LAW IS SUBJECT TO STATUTORY REQUIREMENTS THAT MUST BE MET BEFORE A CONVEYANCE IS VALID**

***ARGUMENT III*** **ANY TRANSFERS ORIGINATING FROM MORTGAGE ELECTRONICS REGISTRATION SYSTEMS (MERS) ULTIMATELY TO DEUTSCHE BANK IS NULL AND VOID**

## DEUTSCHE BANK NATIONAL TRUST COMPANY PURPORTED INTEREST MUST BE DISMISSED FOR LACK OF EVIDENCIARY SUPPORT

The foregoing establishes that Deutsche Bank does not have, nor has never had an interest in the subject property for which is seeks to lift the automatic stay in this case, and thus Deutche Bank is NOT a creditor or party in interest, and its claim must be dismissed with prejudice.

## IV.

## DEUTSCHE BANK CANNOT ESTABLISH THAT IT IS A "HOLDER IN DUE COURSE", "PARTY IN INTEREST" OR "CREDITOR" ENTITLED TO SEEK AND OBTAIN RELIEF FROM THE STAY AS IT CANNOT MEET ITS BURDEN OF PROOF WITH ITS "COPY" OF THE NOTE WHEREAS SUCH COPY IS NOT AUTHENTICATED UNDER FEDERAL RULE OF EVIDENCE 901(a)

In response to debtors' response to production of documents, Deutsche Bank forwarded to plaintiff a copy of the note, and that copy is attached herein as Exhibit "1" for this court review. Deutshe Bank has proposed no witnesses that can testify to the authenticity of the note, and the copy sent to debtor is clearly a copy of what appears to be a forged or modified instrument.

Moreover, as will be shown herein below, Deutsche Bank according to its own answers to discovery (See Exhibit 2 - Response to Interrogatory #2) cannot even identify the source of such note, despite the fact that its counsel Susan Hendrick represented on November 3, 2011 to this court when asked: “where is the original of the note right now?” Aplt. App., Vol. II at 95. Counsel responded, “The original of the note has been requested, and it should be on the way to our firm here shortly. I can present that at any evidentiary hearing.” Id. Deutsche has yet to present the original, and was actually required to produce that original at that hearing, prior to even filing its motion for relief from the automatic stay. However, this mere copy is not authenticated under Rule 901(a) as the actual, bonafide "blue ink", unmodified original note, or a certified copy of the original has never been presented to this court in any follow up hearing, nor has it been provided to the debtors in discovery.

Debtor wrote a letter seeking the discovery and advised Counsel for Deutsche Bank that answers and objections were unfounded and sought to secure the answers without court intervention, and supported its position of that the word "SOURCE" was well defined in Black Law Dictionary. No answer has been received (See Exhibit 9)

In part, Rule 901 provides as follows: RULE 901. AUTHENTICATING OR IDENTIFYING EVIDENCE (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. Rule 901(b)(1) provides that a witness with knowledge may authenticate evidence by testifying that a matter is what it is claimed it be." United States v. Henry, 164 F.3d 1304, 1309 (10th Cir. 1999). Here no witness are presented to authenticate such instrument.

**V.**

**DEUTSCHE BANK LACKS STANDING BECAUSE THERE IS NO EVIDENCE THAT WOULD SUPPORT A VALID 'ASSIGNMENT" TO DEUTSCHE BANK AND MOVANT HAS FAILED TO PROVE ITS STATUS AS TRANSFEREE THROUGH A SERIES OF RECORDED ASSIGNMENT REQUIRED UNDER COLORADO STATE LAW**

Not only does Deutsche Bank fail to present supporting evidence or credible witnesses who could testify to the authenticity of the purported note, it fails to present the actual instrument or certified copy thereof, and further failed to prove its status as a transferee through a series of recorded assignment in Colorado's Real property records. Nothing in public property records even remotely suggest that Deutsche Bank has an recorded interest in the subject property. (See Exhibit #8) Deutsche Bank appears nowhere in the recorded history, and this is fatal to its claim.

As stated in the recent 10th Circuit decision (page 13) (Exhibit 4) rendered on February 1, 2012, "Under Colorado law, a promise or order such as the Note is payable "to order" "if it is payable (i) to the order of an identified person or (ii) to an identified person or order." Colo. Rev. Stat. § 4-3-109(b). The Note at issue here is payable "to the order of Lender. Lender is IndyMac Bank, F.S.B., a federally chartered savings bank[.]" Aplt. App., Vol. I at 14. Thus, the Note is payable to the "order" of IndyMac Bank under § 4-3-109(b). But "[a]n instrument payable to an identified person [such as IndyMac Bank] may become payable to bearer if it is indorsed in blank pursuant to section 4-3-205(b)." Colo. Rev. Stat. § 4-3-109(c).7 Section 4-3-205(b) provides that "[i]f an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a 'blank indorsement.' When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specifically indorsed....Deutsche Bank must also prove it has possession of the Note." "Possession is an element designed to prevent two or more claimants from qualifying as holders who could take free of the other party's claim of ownership." Georg v. Metro Fixtures Contractors, Inc., 178 P.3d 1209, 1213 (Colo. 2008)

As already stated, a copy of the note does not, and cannot constitute the original note under rule 901 of the Federal Rules of Evidence or as required by the UCC of Colorado state law.

Thus Deutsch Bank claims fails miserably, and Summary judgment here is appropriate.

VI.

**THE PURPORTED CONVEYANCE FROM INDYMAC TO DEUTSCHE BANK IS UNENFORCEABLE BECAUSE THE CONVEYANCE OF LAND UNDER COLORADO LAW IS SUBJECT TO STATUTORY REQUIREMENTS THAT MUST BE MET BEFORE A CONVEYANCE IS VALID**

The original deed of trust names MORTGAGE ELECTRONIC REGISTRATION SYSTEMS (MERS) as the beneficiary which implies that IndyMac ultimately received its assignment from MERS, but this assignment is completely ineffective.. As nominee for the lender, MERS serves in a very limited capacity. Specifically, MERS records the mortgage and tracks ownership of the lien. MERS has no substantive rights itself and, therefore, cannot assign what it does not have. "A nominee of the owner of the note and mortgage may not effectively assign the note and mortgage to another for want of an ownership interest in said note and mortgage by the nominee." LaSalle Bank Nat. Ass'n v.Lamy, 824 N.Y.S.2d 769, 2006 WL 2251721 (Sup.2006).

While Deutsche Bank has offered "virtual" proof that IndyMac assigned the Note in blank, it elicited no proof that Deutsche Bank in fact obtained physical possession of the original Note from IndyMac, either voluntarily or otherwise. Under the U.C.C. requirements, Deutsche Bank has therefore failed to show that it is the current holder of the Note, and this is clearly undisputed.

Colorado law does not limit enforcement of an obligation to a holder who received the instrument through negotiation. A note may also be enforced by a transferee. See Colo. Rev. Stat. § 4-3-203. "Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument." Id. § 4-3-203(b). But transfer requires delivery: "An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Id. §4-3-203(a) (emphasis added). "Delivery" with respect to an instrument "means voluntary transfer of possession" of the instrument. Id. §4-1-201(14). Because Deutsche Bank has failed to prove transfer of possession of the original Note it has failed to establish its status as a transferee.

It is well known axiom in law that MERS had no authority to transfer any rights to IndyMac, and any such transfer is completely unenforceable. For these reasons, any conveyances by MERS to any heir or successor, including Deutsche Bank is completely null and void.

## VII.

## ANY TRANSFERS ORIGINATING FROM MORTGAGE ELECTRONICS REGISTRATION SYSTEMS (MERS) ULTIMATELY TO DEUTSCHE BANK IS NULL AND VOID

Deutsche Bank's  lack of standing at the inception of the case is not a defect that may be cured by the acquisition of standing after the case is tiled." Progressive Exp. Ins. Co. v. McGrath Community Chiropractic, 913 So.2d 1281 (Fla. 2nd DCA 2005).

MERS, Inc. is the purported beneficiary under the Deed of Trust in this case. However, there is no evidence of record that establishes that MERS was authorized to assign anything to INDYMAC BANK, and therefore, any subsequent assignment to IndyMac, and ultimately to Deutsche Bank  is clearly invalid and unsupported under governing law.

Deutsche Banks standing at the inception of the case was based entirely on the mistaken belief that some assignment was done to Indymac Bank, who subsequent assigned such note to Deutsche Bank in blank. Deutsche Bank lacks standing now based on the substantive deficiencies with an assignment from MERS purportedly to INDYMAC BANK to DEUTSCHE BANK. Absent standing, there is no justifiable controversy between the parties, and Deutsche Bank's claim must be dismissed with prejudice.

Other courts around the country have likewise recognized the limited role that MERS plays as nominee. This court such as other courts may reject the notion that MERS or its heirs, and assignees, may act on its own, independent of the direction of the specific lender who holds the repayment interest in the security instrument at the time.  Nothing in the record shows that MERS, IndyMac Bank, Deutsche Bank had authority to act." Mortgage Electronic Registration Systems. Inc. v. Southwest Homes of Arkansas, 2009 WL 723182 (Supreme Court of Arkansas, 2009). MERS's role in this transaction casts no light on the contractual and standing issues raised in this case. The relationship that MERS has to INDYMAC and subsequently Deutsche Bank is more akin to that of a straw man than to a party possessing all the rights given a buyer." Landmark National Bank v. Kesler, 216 P.3d 158 (Supreme Court of Kansas, 2009).

## VIII.  POINTS & AUTHORITIES

A party to the case may move for summary judgment. The bankruptcy judge may grant a summary judgment when a party to the case has not presented an issue of material fact for which relief could be granted. (See Rule 7056 Fed. R. Bank. P., and Rule 56 Fed. R. Civ Pro., the moving party has the initial burden to establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978).  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The responding party then has the burden of producing evidence of  "specific facts showing there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)  The Supreme Court in Anderson went on to say that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248. Deutshe can produce no such evidence or facts.

Deutsche Bank "bears the burden of demonstrating standing and must plead its components with specificity." Coyne, 183 F. 3d at 494; Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464 (1982). Although Deutsche Bank plead it is the note holder, it has failed to produce any such evidence of the any such note. Moreover, Deutsche Bank fails to plead how it became in possession of the note it purportedly has in its possession. Deutsche Bank bears the burden of proving its statutory standing as a "party in interest." See Colorado Farm Bureau Federation v. U.S. Forest Service, 220 F.3d 1171, 1174 (10th Cir. 2000) (affirming dismissal of complaint where plaintiffs failed to carry their burden of establishing statutory standing under Administrative Procedures Act). Cf. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (stating general rule that party invoking federal jurisdiction bears burden of establishing Article III standing).

## IX. CONCLUSION & PRAYER

Because Deutsche Bank National Trust Company cannot established itself as Party in Interest in this case, the Debtors are entitled to summary judgment on the issue of standing. In addition, the undisputed evidence indicates that the Deutsche Bank National Trust Company cannot prove its standing as required by law.

Any conveyances from MERS in this case is clearly null and void as it is a well known the MERS has no legal authority to transfer, or convey anything to any purported trust, simply because MERS has no authority to act. Thus any purported conveyances to INDYMAC, and subsequent to Deutsche Bank is null and void.

It is abundantly clear from the face of the record here that Deutsche Bank is not a valid transferee, since its transfers is based solely on conveyances from MERS, Inc who is named as the original beneficiary in the deed of trust in this case.

WHEREFORE, debtors in the above-styled bankruptcy case and numbered cause prays that they be granted Summary Judgment in this case, dismissing Deutshe Bank National Trust Company claim with prejudice, and assessing any and all costs of this action to Deutsche Bank National Trust Company, and for all other relief this court deems just in the interest of justice in this case.

Respectfully Submitted,

Mark S. Miller & Jamileh Miller
19733 E Union Dr
Centennial, CO 80015
Phone: 303-358-1190

Dated: ***September 05, 2012 Wednesday***

# PROOF OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument entitled:

**MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO RULE 7056 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**(WITH SUPPORTING STATEMENT OF UNDISPUTED MATERIAL FACT)**

has been forwarded to all counsel of record, and parties, by depositing a true and correct copy of the same on the date and manner indicated below, to wit:

**Susan Hendricks**
**Aronowitz & Mecklenburg**
**1199 Bannock Street**
**Denver, CO 80204**

**DELIVERED VIA:**

- [x] **U.S. First Class Mail**
- [ ] **U.S. Express Mail**
- [x] **Certified Mail/RRR**

____________________

- [ ] **Hand Delivered**
- [ ] **Via Fax#** ____________
- [ ] **Via Email:**____________

[signature]
Mark S. Miller

Dated: 9-5-12

# APPENDIX OF EXHIBITS

| Exhibit # | Description of Exhibit |
|---|---|
| 1 | ANSWER TO PRODUCTION OF DOCUMENTS - "COPY" OF THE NOTE |
| 2 | ANSWER TO INTERROGATORIES BY DEUTSCHE BANK |
| 3 | AFFIDAVIT OF JAMILEH MILLER IN SUPPORT OF SUMMARY JUDGMENT |
| 4 | 10TH CIRCUIT OPINION DATED FEBRUARY 1, 2012 |
| 5 | INDYMAC LETTERS STATING NOTE IS NOT AVAILABLE |
| 6 | TransUnion Credit Report of Debtors |
| 7 | OPINION & ORDER by Federal Judge Christopher A. Boyko - Eastern District Ohio |
| 8 | COLORADO Real Property Record Relative to the Subject Property |
| 9 | Urgent Letter dated 8/27/2012 regarding Discovery Dispute (Unanswered) |

Exhibit 7

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

*In Re:*

Chapter 13
Case No. 10-25453-MER

MARK STANLEY MILLER aka A Moment to Remember Photo & Video aka Illusion Studioz and JAMILEH MILLER, **Debtor(s),**

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, Successors, Assigns, Servicers, Investors and Trustees, **Movant.**

**LIST OF WITNESSES AND EXHIBITS**

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, Successors, Assigns, Servicers, Investors and Trustees, by and through its counsel, Aronowitz & Mecklenburg, LLP, designates the following witnesses and exhibits for the on , at in Courtroom D.

I. WITNESSES

Movant will call the following witnesses:

1. A representative of OneWest, to testify regarding the subject note, subject deed of trust, ownership of the note, the loan history, the default, and the total amount of the debt owed.

Movant may call the following witnesses:

1. A representative of Deutsche Bank, to testify as to the standing in interest of the Movant regarding the Motion for Relief.

2. The Debtors, to testify as adverse witnesses.

3. Any witness endorsed by any other party.

4. Any witness necessary for rebuttal or impeachment

II. EXHIBITS

Movant intends to introduce as exhibits at the hearing/trial those exhibits enumerated in Attachment 1, attached hereto and incorporated herein.

DATED: 4/17/12

E-FILED ORIGINAL
Document to be retained in file of Aronowitz & Mecklenburg, LLP

ARONOWITZ & MECKLENBURG, LLP
Susan J. Hendrick

Susan J. Hendrick, No. 33196
Stacey L. Aronowitz, No. 36290
Monica Kadrmas, No. 34904
Andrea Rickles-Jordan, No. 39005
Catherine A. Hildreth, No. 40975
1199 Bannock Street
Denver, Colorado 80204
Telephone: (303) 813-1177
Telecopier: (303) 813-1107
Email Address: bk@amlawco.com

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

*In Re:*

Chapter 13
Case No. 10-25453-MER

MARK STANLEY MILLER aka A Moment to Remember Photo & Video aka Illusion Studioz and JAMILEH MILLER, Debtor(s),

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, Successors, Assigns, Servicers, Investors and Trustees, Movant.

ATTACHMENT 1
EXHIBITS FOR HEARING

Submitted by: DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, Movant.

In connection with: A hearing on the motion for relief and subsequent response.

| Exhibit Number | Description | Offered (Yes/No) | Admitted (Yes/No) | Additional Comments |
|---|---|---|---|---|
| 1 | Orignal Note | | | |
| 2 | Original Deed of Trust | | | |
| 3 | Payment History | | | |
| | Any exhibit necessary for rebuttal or impeachment purposes and any document presented by or listed by another party. | | | |

Certificate of Service

I hereby certify that on this April 17, 2012, true and correct copies of the foregoing were deposited into the United States mail, first class, postage prepaid and addressed to the following:

DOUGLAS B. KIEL
4725 S. Monaco St.
Suite 120
Denver, CO 80237

Mark Stanley Miller
19733 E Union Dr.
Centennial, CO 80015

Mark Stanley Miller
9303 Paramount Blvd.
Downey, CA 90240

Jamileh Miller
19733 E Union Dr.
Centennial, CO 80015

Danielle Wafford
Signature

Danielle Wafford
Printed Name

# FIXED/ADJUSTABLE RATE NOTE
# INTEREST ONLY FIXED PERIOD

(1 Year LIBOR Index (As Published In *The Wall Street Journal*)-Rate Caps)

Loan #                                                    MIN:

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| April 20, 2006 | Denver | Colorado |
|---|---|---|
| [Date] | [City] | [State] |

19733 E Union Dr, Centennial, CO 80015

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 216,236.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is IndyMac Bank, F.S.B., a federally chartered savings bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.625 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on June, 2006 . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on May 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My monthly payment will be in the amount of U.S. $ 1,193.80 before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - 1 YEAR LIBOR INDEX - Single Family
(Fixed and Interest Only Periods are the same)
Initials:
Page 1 of 5
VMP Mortgage Solutions, Inc. (800)521-7291
Form 5602 6/05
Page 20

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May, 2016 , and the adjustable interest rate I will pay may change on that day every 12thmonth thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.625 % or less than 2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than 2.000 percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

Loan No:
Page 2 of 5
Form 5602
Page 21

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Loan No:
Page 3 of 5
Form 5602
Page 22

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan No:
Page 4 of 5
Form 5602
6/05
Page 23

Exh. 1

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Mark S Miller (Seal) -Borrower

Jamileh Miller (Seal) -Borrower

(Seal) -Borrower (Seal) -Borrower

(Seal) -Borrower (Seal) -Borrower

(Seal) -Borrower (Seal) -Borrower

Pay To The Order Of

[Sign Original Only]

Without Recourse
IndyMac Bank, F.S.B.
By:
Sam Lindsay
Vice President

Loan No: [redacted]

Form 5602

Page 6 of 8

## ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: [redacted]

THIS ADDENDUM is made this 20th day of April, 2006, and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than 11.625 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than two and NO/1000ths percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.625 % or less than 2.750 %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated: 4/20/06

Mark S Miller (Seal) -Borrower

Jamileh Miller (Seal) -Borrower

(Seal) -Borrower (Seal) -Borrower

(Seal) -Borrower (Seal) -Borrower

(Seal) -Borrower (Seal) -Borrower

IndyMac Bank
ARM Note Addendum - Multistate

VMP Mortgage Solutions, Inc.

I074 (2/06)

20
5/8/06
MJS

After recording please return to:
IndyMac Bank, F.S.B. c/o Document Management

(Company Name)

R $116.00
D $0.00
2006048620 TD
04/25/2006 02:53:33 PM 23 Page(s)
Jefferson County, Colorado

(Name of Natural Person)

901 E. 104th Street Building B Suite 400/500
(Street Address)

Kansas City, MO 64131
(City, State Zip Code)

116.00

[Space Above This Line For Recording Data]

1.23

# DEED OF TRUST

MIN [redacted]

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 20, 2006 together with all Riders to this document.

(B) "Borrower" is Mark S Miller and Jamileh Miller

. Borrower is the trustor under this Security Instrument.

(C) "Lender" is IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a Federal Savings Bank organized and existing under the laws of United States of America. Lender's address is 155 North Lake Avenue, Pasadena, CA 91101

(D) "Trustee" is the Public Trustee of Arapahoe County, Colorado.

Loan No: [redacted]

Initials:

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—

MERS Modified Form 3006 01/01

Page 1 of 13

2

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated April 20, 2006. The Note states that Borrower owes Lender two hundred sixteen thousand two hundred thirty six and NO/100ths Dollars (U.S. $ 216,236.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

- [x] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) *[specify]*
- [ ] Condominium Rider
- [x] Planned Unit Development Rider
- [ ] Revocable Trust Rider
- [ ] Second Home Rider
- [ ] Biweekly Payment Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No: [redacted]

Initials:

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—

MERS Modified Form 3006 01/01

Page 2 of 13

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

3

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Arapahoe :

*[Type of Recording Jurisdiction]* *[Name of Recording Jurisdiction]*

See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of 19733 E Union Dr *[Street]*

Centennial *[City]*, Colorado 80015 *[Zip Code]* ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants

Initials: [initials]

and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

4

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and

Initials: [initials]

Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

5

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

Initials: 

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

6

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may

Initials: [initials]



Exhibit 1

use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

8

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

9

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security

Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

10

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

11

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Initials: [signature]

Loan No: [redacted]
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
Page 11 of 13
MERS Modified Form 3006 01/01
Page 36

12

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

Initials: [signature]

Loan No: [redacted]
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
Page 12 of 13
MERS Modified Form 3006 01/01
Page 37

13

24. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

[signature] (Seal)
Mark S Miller -Borrower

Mailing Address: 16355 Highway 50, Rocky Ford, CO 81067

[signature] (Seal)
Jamileh Miller -Borrower

Mailing Address: 16355 Highway 50, Rocky Ford, CO 81067

_______________ (Seal)
-Borrower

Mailing Address:

_______________ (Seal)
-Borrower

Mailing Address:

[Space Below This Line For Acknowledgment]

State of Colorado §
§
County of Denver §

Before me the undersigned authority, on this day personally appeared Mark S Miller and Jamileh Miller

known to me (or proved to me through an identity card or other document) to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal on this 20 day of April 2006

[signature]
Notary Public
My Commission Expires: 1-3-09

[Seal: CAROLYN S. CARTER NOTARY PUBLIC STATE OF COLORADO]

Loan No: [redacted]
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
Page 13 of 13
MERS Modified Form 3006 01/01
Page 38

14

EXHIBIT "A"

LOT 7, BLOCK 4,

FOX HILL FILING NO. 4,

COUNTY OF ARAPAHOE,

STATE OF COLORADO

Page 39

Exhibit 1

15

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 20th day of April, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to IndyMac Bank, F.S.B., a federally chartered savings bank (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

Villages of Parker

*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No: [redacted] MIN: [redacted]
Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.— Page 1 of 3
Page 40

16

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

*[Signatures on Following Page]*

Loan No: [redacted]
Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.— Page 2 of 3
Page 41

17

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

| | | | |
|---|---|---|---|
| Mark S Miller | (Seal) -Borrower | Jamileh Miller | (Seal) -Borrower |
| | (Seal) -Borrower | | (Seal) -Borrower |

*[Sign Original Only]*

Loan No: [redacted]
Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.— Page 3 of 3
Page 42

18

## FIXED/ADJUSTABLE RATE RIDER
## INTEREST ONLY FIXED PERIOD

**(LIBOR 1 Year Index (As Published In The Wall Street Journal)- Rate Caps)**

Loan # [redacted] MIN: [redacted]

THIS FIXED/ADJUSTABLE RATE RIDER is made this 20th day of April, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to IndyMac Bank, F.S.B., a federally chartered savings bank ("Lender") of the same date and covering the property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of 6.625 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May, 2016, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - 1 Year LIBOR - Single Family
(Fixed and Interest Only Periods are the same)
Page 1 of 4 Form 5603
[redacted] VMP Mortgage Solutions, Inc. (800)521-7291 6/05
Page 43

19

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.625 % or less than 2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.625 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment due after the first Change Date.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

> Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Page 44

20

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

> Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.
>
> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

Page 45

21

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

| | |
|---|---|
| Mark S Miller (Seal) -Borrower | Jamileh Miller (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |

Page 46

22

## ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #: [redacted]

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this 20th day of April, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

ADDITIONAL COVENANTS. In Addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than 11.625 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than two and NO/1000ths percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.625 % or less than 2.750 %.

Page 47

Exhibit I

23

2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and effect.

Dated: 4/20/06

Mark S Miller (Seal) -Borrower | Jamileh Miller (Seal) -Borrower

(Seal) -Borrower | (Seal) -Borrower

(Seal) -Borrower | (Seal) -Borrower

(Seal) -Borrower | (Seal) -Borrower

Page 2 of 2

1075
2/06

P309 LN [redacted] MORTGAGE LOAN HISTORY 09-28-10

NAME MS MILLER INV-LN [redacted] DUE 05-01-09 TYPE 13-A

BR SP MAN B P-TYPE 1 INT .0682500 FIRST PB 214,302.28 2ND PB .00

HUD .00 NET 1440.29 SF .00375000 SUSP .00 STOP D B P F N A D L

REP .00 RES .00 B 0 0 4 2 0 5 1

| APP | 07-26 | 06-16 | 06-15 | 06-10 | 05-24 |
|---|---|---|---|---|---|
| DUE | 00-00 | 05-09 | 00-00 | 00-00 | 00-00 |
| TYPE/TRAN | 6 30 | 1 52 | 6 33 | 6 33 | 6 33 |
| AMOUNT | .00 | .00 | .00 | .00 | .00 |
| PRIN-PD | .00 | .00 | .00 | .00 | .00 |
| PRIN-BAL | 214,302.28 | 214,302.28 | 214,302.28 | 214,302.28 | 214,302.28 |
| INT-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-BAL | .00 | .00 | .00 | .00 | .00 |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES | .00 | 1 59.16- | .00 | .00 | .00 |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | 2,695.21 | 2,695.21 | 2,695.21 | 2,695.21 | 2,695.21 |
| SUSP | .00 | .00 | .00 | .00 | .00 |
| SC/PAYEE | AT5368 | | P13000 | P13000 | P13000 |

PAGE 003 OF 010 TOTAL TRANS AVAILABLE 0047 OLDEST TRAN 09-04-09 /P

P309 LN [redacted] MORTGAGE LOAN HISTORY 09-28-10

NAME MS MILLER INV-LN [redacted] DUE 05-01-09 TYPE 13-A

BR SP MAN B P-TYPE 1 INT .0682500 FIRST PB 214,302.28 2ND PB .00

HUD .00 NET 1440.29 SF .00375000 SUSP .00 STOP D B P F N A D L

REP .00 RES .00 B 0 0 4 2 0 5 1

| APP | 07-26 | 07-26 | 07-26 | 07-26 | 07-26 |
|---|---|---|---|---|---|
| DUE | 00-00 | 00-00 | 00-00 | 00-00 | 00-00 |
| TYPE/TRAN | 6 32 | 6 32 | 6 32 | 6 32 | 6 32 |
| AMOUNT | .00 | .00 | .00 | .00 | .00 |
| PRIN-PD | .00 | .00 | .00 | .00 | .00 |
| PRIN-BAL | 214,302.28 | 214,302.28 | 214,302.28 | 214,302.28 | 214,302.28 |
| INT-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-BAL | .00 | .00 | .00 | .00 | .00 |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES | .00 | .00 | .00 | .00 | .00 |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | 2,695.21 | 2,695.21 | 2,695.21 | 2,695.21 | 2,695.21 |
| SUSP | .00 | .00 | .00 | .00 | .00 |
| SC/PAYEE | AT5368 | AT5368 | AT5368 | AT5368 | AT5368 |

PAGE 002 OF 010 TOTAL TRANS AVAILABLE 0047 OLDEST TRAN 09-04-09 /P

P309 LN [redacted] MORTGAGE LOAN HISTORY 09-28-10

NAME MS MILLER INV-LN [redacted] DUE 05-01-09 TYPE 13-A

BR SP MAN B P-TYPE 1 INT .0682500 FIRST PB 214,302.28 2ND PB .00

HUD .00 NET 1440.29 SF .00375000 SUSP .00 STOP D B P F N A D L

REP .00 RES .00 B 0 0 4 2 0 5 1

| APP | 09-27 | 09-14 | 09-01 | 08-27 | 07-26 |
|---|---|---|---|---|---|
| DUE | 00-00 | 00-00 | 00-00 | 00-00 | 00-00 |
| TYPE/TRAN | 6 33 | 6 33 | 6 30 | 6 33 | 6 32 |
| AMOUNT | .00 | .00 | .00 | .00 | .00 |
| PRIN-PD | .00 | .00 | .00 | .00 | .00 |
| PRIN-BAL | 214,302.28 | 214,302.28 | 214,302.28 | 214,302.28 | 214,302.28 |
| INT-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-BAL | .00 | .00 | .00 | .00 | .00 |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES | .00 | .00 | .00 | .00 | .00 |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | 2,695.21 | 2,695.21 | 2,695.21 | 2,695.21 | 2,695.21 |
| SUSP | .00 | .00 | .00 | .00 | .00 |
| SC/PAYEE | P13000 | MS4855 | AT5368 | P13000 | AT5368 |

PAGE 001 OF 010 TOTAL TRANS AVAILABLE 0047 OLDEST TRAN 09-04-09 /P

Exhibit 2

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

*In Re:*

Chapter 13
Case No. 10-25453-MER

MARK STANLEY MILLER aka A Moment to Remember Photo & Video aka Illusion Studioz and JAMILEH MILLER, **Debtors,**

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, Successors, Assigns, Servicers, Investors and Trustees, Movant.

---

RESPONSES TO INTERROGATORIES

---

COMES NOW, Deutsche Bank National Trust Company ("DBNTC"), as Trustee ("Trustee") for the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates Series 2006-AR13 ("Trust") under the Pooling and Servicing Agreement dated as of May 1, 2006 ("PSA"). DBNTC, by and through its attorneys, Aronowitz & Mecklenburg, LLP, for its Responses to Interrogatories as follows:

**Interrogatory No. 1**: *Identity of Persons Answering These Interrogatories*
Please identify all persons who assisted or participated in answering these interrogatories, and with respect to this interrogatory, please state whether or not such persons are employees, or agents of respondent Deutsche Bank National Trust Company.

**Response to Interrogatory No. 1**: Barbara Campbell, Vice President of DBNTC; Lissa Kalt, Esq., counsel for DBNTC; Susan J. Hendrick, Esq., counsel for DBNTC; and Stefanie Jeffries, an employee of Aronowitz & Mecklenburg, LLP, to the extent that she electronically filed and served the Responses to Interrogatories.

**Interrogatory No. 2**: *Regarding the Original Promissory Note*
Please identify the source of the purported original promissory note that you claim to have in your possession or in the possession of your attorneys, and with respect to this inquiry please identify the persons, company, from which this note was transferred to your attorneys, and whether or not you alleged this promissory note is the true, correct, unmodified original promissory note.

Interrogatory No. 2 is limited by Court order dated July 18, 2012 whereby the Court found that the Debtors are entitled to seek the identity of the source of the "purported original promissory note," and the identity of the entity from which the note was

transferred to DBNTC's counsel to the extent that DBNTC has knowledge of the information requested.

**Response to Interrogatory No. 2**: DBNTC objects to the term "source" as it is vague and ambiguous. Since the term "source" is vague and ambiguous, DBNTC is without personal knowledge as to the source of the original promissory note. DBNTC has personal knowledge that it received the original promissory note for borrowers Mark S. Miller and Jamileh Miller ("Note") on or about April 25, 2006. DBNTC has personal knowledge that it was in continuous possession of the Note since its initial receipt of it on or about April 25, 2006 until release of the Note was requested by the servicer, OneWest Bank, at which point DBNTC sent the Note to OneWest Bank by overnight mail on or about October 21, 2010. DBNTC lacks personal knowledge regarding how the Note came into defense counsel's possession following delivery to OneWest, but DBNTC has personal knowledge that the Note was in its original, unmodified state when it was delivered to OneWest. DBNTC has since received the original Note back by overnight mail from its counsel on or about August 2, 2012 and hereby confirms that the Note is still in its original, unmodified state.

**Interrogatory No. 3**. Please identify the source of the purported Deed of Trust that you claim to have in your possession or in the possession of your attorneys, and with respect to this inquiry please identify the persons, company, from which this note was transferred to your attorneys, and whether or not you alleged this promissory note to be the true, correct, unmodified original deed of trust.

Interrogatory No. 3 is limited by Court order dated July 18, 2012, whereby the Court found that Debtors are entitled to seek the identity of the source of the "purported Deed of Trust." Accordingly, by Court order, this interrogatory is limited to the source of the Deed of Trust.

**Response to Interrogatory No. 3**: DBNTC objects to term "source" in this interrogatory as vague and ambiguous. DBNTC further objects to the entire interrogatory as vague, ambiguous and confusing, as the terms promissory note and deed of trust are used both interchangeably and inconsistently, when the documents are separate and distinct. Without waiving such objections, and assuming that the interrogatory involves soley the deed of trust, DBNTC lacks personal knowledge regarding the "source" of the original deed of trust ("DOT"), but DBNTC has personal knowledge that it received the DOT on or about May 26, 2006. DBNTC also has personal knowledge that it was in continuous possession of the DOT from on or about May 26, 2006 until release of the DOT was requested by the servicer, OneWest Bank, at which point DBNTC sent the DOT to OneWest Bank by overnight mail on or about October 21, 2010. DBNTC lacks personal knowledge regarding how the DOT came into counsel's possession following delivery to OneWest.. DBNTC has personal knowledge that the Note was in its original, unmodified state when it was delivered to OneWest. DBNTC has since received the original DOT back by overnight mail from its counsel on or about August 2, 2012 and hereby confirms that the DOT is still in its original, unmodified state.

Exhibit 2

**Interrogatory No. 4.** *Regarding the Original Promissory Note & Assignment*
Please indicate the exact date that the alleged promissory note was assigned to Deutsche Bank National Trust Company, and whether or not any such assignment was properly recorded in the Colorado Property Real Property records in accordance with Colorado State law.

**Response to Interrogatory No. 4**: DBNTC objects to this question as it is vague, ambiguous as to the the terms "assigned" and "assignment" (since Notes are not "assigned") and as to the reference to "Colorado Property Real Property records" DBNTC further objects on the grounds that the interrogatory calls for a legal conclustion The Note is endorsed in blank. The Note was received by DBNTC on or about April 25, 2006. Pursuant to the PSA, the loan that is the subject of this action for the property located at 19733 E. Union Drive, Centennial CO 80015 ("Subject Loan") was transferred to DBNTC as Trustee of the Trust for the benefit of the certificateholders of the Trust on or about the closing date of the Trust, which was May 30, 2006.

**Interrogatory No. 5**: *Regarding Assignment of the Promissory Note to any Securitized Trust*
Please indicate the exact date that the alleged promissory note was assigned to Deutsche Bank National Trust Company Trust, or any trust, and whether or not such assignment was properly recorded with the Security and Exchange Commissioner.

Pursuant to the order entered on July 18, 2012, this interrogatory is limited to the date that the promissory note was assigned to "any trust".

**Response to Interrogatory No. 5**: See objections to Interrogatory No. 4 regarding the terms "assigned" and "assignment," which objections are incorporated herein. This interrogatory also calls for a legal conclusion. The Note is endorsed in blank. The Note was received by DBNTC on or about April 25, 2006. Pursuant to the PSA, the Subject Loan was transferred to DBNTC as Trustee of the Trust for the benefit of the certificateholders of the Trust on or about the closing date of the Trust, which was May 30, 2006.

**Interrogatory No. 9:** *Regarding MERS as beneficiary of the Note*
With respect to MERS being the beneficiary of the purported promissory note, please indicate each and every reason you assert that such note was ultimately transferred to Deutsche Bank National Trust company by any assignee orignaing (sic) from MERS, which is a company who has no legal standing to hold or convey any real property.

Pursuant to the Court's order dated July 18, 2012, limiting the scope of this interrogatory is to state each and every reason DBNTC asserts that the note was ultimately transferred to DBNTC by any assignee orignaing (sic) from MERS.

**Response to Interrogatory No. 9**: DBNTC objects to this interrogatory as it is vague, ambiguous and confusing. DBNTC has no personal knowledge of any actions that may have been taken by MERS. Pursuant to the PSA, the Subject Loan was transferred to

DBNTC as Trustee of the Trust for the benefit of the certificateholders of the Trust on or about the closing date of the Trust, which was May 30, 2006.

**Interrogatory No. 10**: *Regarding Conveyance of the Subject Property in Real Property Records*
Attached as Exhibit 1 is the Clerk's Official recording for the subject property located at 19733 E. UNION DR., CENTENNIAL, CO. 80015 and identified as: "Fox Hill Subdivision 4th Filing, Lot 7 Block 4" from 1/1/1902 to present which is 3/13/2012 at 7:34 Pm MDT, please explain the reason that Deutsche Bank National Trust Company does not appear in this listing or within the official records of the Clerk's Office.

**Response to Interrogatory No. 10:** The official records of the Clerk's Office with respect to real property speak for themselves, and DBNTC lacks personal knowledge with which to further respond to this interrogatory.

**Interrogatory No. 14**: *Regarding the true Holder in Due Course of the Promissory Note*
Please identify the true, bonafide holder in due course of the promissory note related to the subject property located at 19733 E. UNION DR., CENTENNIAL, CO. 80015 and identified as: "Fox Hill Subdivision 4th Filing, Lot 7 Block, and with respect to this inquiry, please state whether or not Deutsche Bank National Trust Company claims to be true Holder in due course of such note.

**Response to Interrogatory No. 14**: DBNTC objects to this interrogatory as vague and ambiguous and as calling for a legal conclusion. The Note, endorsed in blank, was received by DBNTC on or about April 25, 2006. Pursuant to the PSA, the Subject Loan was transferred to DBNTC as Trustee of the Trust for the benefit of the certificateholders of the Trust on or about the closing date of the Trust, which was May 30, 2006. DBNTC is in possession of the Note.

**Interrogatory No. 16**: *Regarding Payment History Asserted by Deutsche Bank National Trust Company*
Please indicate the reason the Payment History you plan to submit at the hearing to be held on May 2, 2012 is a valid debt owed to Deutsche Bank National Trust Company.

**Response to Interrogatory No. 16**: DBNTC objects to Interrogatory No. 16 to the extent it seeks information subject to the attorney-client and/or work-product privilege or discovery of the mental impressions of DBNTC's counsel and calls for a legal conclusion. Deutsche is the holder of the Note and DOT, and the loan was transferred to the Trustee on behalf of the certificateholders of the Trust. Pursuant to the PSA, the Servicer is responsible for collecting loan payments,and any payment history for the Subject Loan that is submitted at a future hearing (the May 2, 2012 hearing date has passed) would be payment history received from the Servicer. Based upon information and belief, the Servicer's payment history will reflect that the borrowers have defaulted on the debt owed pursuant to the Note.

Exhibit 2

Respectfully submitted this 7th day of August, 2012.

Barbara Campbell
Vice President
Deutsche Bank National Trust Company

As to objections:

Susan J. Hendrick, Esq.
Aronowitz & Mecklenburg, LLP
1199 Bannock Street
Denver, Colorado 80204
(303) 813-1177
(303) 813-1107
bk@amlawco.com

Exhibit 2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of August, 2012, a true and correct copy of the foregoing was deposited into the United States mail, first-class, postage prepaid and addressed as follows:

Mark Stanley Miller
19733 E. Union Drive
Centennial, Colorado 80015

Jamileh Miller
19733 E. Union Drive
Centennial, Colorado 80015

Mark Stanley Miller
9303 Paramount Blvd.
Downey, CA 90420

Stefanie S. Jeffries

Mark S. Miller & Jamileh Miller
19733 E Union Dr
Centennial, CO 80015
Phone: 303-358-1190

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| Mark S. Miller & Jamileh Miller<br>**Debtor(s)**<br>**vs**<br><br>Deutsche Bank National Trust Company<br>**Respondent** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No.** 10-25453 MER<br><br><br><br>**AFFIDAVIT** |

## AFFIDAVIT OF JAMILEH MILLER IN SUPPORT OF SUMMARY JUDGMENT

BEFORE ME, the undersigned authority on this day, personally appeared Jamileh Miller known to me to be a credible person competent in all respects to make this affidavit and who presented a valid state authorized Driver's License or other valid identification, and who by me, duly sworn, upon oath stated as follows:

***1. My name is Jamileh Miller, and I am over the age of eighteen (18) years old and competent to make this affidavit.***

***2. I am making this affidavit in support of my Summary Judgment motion filed in this case, and the facts stated in this affidavit is true and correct to the best of my knowledge.***

***3. Prior to the filing of my Chapter 13 Bankruptcy case, Deutsche Bank National Trust Company has never been a creditor, nor have I made any payments to this entity.***

***4. Deutsche Bank did not record its lien in Real Property Records according to State law, and the attached property record that is being used in this motion for Summary Judgment is a true and correct listing of the subject property from the County Recorder's Office. (Exhibit 8)***

***5. I have received several letters from Deutsche Bank National Trust company plainly admitting that it is not in possession of the original note connected to the subject property which made the basis of this case.***

***6. I have checked my national credit report several times to determine what entity is reporting my mortgage, and have never observed Deutsche Bank National Trust company either as a Servicing company or owner of the note.***

***7. The copy of the Credit report obtained from TransUnion Credit Bureau which is being used as Exhibit 6 of this Summary Judgment motion is indeed a true and correct copy (REDACTED) report which was obtained online via website.***

***8. I certify that I have sent Exhibit 9, to Counsel of Deutsche Bank, namely, Susan Hendrick, but have never received a response to this discovery dispute.***

Further, Affiant sayeth not.

Jamileh Miller, Affiant

SUBSCRIBED AND SWORN BEFORE ME, by the said Jamileh Miller on this the 5th day of September to certify which witness my hand and seal of office.

K. CHRISTOPHER HAWKINS NOTARY PUBLIC STATE OF COLORADO

Notary Public, in and for the State of COLORADO
My Commission Expires: 11/10/2015

My Commission Expires: 11/10/2015

FILED
United States Court of Appeals
Tenth Circuit

February 1, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: MARK STANLEY MILLER, also known as A Moment to Remember Photo & Video, also known as Illusion Studioz; JAMILEH MILLER,

Debtors.

---

MARK STANLEY MILLER; JAMILEH MILLER,

Appellants,

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,

Appellee.

No. 11-1232

---

**APPEAL FROM THE UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE TENTH CIRCUIT (BAP No. 10-073-CO)**

---

Submitted on the briefs:*

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Exhibit 4

Mark S. Miller and Jamileh Miller, Pro se.

Susan J. Hendrick, Aronowitz & Mecklenburg, LLP, Denver, Colorado, for the Appellee.

---

Before **KELLY**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **MATHESON**, Circuit Judge.

---

**PORFILIO**, Senior Circuit Judge.

---

After Deutsche Bank National Trust Company (Deutsche Bank) brought a foreclosure action against the home owned by appellants Mark Stanley Miller and Jamileh Miller and obtained an Order Authorizing Sale (OAS) from a Colorado court, the Millers filed a Chapter 13 bankruptcy petition. Upon the filing of their petition, an automatic stay entered, halting the foreclosure proceedings. *See* 11 U.S.C. § 362(a). Deutsche Bank obtained an order from the bankruptcy court relieving it from the stay to permit the foreclosure to continue. *See id.* § 362(d). The Tenth Circuit Bankruptcy Appellate Panel (BAP) affirmed the bankruptcy court's order granting Deutsche Bank relief from the automatic stay. The Millers now appeal from the BAP's order affirming relief from stay.

The issue before us is whether Deutsche Bank established that it was a "party in interest" entitled to seek and obtain relief from the stay. *See id.* Because we conclude that Deutsche Bank did not meet its burden of proof on this issue, we reverse the BAP's order and remand for further proceedings.

## BACKGROUND

On April 20, 2006, the Millers executed a promissory note (Note) in the amount of $216,236 in favor of IndyMac Bank, F.S.B. (IndyMac). The Note was secured by a Deed of Trust assigning a security interest in the Millers' Colorado home to the public trustee of Arapahoe County and creating a power of sale in the public trustee. The Deed of Trust identified Mortgage Electronic Registration Systems, Inc. (MERS), acting as a nominee for IndyMac, as its beneficiary. It further provided that "[t]he Note . . . (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." Aplt. App. at 31.

**1. State Court Proceedings**

The Millers failed to make the required payments on the Note. In February 2010, Deutsche Bank, claiming to be the current holder of the Note, filed a foreclosure action in the Arapahoe County, Colorado District Court and sought an OAS under Colorado Rule of Civil Procedure 120.[1]

On May 4, 2010, the Millers filed their "Motion for Hearing on Jurisdiction" in the Rule 120 proceeding. The Millers argued that Deutsche Bank lacked standing to seek an OAS. *See* Aplee. Supp. App. at 56 (arguing that

---

[1] Deutsche Bank applied for the OAS in the name of "Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 Under the Pooling and Servicing Agreement dated May 1, 2006." Aplee. Supp. App. at 49.

"standing to bring [a Rule 120] proceeding stems from an interest recorded in the public record which the Petitioner here does not have and has made no effort to present such evidence to the court").

On May 6, 2010, the state district court entered an order denying the Millers' motion. In this order, the court determined that Deutsche Bank had made a sufficient showing that it was an "interested person" entitled to an OAS. The text of the order reads as follows:

> The issue before the Court is whether the party seeking the ord[e]r auth[or]izing sale is an "interested person" as that term is used in C.R.C.P. 120. *A copy of the note* is attached to the motion requesting an order auth[oriz]ing sale. The note on page 6 below the respo[n]d[e]nts' signatures is endorsed in blank by Lender. No evidence has been presented to suggest that the endorsement is not genuine or that the pet[i]tioner is not in possession of the original note. The pet[i]tioner is entitled to an order auth[oriz]ing sale.

*Id.* at 51 (emphasis added).

The state court thus reached its conclusions based on its review of a copy of the Note, which had been indorsed in blank. There is no evidence that the state court was presented with the original Note before it authorized the sale. A few days later, the Millers again moved for a hearing on the jurisdictional issue. The state court summarily denied their motion. It later entered an OAS and an additional summary order finding that Deutsche Bank had established jurisdiction in its pleadings and that the Millers had "not specified a legal reason why jurisdiction has not been established." *Id.* at 62.

**2. Proceedings in Bankruptcy Court**

The Millers filed their Chapter 13 bankruptcy petition on June 22, 2010. On October 7, 2010, Deutsche Bank filed its motion for relief from stay. In its motion, Deutsche Bank recited that it was the current owner of the Note and Deed of Trust. A copy of the Note, indorsed in blank, was attached to the motion.[2]

The Millers responded in two ways. First, they filed an adversary proceeding in which they accused Deutsche Bank of filing a fraudulent foreclosure and fraudulently seeking relief from stay. (The adversary proceeding is not a subject of this appeal.) Second, they lodged an objection to the motion for relief from stay. In their objection, the Millers asserted that Deutsche Bank was not the proper party in interest and lacked standing to bring the motion. Specifically, they complained that Deutsche Bank had not produced the original Note or proved that it was in possession of the Note.

On November 3, 2010, the bankruptcy court held a hearing on the motion for relief from stay. During the hearing, counsel for Deutsche Bank proffered a copy of the Note indorsed in blank by IndyMac, along with a copy of the Deed of Trust. The bankruptcy judge asked counsel "where is the original of the note right now?" Aplt. App., Vol. II at 95. Counsel responded, "The original of the

---

2 The copy of Deutsche Bank's motion in the record on appeal does not include an attached copy of the Note.

note has been requested, and it should be on the way to our firm here shortly. I can present that at any evidentiary hearing." *Id.*

Apparently, no further evidentiary hearing was held on the issue of Deutsche Bank's possession of the Note. Instead, the bankruptcy court made findings from the bench at the close of the hearing on the motion for relief from stay. The court observed that it had a copy of the Note and that "I have representation of counsel that the original is on its way." *Id.* at 107. After noting the state court's findings that Deutsche Bank had standing to proceed under Colorado Rule of Civil Procedure 120, the bankruptcy court found that "sufficient grounds exist for the lifting of the automatic stay" and that relief from stay was appropriate. *Id.* at 110.

**3. The BAP Appeal**

The Millers appealed the bankruptcy court's order granting relief from stay to the BAP. The BAP began its decision by noting that "[t]he details surrounding the assignment to Deutsche Bank are not part of the record on appeal." Aplee. Supp. App. at 6 n.8. In particular, the record submitted to the BAP did not even contain a copy of the Note, much less the original.[3]

---

[3] To the extent the Millers assert that the absence of a copy of the indorsed Note from the BAP record prevents us from taking notice of the indorsement in this appeal, we disagree. The bankruptcy court had in its possession a copy of the Note, indorsed in blank, and made a finding based on the copy that the Note had been so indorsed. It was the Millers' duty as the appealing parties to designate
(continued...)

In its decision, the BAP spent little time discussing the adequacy of proof that Deutsche Bank was in possession of the original Note, and the legal consequences thereof. Instead, the BAP relied on the *Rooker-Feldman* doctrine. *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Though noting that the bankruptcy court had not expressly mentioned this doctrine, it concluded that the court had relied on the state court's decision on the standing issue. The BAP further concluded that in light of this doctrine, which generally prohibits federal courts from entertaining suits by parties who have lost in state court and who seek review of state court decisions in federal court, "the bankruptcy court properly declined to revisit the state court's decision that Deutsche Bank was an 'interested person' entitled to a Rule 120 order of sale." Aplee. Supp. App. at 16. Armed with the state-court decision finding Deutsche Bank had standing to proceed with the foreclosure, the BAP reached a further conclusion that Deutsche Bank had standing to seek relief from stay.

---

[3](...continued)
the record for the BAP appeal. *See* Fed. R. Bankr. P. 8006. Having failed to provide a complete record on this issue, they could not challenge the bankruptcy court's findings concerning the copy of the Note containing the indorsement. *See Lopez v. Long (In re Long)*, 255 B.R. 241, 245 (10th Cir. B.A.P. 2000) ("[W]hen the record on appeal fails to include copies of the documents necessary to decide an issue on appeal, [the BAP] is unable to rule on that issue and may summarily affirm the bankruptcy court.").

## ANALYSIS

### 1. Standard of Review

"Although this appeal is from a decision by the BAP, we review only the Bankruptcy Court's decision." *C.O.P. Coal Dev. Co. v. C.W. Mining Co. (In re C.W. Mining Co.)*, 641 F.3d 1235, 1240 (10th Cir. 2011) (internal quotation marks omitted). "We review matters of law de novo, and we review factual findings made by the bankruptcy court for clear error." *Id.* (citation omitted). "[W]e treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference (although they certainly may be persuasive)." *Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1204 (10th Cir. 2010).

The bankruptcy court's decision whether to grant relief from stay is reviewed for an abuse of discretion. *Chizzali v. Gindi (In re Gindi)*, 642 F.3d 865, 872 (10th Cir. 2011), *overruled on other grounds by TW Telecom Holdings, Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 497 (10th Cir. 2011). We review the application of the *Rooker-Feldman* doctrine de novo. *See Mann v. Boatright*, 477 F.3d 1140, 1145 (10th Cir. 2007) (holding that the dismissal of a complaint pursuant to the *Rooker–Feldman* doctrine is reviewed de novo).

### 2. Relief from Stay Standard

The Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay" if the party in interest has made the appropriate showing to obtain such relief. 11 U.S.C.

§ 362(d).[4] The Bankruptcy Code does not define the term "party in interest" for purposes of this subsection. Courts have concluded, however, that in order to invoke the court's power to award relief under § 362(d), a party must be either a creditor or a debtor of the bankruptcy estate. *See, e.g., Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2d Cir. 1983). The question, then, is whether Deutsche Bank has established its status as a creditor of the Millers' bankruptcy estate.

**3. Applicability of *Rooker-Feldman* and Other Preclusion Doctrines**

Deutsche Bank argues that in reaching their conclusions on the standing issue, the BAP and the bankruptcy court properly relied on the *Rooker-Feldman* doctrine. But we conclude this reliance was unjustified for at least two reasons. First, given the posture of the parties in this bankruptcy court proceeding, the issue should have been analyzed as one of collateral estoppel (issue preclusion) rather than application of the *Rooker-Feldman* doctrine. Second, neither

---

[4] The Code provides that with the exception of the debtor's equity in the property, the party opposing relief from stay has the burden of proof on all issues. 11 U.S.C. § 362(g)(2). Whether a party has standing to seek relief as a party in interest, however, is an issue distinct from whether that party's underlying claim is valid. We conclude that Deutsche Bank bears the burden of proving its statutory standing as a "party in interest." *See Colorado Farm Bureau Federation v. U.S. Forest Service*, 220 F.3d 1171, 1174 (10th Cir. 2000) (affirming dismissal of complaint where plaintiffs failed to carry their burden of establishing statutory standing under Administrative Procedures Act). *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (stating general rule that party invoking federal jurisdiction bears burden of establishing Article III standing).

*Rooker-Feldman* nor issue preclusion applies because the state court finding of "standing" was not a final judgment to which these doctrines could attach.

The *Rooker-Feldman* doctrine precludes a losing party in state court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in federal court. *See, e.g., Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005). While the Millers did "lose" in state court on their standing argument, it is Deutsche Bank that now seeks affirmative relief in a federal court, in the form of relief from the automatic stay.

It is undeniable that the Millers have not accepted the state court's judgment on the standing issue. They do raise as a defense a similar standing issue to that on which they lost in state court.[5] But attempts merely to relitigate an issue determined in a state case are properly analyzed under issue or claim preclusion principles rather than *Rooker-Feldman*. This is because, in addition to the inherently limited scope of *Rooker-Feldman*, preclusion in federal court on the basis of a state-court judgment is determined by state law, not a federally-specified doctrine. "[I]ncorporation of preclusion principles into

---

5 We also note that the standing required for a creditor to proceed under Rule 120(a) ("any interested person") is not precisely the same as the statutory standing required to seek relief from stay under § 362(d) (a "party in interest"). In light of our other reasons for rejecting the preclusive effect of the state court order, we need not determine whether the slight difference in wording would have any effect on the preclusion analysis.

*Rooker-Feldman* risks turning that limited doctrine into a uniform *federal* rule governing the preclusive effect of state-court judgments, contrary to the Full Faith and Credit Act." *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (citing 28 U.S.C. § 1738).

We must therefore consider the preclusive effect under Colorado law of the standing determination the Colorado state court reached in the Rule 120 proceeding. We note that Rule 120 itself provides that "[t]he granting of [a Rule 120 motion] shall be *without prejudice* to the right of any person aggrieved to seek *injunctive or other relief* in any court of competent jurisdiction[.]" Colo. R. Civ. P. 120(d) (emphasis added). By filing their bankruptcy petition, the Millers sought and obtained injunctive relief in a court of competent jurisdiction, in the form of the automatic stay.

We further note indications that the Colorado courts would limit the effect of determinations in Rule 120 proceedings. The Colorado Court of Appeals has stated that "proceedings pursuant to C.R.C.P. 120 are not adversarial in nature, are not final, and generally no appeal may be taken to review the resulting orders." *United Guar. Residential Ins. Co. v. Vanderlaan*, 819 P.2d 1103, 1105

(Colo. Ct. App. 1991).[6] Accordingly, no final judgment is entered in Rule 120 proceedings and the rulings of the court in such proceedings do not have preclusive effect. *Id.*

We conclude that neither the *Rooker-Feldman* doctrine nor issue preclusion applies to prevent a federal court from determining whether Deutsche Bank is a "party in interest" entitled to seek relief from stay. Because the BAP incorrectly relied on *Rooker-Feldman* and because neither the bankruptcy court nor the BAP conducted a proper statutory standing analysis under § 362(d), we could simply stop our analysis here and remand for a further consideration of the standing issue. The parties, however, have presented arguments on the merits concerning standing, and the sufficiency of Deutsche Bank's showing concerning standing in this case is a legal issue that can be resolved on appeal. We will therefore now proceed to discuss why Deutsche Bank has failed to demonstrate its standing as a "party in interest."

---

6 Cases from the Colorado federal district court have reached differing results concerning whether orders in Rule 120 proceedings have preclusive effect or sufficient finality under the *Rooker-Feldman* doctrine to prevent relitigation in subsequent federal proceedings. *See Goldenhersh v. Aurora Loan Servs., LLC*, No. 10-CV-01936-MSK, 2010 WL 3245166, at *2 (D. Colo. Aug. 16, 2010) (discussing split in cases). We find those cases denying preclusive effect or *Rooker-Feldman* treatment more persuasive than those granting preclusive effect or applying *Rooker-Feldman*.

**4. Deutsche Bank's Status as "Party in Interest"**

We return to the key question: is Deutsche Bank a "creditor" of the Millers with standing to seek relief from stay? To answer this question, we turn to the Bankruptcy Code. According to the Bankruptcy Code, a "creditor" includes an "entity that has a claim against the debtor." 11 U.S.C. § 101(10)(a). A "claim" is a "right to payment." *Id.* § 101(5)(A).

Does Deutsche Bank have a "right to payment" from the Millers? In examining this question, we begin with the principle that "[w]ithin the context of a bankruptcy proceeding, state law governs the determination of property rights." *In re Mims*, 438 B.R. 52, 56 (Bankr. S.D.N.Y. 2010). We must therefore turn to Colorado law, in particular that state's version of the Uniform Commercial Code (U.C.C. or Code).

We ask first how Colorado law would classify the Note signed by the Millers. Under Colorado law, a promise or order such as the Note is payable "to order" "if it is payable (i) to the order of an identified person or (ii) to an identified person or order." Colo. Rev. Stat. § 4-3-109(b). The Note at issue here is payable "to the order of Lender. Lender is IndyMac Bank, F.S.B., a federally chartered savings bank[.]" Aplt. App., Vol. I at 14. Thus, the Note is payable to the "order" of IndyMac Bank under § 4-3-109(b).

But "[a]n instrument payable to an identified person [such as IndyMac Bank] may become payable to bearer if it is indorsed in blank pursuant to section

4-3-205(b)." Colo. Rev. Stat. § 4-3-109(c).[7] Section 4-3-205(b) provides that "[i]f an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a 'blank indorsement.' When indorsed in blank, an instrument becomes payable to bearer and may be *negotiated by transfer of possession* alone until specifically indorsed." (emphasis added).

Deutsche Bank presented evidence that IndyMac had indorsed the Note in blank. Is proof of this indorsement sufficient under the U.C.C. requirements to establish Deutsche Bank as the successor holder of the note? As we shall see, it is not, because Deutsche Bank must also prove it has possession of the Note.

The U.C.C. identifies the requirements for "negotiation" of a note, that is, for "transfer of possession . . . to a person who thereby becomes its holder." *Id.* § 4-3-201(a). This statute provides that "if an instrument is payable to an identified person, negotiation requires *transfer of possession* of the instrument and its indorsement by the holder." *Id.* § 4-3-201(b) (emphasis added). The Official Commentary to section 4-3-201 explains that negotiation "*always requires a change in possession of the instrument* because nobody can be a holder without possessing the instrument, either directly or through an agent."

---

[7] For U.C.C. purposes, "'Person' means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, government subdivision, agency, or instrumentality, or any other legal or commercial entity." Colo. Rev. Stat. § 4-1-201(26).

(emphasis added). *See also* Colo. Rev. Stat. § 4-1-201(b)(20)(A) (defining "holder" of negotiable instrument as "person in possession" of it).

"Possession is an element designed to prevent two or more claimants from qualifying as holders who could take free of the other party's claim of ownership." *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1213 (Colo. 2008) (citation omitted).[8] "With rare exceptions, those claiming to be holders have physical ownership of the instrument in question." *Id.* (citation omitted).[9] In the case of bearer paper such as the Note, physical possession is essential because it constitutes proof of ownership and a consequent right to payment.[10]

---

8 We note that the 9th Circuit BAP has stated that because relief from stay is a limited proceeding that does not ultimately determine the lender's and debtor's rights, "the concern of real party in interest jurisprudence for avoiding double payment is quite reduced" in such proceedings. *Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 914 (9th Cir. B.A.P. 2011). We also note, however, that after making this statement in *Veal*, the 9th Circuit BAP reversed a bankruptcy court determination granting relief from stay because the purported holder of the note and mortgage could not produce the original note or otherwise provide proof under state law that it was the holder of the note or a person entitled to enforce it. *See id.* at 917-18.

9 Colorado law recognizes a theory of "constructive possession" where the instrument is held for its owner in the hands of a third party. *See Georg*, 178 P.3d at 1213-14. There is no evidence of constructive possession or constructive delivery in this case.

10 A lost instrument may be enforced in certain circumstances by a person who was formerly in possession of it. *See* Colo. Rev. Stat. § 4-3-309. Here, even assuming such a loss, Deutsche Bank has offered no proof that it was ever in possession of the Note "and entitled to enforce it when loss of possession

(continued...)

While Deutsche Bank has offered proof that IndyMac assigned the Note in blank, it elicited no proof that Deutsche Bank in fact obtained physical possession of the original Note from IndyMac, either voluntarily or otherwise.[11] Under the U.C.C. requirements, Deutsche Bank has therefore failed to show that it is the current holder of the Note.

Colorado law does not limit enforcement of an obligation to a holder who received the instrument through negotiation. A note may also be enforced by a *transferee*. *See* Colo. Rev. Stat. § 4-3-203. "Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument." *Id.* § 4-3-203(b). But transfer requires delivery: "An instrument is transferred when it is *delivered* by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." *Id.* § 4-3-203(a) (emphasis added). "Delivery" with respect to an instrument "means voluntary transfer of possession" of the instrument. *Id.* § 4-1-201(14). Because Deutsche Bank has failed to prove

[10](...continued)
occurred." *Id.* § 4-3-309(a)(i).

[11] "The former [U.C.C.] requirement that delivery is required for a negotiation has been changed to a requirement that there be a *change in possession* of the instrument. Change of possession can be either voluntary or involuntary. . . . Clearly, therefore, a thief or finder [of a bearer instrument] is a holder[.]" 2 Frederick M. Hart, Erik F. Gerding & William F. Willier, *Negotiable Instruments Under the Uniform Commercial Code* § 3.05[1] (2011) (emphasis added) (footnotes omitted).

transfer of possession of the original Note it has failed to establish its status as a transferee.

Deutsche Bank also argues that it has standing because under Colorado law it can initiate a public trustee foreclosure without producing the original Note. It cites Colo. Rev. Stat. § 38-38-101(1), which provides that the "holder of an evidence of debt" may initiate a foreclosure. An "evidence of debt" includes a promissory note such as the Note at issue here. Colo. Rev. Stat. § 38-38-100.3(8). Under certain circumstances, the "holder of an evidence of debt" can file a public trustee foreclosure without supplying the original note. *See id.* § 38-38-101(b)(I)-(III).

But this argument depends, first, on Deutsche Bank's ability to show that it is a "holder of an evidence of debt." Article 38 defines a "holder of an evidence of debt" as a person "*in actual possession of*" or "*entitled to enforce* an evidence of debt." Colo. Rev. Stat. § 38-38-100.3(10) (emphasis added). Section 38-38-100.3(10) lists a number of presumptive holders of a debt presumed to be the "holder of an evidence of debt." Each of these requires *possession* of the evidence of debt, which Deutsche Bank has thus far failed to demonstrate. *See id.* § 38-38-100.3(10)(a)-(d).

Deutsche Bank appears to argue that notwithstanding its failure to prove it has actual possession of the Note, it qualifies as a "person entitled to enforce an evidence of debt" under § 38-38-100.3(10) and thus is a "holder of an evidence of

debt" because (1) it holds a copy of the Note indorsed in blank and (2) it can initiate a foreclosure without presenting the original Note to the public trustee. Deutsche Bank contends that it is a "qualified holder," *see id.* § 38-38-100.3(21), that would be permitted under Colorado law to foreclose without presenting the original note, *see id.* § 38-38-101(B)(II). But foreclosure under this provision requires either the bank or its attorney to execute a statement "citing the paragraph of section 38-38-100.3(20) under which the holder claims to be a qualified holder and certifying or stating that the copy of the evidence of debt is true and correct" and that the bank agrees to "indemnify and defend any person liable for repayment of any portion of the original evidence of debt in the event that the original evidence of debt is presented for payment to the extent of any amount, other than the amount of a deficiency remaining under the evidence of debt after deducting the amount bid at sale, and any person who sustains a loss due to any title defect that results from reliance upon a sale at which the original evidence of debt was not presented." *Id.* §§ 38-38-101(b)(II), 38-38-101(2)(a). There is no evidence that Deutsche Bank or its attorneys have executed such a certification or intend to do so. We therefore reject Deutsche Bank's claim to standing founded on these statutes.

**5. Conclusion**

For the foregoing reasons, the evidence is insufficient as it currently stands to establish that Deutsche Bank is a "party in interest" entitled to seek relief from

stay. The bankruptcy court therefore abused its discretion by granting Deutsche Bank relief from stay.

The Millers raise a number of other objections to the proceedings and orders in the bankruptcy court and the BAP but we need not reach any of them in light of the remand we now order. The judgment of the BAP is REVERSED and the case is REMANDED to the BAP with instructions to remand to the bankruptcy court for further proceedings in accordance with this opinion. The Millers' motion for leave to file a supplemental appendix is DENIED.

a division of OneWest Bank®, FSB
Home Loan Servicing • P.O. Box 4045 • Kalamazoo, MI 49009-4045

Exhibit 5
E-1

October 6, 2010

Mark S Miller
Jamieh Miller
19733 E Union Drive
Centennial, CO 80015

RE: Mortgage Loan Number 1007505843

Dear Mark S Miller and Jamieh Miller,

This letter is in response to your correspondence received September 23, 2010 regarding the above referenced home loan. Although your correspondence is presented as a Qualified Written Request (QWR) the information requested is well beyond the scope of a QWR as defined in the Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. 2605(e)(1)(B), and does not constitute a QWR subject to the provisions of that statute. This response is provided solely as a matter of customer service in accordance with IndyMac Mortgage Services, a division of OneWest Bank®, FSB's policy.

A QWR is written correspondence to your loan servicer stating specific reasons why you believe the servicing of your account is in error. It must also include sufficient detail to allow the servicer the opportunity to fully investigate the matter to determine if errors were made in connection with the servicing of the account. Your correspondence fails to state that you believe there are specific errors in the servicing of your account. If you have a specific loan servicing issue, such as a payment application issue or a disbursement issue, please send all inquiries to the address below with a detailed explanation as to why you feel the account is in error.

IndyMac Mortgage Services
6900 Beatrice Drive
Kalamazoo MI 49009
Attention: Research Department

A QWR is not a vehicle for obtaining information regarding the lender's general business practices, including but not limited to its operations, systems of record, servicing by a prior servicing company or business relationships. With respect to those of your inquiries which go beyond the scope of a legitimate QWR, IndyMac Mortgage Services respectfully declines to provide the information requested

From your letter I understand you are questioning the validity of the loan referenced above. Enclosed is a copy of the Executed Note that was signed at closing showing you entered into a contractual agreement. As a courtesy a 24 month payment history has also been included to show you have acknowledged the debt. We recognize you have filed for Chapter 13 Bankruptcy and we will continue to service this account in compliance with bankruptcy law.

Your correspondence contains general statements regarding the accuracy of the servicing of your loan. We are in the opinion your loan has been serviced in accordance with our agreement with you and applicable law. In addition to the enclosed payment history we have included a copy of the most recent escrow analysis for your review. If you would like a complete history of the mortgage loan, please refer to the order form and fee schedule enclosed. Be advised if there have been foreclosure fees assessed to your account they do not reflect on the enclosed payment history.

a division of OneWest Bank, FSB
Home Loan Servicing • P.O. Box 4045 • Kalamazoo, MI 49009-4045

Exhibit 5
E-2

Due to the status of your mortgage we are unable to provide a payoff statement with this correspondence. Please contact our Customer Service Department to order your payoff statement. This request may take up to three business days to complete.

Your letter included a request for copies of certain documents that pertain to your loan. The copies you requested can be costly, so as a courtesy we are writing you to encourage you to check your records to determine if you have retained the documents provided when your loan closed. Limiting the number of document copies you actually need from IndyMac Mortgage Services will be less expensive to you and may save time.

Please research your records and complete the enclosed order form once you have identified the document copies you still require from IndyMac Mortgage Services. An example of how to fill out the order form is presented on the back of the form. Once your form is complete, please submit a check in the total amount due along with the request form to:

IndyMac Mortgage Services
6900 Beatrice Drive
Kalamazoo MI 49009
Attention: RESPA Department

Upon receiving your request and payment, we will provide the desired documents to you within 30 business days of our receipt of the order form. If we do not receive the order form and payment within 30 business days, we will close this request.

Original documents – or at least the original promissory note and deed of trust/mortgage – are not available for inspection although if you would like to obtain a certified copy please fill out the order form enclosed.

Please be advised that in providing the above response, IndyMac Mortgage Services is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under the loan documents, at law or in equity, all of which rights and remedies are expressly reserved. Further, the subject loan remains in full force and effect and we will continue to service the loan in accordance with the loan documents and applicable law.

Please be assured all options were considered in every effort to assist you with this matter. In the event you require further assistance please call 1-800-781-7399 Monday through Thursday from 8:00 a.m. until 9:00 p.m. EST, Friday from 8:00 a.m. until 9:00 p.m. EST and Saturday from 9 a.m. until 6:00 p.m. EST.

Respectfully,

IndyMac Mortgage Services, a division of OneWest Bank®, FSB

*** This company is a debt collector. We are attempting to collect a debt and any information obtained will be used for that purpose. However, if your debt has been discharged pursuant to the Bankruptcy laws of the United States, this communication is intended solely for informational purposes.***

Exhibit 5
E-3

IndyMac Mortgage Services a Division of OneWest Bank
Document Request Form

IndyMac Mortgage Loan Number: ______________________
IndyMac Borrower(s) Name: ______________________
Property Address: ______________________

Check the box that corresponds to the document copies needed:

| | Item Requested | Fee | Your Request |
|---|---|---|---|
| | Authorization | $5.00 | |
| | Loan Application | $5.00 | |
| | Good Faith Estimate | $5.00 | |
| | Truth in Lending Statement | $5.00 | |
| | HUD-1 | $5.00 | |
| | Deed of Trust | $10.00 | |
| | Note & Any Addendums | $10.00 | |
| | Initial Disclosures | $5.00 | |
| | Notice of Right to Cancel (Refinance Only) | $5.00 | |
| | Appraisal | $10.00 | |
| | Payment History (12 Month) | Free | |
| | Payment History (24 Month) | $10.00 | |
| | Payment History (36 Month) | $20.00 | |
| | Payment History (48 Month) | $30.00 | |
| | | Total | $ |

Once complete, send this order form and a check for the total amount due to:

IndyMac Mortgage Services
6900 Beatrice Drive
Kalamazoo, MI 49009
Attn: RESPA Dept

Home Loan Servicing • P.O. Box 4045 • Kalamazoo, MI 49009-4045 a division of OneWest Bank, FSB

Exhibit 5

F-1

March 12, 2012

Mark Miller
Jamileh Miller
19733 E. Union Dr
Centennial, CO 80015

Re: Mortgage Loan Number: 1007505843

Dear Mark and Jamileh Miller:

This letter is in response to your correspondence dated March 3, 2012 we received March 12, 2012 regarding the above referenced home loan. Although your correspondence is presented as a qualified written request (QWR) it does not constitute a QWR subject to the provisions of the Real Estate Settlement Procedures Act (RESPA 12 U.S.C. 2605(e)(1)(B)).

A QWR is written correspondence to the loan servicer stating specific reasons a customer believes the servicing of his/her account is in error. It must also include sufficient detail to allow the servicer the opportunity to fully investigate the matter to determine if errors were made in connection with the servicing of the account. Your correspondence fails to state that you believe there are specific errors in the servicing of the account sufficient to allow IndyMac Mortgage Services, a division of OneWest Bank, FSB the ability to investigate further. If you have a specific loan servicing issue, such as a payment application or disbursement issue, please send all inquiries to the address below with a detailed explanation as to why you believe the account is in error.

IndyMac Mortgage Services,
a division of OneWest Bank, FSB
Attention: Research Department
6900 Beatrice Drive
Kalamazoo, MI 49009

In compliance with the FDCPA, enclosed is a copy of the promissory note dated April 20, 2006 you signed at closing that evidences your obligation to repay the loan at the stated terms. A 24-month payment history is included that accurately reports the application of all payments we received during that period. If you dispute the pay history, please provide us details in support of any dispute, including but not limited to the dates of any transaction in dispute, amounts in dispute, copies of cancelled checks, receipts, bank statements, etc. You may request a life of loan payment history by completing the attached form and submitting it and the required fee to the address shown on the form.

Your correspondence contains general statements regarding the accuracy of the servicing of your loan. We are in the opinion your loan has been serviced in accordance with our agreement with you and applicable law. If you would like a complete history of the mortgage loan, please refer to the order form and fee schedule enclosed. The payment history included shows funds received by IndyMac Mortgage Services and servicing fees assessed to the account. This information is accurate as of March 12, 2012. Be advised if there have been foreclosure fees assessed to your account they do not reflect on this payment history.

Home Loan Servicing • P.O. Box 4045 • Kalamazoo, MI 49009-4045 a division of OneWest Bank, FSB

Exhibit 5

We have included he most recent escrow analysis with this correspondence for your review. We are in the opinion all information referenced on the payment history is correct.

Due to the status of your mortgage we are unable to provide a payoff statement with this correspondence. Please contact our Customer Service Department toll-free at 1.866.706.8647 to order your payoff statement. This request may take up to seven business days to complete.

Original documents – or at least the original promissory note and deed of trust/mortgage – are not available for inspection although if you would like to obtain a certified copy please fill out the order form enclosed.

Your letter included a request for copies of certain documents that pertain to your loan. The copies you requested can be costly, so as a courtesy we are writing to encourage you to check your records to determine if you have retained the documents provided when your loan closed. Limiting the number of document copies you actually need from IndyMac Mortgage Services will be less expensive and may save time.

Please research your records and complete the enclosed order form once you have identified the document copies you still require from IndyMac Mortgage Services. An example of how to fill out the order form is presented on the back of the form. Once your form is complete, please submit a check in the total amount due along with the request form to IndyMac Mortgage Services, a division of OneWest Bank, FSB, Attention: RESPA Department, 6900 Beatrice Drive Kalamazoo, MI 49009. Upon receiving your request and payment, we will provide the desired documents to you within 30 business days of our receipt of the order form. If we do not receive the order form and payment within 30 business days, we will close this request.

In providing the above response, IndyMac Mortgage Services is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under your loan documents, at law or in equity, all of which rights and remedies are expressly reserved. Further, the subject loan remains in full force and effect and we will continue to service the loan in accordance with the loan documents and applicable law.

Please be assured all options were considered in every effort to assist you with this matter. In the event you require further assistance please call 1.800.781.7399 Monday through Friday, from 8:00 a.m. until 9:00 p.m. Eastern Time.

Respectfully,

IndyMac Mortgage Services,
a division of OneWest Bank, FSB

***This company is a debt collector and any information obtained will be used for that purpose. However, if a bankruptcy petition has been filed and there is either an "automatic stay" in effect in the bankruptcy case, or the debt has been discharged pursuant to the bankruptcy laws of the United States, this communication is intended solely for informational purposes.***

Exhibit 5
F-3

IndyMac Mortgage Services a Division of OneWest Bank
Document Request Form

IndyMac Mortgage Loan Number: 1000000000
IndyMac Borrower(s) Name: John Doe
Property Address: 234 Test Dr. Somewhere, TX 99999

Check the box that corresponds to the document copies needed:

| | Item Requested | Fee | Your Request |
|---|---|---|---|
| X | Authorization | $5.00 | 5.00 |
| X | Loan Application | $5.00 | 5.00 |
| | Good Faith Estimate | $5.00 | |
| | Truth in Lending Statement | $5.00 | |
| | HUD-1 | $5.00 | |
| X | Deed of Trust | $10.00 | 10.00 |
| | Note & Any Addendums) | $10.00 | |
| | Initial Disclosures | $5.00 | |
| | Notice of Right to Cancel (Refinance Only) | $5.00 | |
| | Appraisal | $10.00 | |
| X | Payment History (12 Month) | Free | 0.00 |
| X | Payment History (24 Month) | $10.00 | 10.00 |
| | Payment History (36 Month) | $20.00 | |
| | Payment History (48 Month) | $30.00 | |
| | | Total | $ 30.00 |

Sample

Once complete, send this order form and a check for the total amount due to:

IndyMac Mortgage Services
6900 Beatrice Drive
Kalamazoo, MI 49009
Attn: RESPA Dept

Exhibit 6

**-Begin Credit Report-**

Personal Information

**File Number:** 325446109

| | | | |
|---|---|---|---|
| **Name:** | MARK S. MILLER | **SSN:** | XXX-XX-9481 |
| | | **Date of Birth:** | 10/09/1965 |
| You have been on our files since 09/01/1987 | | **Telephone:** | 325-3981 |
| | | Your SSN is partially abbreviated for your protection. | |

## CURRENT ADDRESS

**Address:** 19733 E UNION DR
CENTENNIAL, CO 80015

**Reported:** 11/01/2000

## OTHER ADDRESSES

**Address:** 16255 HWY 50
ROCKY FORD, CO 81067

**Reported:** 11/30/2006

**Address:** 16255 US HIGHWAY 50
ROCKY FORD, CO 81067

## EMPLOYMENT DATA REPORTED

| | | | |
|---|---|---|---|
| **Employer Name:** | COLORADO DEPT O | **Position:** | WHITE COLLAR |
| **Date Verified:** | 02/09/2008 | | |
| **Employer Name:** | DEPARTMENT OF HEALTHSOC SVCS | **Position:** | ADMINISTRATOR |
| **Date Reported:** | 10/01/2004 | | |
| **Employer Name:** | PUEBLO COUNTY HEALTH DEP | **Position:** | MISC OTHER |
| **Location:** | ROCKY FORD, CO | | |
| **Date Reported:** | 05/01/2001 | | |
| **Employer Name:** | BENT COUNTY | | |

Special Notes: The display of your Social Security number has been abbreviated and your account numbers have been modified in this report for your protection. You may request disclosure of your full Social Security number by writing to us at the address found at the end of this report. Also, if any item on your credit report begins with 'MEDICAL-', it includes medical information and the data following 'MEDICAL-' is not displayed to anyone but you except where permitted by law.

Exhibit 6

## Public Records

The following items obtained from public records appear on your report. You may be required to explain public record items to potential creditors. Any bankruptcy information will remain on your report for 10 years from the date of the filing. Most other public record information, including discharged chapter 13 bankruptcy, remains for up to 7 years. The amount listed on the public record is not a balance. The amount reflects the original amount of the public record item.

**COLORADO FEDERAL COURT - Docket# 1025453**

721 19TH STREET
US CUSTOM HOUSE RO
DENVER, CO 80202
(720) 904-7300

| | | | |
|---|---|---|---|
| **Type:** | CHAPTER 13 BANKRUPTCY FILING | **Responsibility:** | Contractually Liable Debt |
| | | **Plaintiff Attorney:** | PRO SE |
| **Court Type:** | Federal District | **Liabilities:** | $0 |
| **Date Filed:** | 06/22/2010 | **Assets:** | $0 |

**Estimated month and year that this item will be removed:** 05/2020

Exhibit 6

The following information concerning adjustable rate mortgages was obtained from public records and appears on your report. The information was obtained from the Recorder's Office in the jurisdiction and State specified below. None of these items contain adverse information; they are simply a listing of the information filed in the Recorder's Office concerning your adjustable rate mortgage.

## PUBLIC RECORD MORTAGAGE DETAILS

| **Recorder's Office:** | | | | |
|---|---|---|---|---|
| ARAPAHOE, CO | **Origination Date:** | 04/2006 | **Loan Amount:** | $216,236 |
| | **Initial Rate Adjustment:** | 05/2016 | **Initial Interest Rate:** | 6.625% |
| | **Next Rate Change Date:** | 05/2016 | **Rate Calculation Change:** | 2.75% |
| | **Rate Change Frequency:** | Monthly | **Change Percent Limit:** | 2.0% |
| | **Rate Change Interval:** | 12 | **First Rate Change Cap:** | 11.625% |
| | **Index Type:** | libor | **Maximum Rate:** | 11.625% |
| | **Look Back Period (days):** | 45 | **Combined Loan to Value:** | 91.70% |
| | | | **Interest Only:** | Yes |

Exhibit 6

The key to the right helps explain the payment history information contained in some of the accounts below. Not all accounts will contain payment history information, but some creditors report how you make payments each month in relation to your agreement with them.

| NA | X | | | | | |
|---|---|---|---|---|---|---|
| Not Applicable | Unknown | Current | 30 days late | 60 days late | 90 days late | 120 days late |

The following accounts contain information which some creditors may consider to be adverse. Adverse account information may generally be reported for 7 years from the date of the first delinquency, depending on your state of residence. The adverse information in these accounts has been printed in >brackets< or is shaded for your convenience, to help you understand your report. They are not bracketed or shaded this way for creditors.

### BANK OF AMERICA #488893299742****

P O BOX 982238
EL PASO, TX 79998
(800) 421-2110

**Balance:** $0
**Date Updated:** 09/22/2010
**High Balance:** $3,925
**Credit Limit:** $2,500
**Last Payment:** 06/04/2010

**Pay Status:** Unrated
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 03/23/2004
**Date Closed:** 07/31/2008
**Date Paid:** 06/04/2010

**Loan Type:** CREDIT CARD
**Remarks:** >INCLUDED IN BANKRUPTCY<
**Estimated month and year that this item will be removed:** 05/2017

### BANK OF AMERICA #488893799538****

P O BOX 982238
EL PASO, TX 79998
(800) 421-2110

**Balance:** $0
**Date Updated:** 07/21/2009
**High Balance:** $11,778
**Credit Limit:** $9,200
**Last Payment:** 01/23/2008

**Pay Status:** >Charged Off<
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 02/16/2000
**Date Closed:** 09/30/2008
**Date Paid:** 01/23/2008

**Loan Type:** CREDIT CARD
**Remarks:** PURCHASED BY ANOTHER LENDER
**Estimated month and year that this item will be removed:** 03/2015

### CAPITAL ONE BANK USA NA #412174827665****

PO BOX 30281
SALT LAKE CITY, UT 84130
(800) 258-9319

**Balance:** $0
**Date Updated:** 01/02/2011
**High Balance:** $1,093
**Credit Limit:** $1,000
**Last Payment:** 08/05/2010

**Pay Status:** >Account Included in Ch 13 Bankruptcy<
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 07/29/2000
**Date Closed:** 11/29/2010
**Date Paid:** 08/05/2010

**Loan Type:** CREDIT CARD
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 06/2017

### CHASE BANK USA NA #518337775000****

PO BOX 15298
WILMINGTON, DE 19850
(800) 955-9900

**Balance:** $0
**Date Updated:** 09/19/2010
**High Balance:** $4,669
**Credit Limit:** $4,700
**Last Payment:** 06/03/2010

**Pay Status:** >Account Included in Ch 13 Bankruptcy<
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 06/16/2002
**Date Closed:** 06/24/2010
**Date Paid:** 06/03/2010

**Loan Type:** CREDIT CARD
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 05/2017

Exhibit 6

### CITIMORTGAGE INC #77094****

PO BOX 6243
SIOUX FALLS, SD 57117
(800) 283-7918

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Charged Off< |
| **Date Updated:** | 11/28/2009 | **Account Type:** | Mortgage Account |
| **High Balance:** | $54,060 | **Responsibility:** | Joint Account |
| **Last Payment:** | 04/07/2009 | **Terms:** | $449 per month, paid Monthly for 180 months |
| | | **Date Opened:** | 04/20/2006 |
| | | **Date Closed:** | 11/28/2009 |

**Loan Type:** SECOND MORTGAGE
**Remarks:** CONTACT SUBSCRIBER
**Estimated month and year that this item will be removed:** 04/2016

### GECRB/CARE CREDIT #601918038727****

C/O PO BOX 965036
ORLANDO, FL 32896
(866) 396-8254

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/03/2012 | **Account Type:** | Revolving Account |
| **High Balance:** | $1,149 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $1,000 | **Date Opened:** | 01/04/2007 |
| **Last Payment:** | 02/18/2010 | **Date Closed:** | 03/27/2009 |
| | | **Date Paid:** | 02/18/2010 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

1 0 0

**Last 48 months**

| jul | jun | may | apr | mar | feb | '12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '11 | dec | nov | oct | sep | aug |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| jul | jun | may | apr | mar | feb | '10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '09 | dec | nov | oct | sep | aug |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | | OK | OK | OK | OK | OK | OK | OK | OK | OK |

### HSBC BANK #545800451321****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Charged Off< |
| **Date Updated:** | 10/31/2008 | **Account Type:** | Revolving Account |
| **High Balance:** | $6,872 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $0 | **Date Opened:** | 03/29/2000 |
| **Last Payment:** | 01/07/2008 | **Date Closed:** | 02/18/2008 |
| | | **Date Paid:** | 01/07/2008 |

**Loan Type:** CREDIT CARD
**Remarks:** PURCHASED BY ANOTHER LENDER
**Estimated month and year that this item will be removed:** 01/2015

### HSBC BEST BUY #702127130734****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 11/21/2010 | **Account Type:** | Revolving Account |
| **High Balance:** | $1,856 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $100 | **Date Opened:** | 09/24/2005 |
| **Last Payment:** | 09/05/2008 | **Date Closed:** | 06/25/2010 |
| | | **Date Paid:** | 09/05/2008 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (48 months)

1 0 0

**Last 48 months**

| oct | sep | aug | jul | jun | may | apr | mar | feb | '10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '09 | dec | nov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| oct | sep | aug | jul | jun | may | apr | mar | feb | '08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '07 | dec | nov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

Exhibit 6

## ONEWEST BANK #668100750****

6900 BEATRICE DR
KALAMAZOO, MI 49009
(800) 781-7399

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Account Included in Ch 13 Bankruptcy< |
| **Date Updated:** | 08/06/2012 | **Account Type:** | Mortgage Account |
| **High Balance:** | $216,236 | **Responsibility:** | Joint Account |
| **Last Payment:** | 04/07/2009 | **Terms:** | $1440 per month, paid Monthly for 360 months |
| | | **Date Opened:** | 04/20/2006 |

**Loan Type:** CONVENTIONAL REAL ESTATE MTG
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 03/2016

## SLC STUD LOAN TRUST #5231994****

P O BOX 6497
SIOUX FALLS, SD 57117
(800) 967-2400

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Unrated |
| **Date Updated:** | 07/31/2010 | **Account Type:** | Installment Account |
| **High Balance:** | $10,376 | **Responsibility:** | Individual Account |
| **Last Payment:** | 07/12/2010 | **Date Opened:** | 03/22/1999 |
| | | **Date Closed:** | 07/31/2010 |

**Loan Type:** STUDENT LOAN
**Remarks:** >INCLUDED IN BANKRUPTCY<
**Estimated month and year that this item will be removed:** 06/2017

## US BANK #10367186****

MAIL LOCATION CN-WN-15
425 WALNUT ST
CINCINNATI, OH 45202
(800) 331-4738

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Account Included in Ch 13 Bankruptcy< |
| **Date Updated:** | 04/01/2012 | **Account Type:** | Line of Credit Account |
| **High Balance:** | $1,476 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $1,500 | **Terms:** | $505 per month |
| **Last Payment:** | 06/03/2008 | **Date Opened:** | 05/07/2001 |
| | | **Date Closed:** | 01/30/2009 |

**Loan Type:** LINE OF CREDIT
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 05/2015

## US BANK RMS CC #479817521700****

205 W 4TH ST
CINCINNATI, OH 45202
(866) 234-4750

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Account Included in Ch 13 Bankruptcy< |
| **Date Updated:** | 01/02/2011 | **Account Type:** | Revolving Account |
| **High Balance:** | $9,124 | **Responsibility:** | Individual Account |
| **Last Payment:** | 10/28/2010 | **Date Opened:** | 10/01/2004 |
| | | **Date Closed:** | 09/07/2008 |
| | | **Date Paid:** | 10/28/2010 |

**Loan Type:** BUSINESS CREDIT CARD
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 02/2015

Exhibit 6

**US BANK RMS CC #419008087975******

205 W 4TH ST
CINCINNATI, OH 45202
(866) 234-4750

| | | | |
|---|---|---|---|
| **Balance:** | $12,537 | **Pay Status:** | >Charged Off< |
| **Date Updated:** | 06/07/2009 | **Account Type:** | Revolving Account |
| **High Balance:** | $11,821 | **Responsibility:** | Primary Borrower on Account |
| **Credit Limit:** | $10,000 | | |
| **Last Payment:** | 09/15/2008 | **Date Opened:** | 04/01/2002 |
| | | **Date Closed:** | 02/01/2009 |

**Loan Type:** LINE OF CREDIT
**Remarks:** TRANSFERRED TO ANOTHER LENDER
**Estimated month and year that this item will be removed:** 07/2015

**US BANK RMS CC #403784000954******

205 W 4TH ST
CINCINNATI, OH 45202
(866) 234-4750

| | | | |
|---|---|---|---|
| **Balance:** | $10,723 | **Pay Status:** | >Charged Off< |
| **Date Updated:** | 09/07/2008 | **Account Type:** | Revolving Account |
| **High Balance:** | $10,412 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $9,000 | **Date Opened:** | 04/01/2007 |
| **Last Payment:** | 01/16/2008 | **Date Closed:** | 09/07/2008 |

**Loan Type:** CREDIT CARD
**Remarks:** TRANSFERRED TO ANOTHER LENDER
**Estimated month and year that this item will be removed:** 02/2015

**MEDICREDIT #112100******

3620 I-70 DRIVE SE STE C
COLUMBIA, MO 65201
(877) 395-3125 x1110

| | | | |
|---|---|---|---|
| **Balance:** | $110 | **Pay Status:** | >In Collection< |
| **Date Updated:** | 07/16/2012 | **Account Type:** | Open Account |
| **Original Amount:** | $110 | **Responsibility:** | Individual Account |
| **Original Creditor:** | MEDICAL-SOUTHLANDS FAMILY MEDICINE (Medical/Health Care) | | |
| **Past Due:** | >$110< | | |

**Loan Type:** COLLECTION AGENCY/ATTORNEY
**Date Placed for Collection:** 04/10/2012
**Remarks:** >PLACED FOR COLLECTION<
**Estimated month and year that this item will be removed:** 09/2018

**MEDICREDIT #110046******

3620 I-70 DRIVE SE STE C
COLUMBIA, MO 65201
(877) 395-3125 x1110

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Unrated |
| **Date Updated:** | 08/16/2010 | **Account Type:** | Open Account |
| **Original Amount:** | $1,107 | **Responsibility:** | Individual Account |
| **Original Creditor:** | MEDICAL-PARKER ADVENTIST HOSPITAL (Medical/Health Care) | | |

**Loan Type:** COLLECTION AGENCY/ATTORNEY
**Date Placed for Collection:** 02/15/2010
**Remarks:** >CHAPTER 7 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 02/2016

**REVENUE ENTERPRISES #20617****

3131 S VAUGHN WAY
SUITE 426
AURORA, CO 80014
(303) 695-3800

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Account Paid in Full; was a Collection< |
| **Date Updated:** | 04/09/2009 | | |
| **Original Amount:** | $60 | **Account Type:** | Open Account |
| **Original Creditor:** | MEDICAL-ARKANSAS VALLEY REGIONAL MD (Medical/Health Care) | **Responsibility:** | Individual Account |
| | | **Date Closed:** | 03/11/2009 |
| | | **Date Paid:** | 03/11/2009 |
| **Last Payment:** | 03/11/2009 | | |

**Loan Type:** COLLECTION AGENCY/ATTORNEY
**Date Placed for Collection:** 08/28/2008
**Remarks:** >PAID COLLECTION<
**Estimated month and year that this item will be removed:** 06/2015

Exhibit 6

The following accounts are reported with no adverse information.

### ASPEN #414682000004****

POB 105555
ATLANTA, GA 30348
Phone number not available

**Balance:** $0
**Date Updated:** 06/30/2005
**High Balance:** $3,094
**Credit Limit:** $3,000
**Last Payment:** 10/01/2004

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 02/10/2003
**Date Paid:** 10/01/2004

**Loan Type:** CREDIT CARD
**Remarks:** ACCOUNT CLOSED BY CONSUMER

### CHASE #418551100121****

2500 WESTFIELD DR
ELGIN, IL 60124
(800) 356-0011

**Balance:** $0
**Date Updated:** 03/27/2008
**High Balance:** $3,401
**Credit Limit:** $6,500
**Last Payment:** 07/15/2005

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 08/04/2000
**Date Closed:** 02/28/2008
**Date Paid:** 04/15/2005

**Loan Type:** CREDIT CARD
**Remarks:** ACCOUNT CLOSED BY CONSUMER

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| feb | '08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| feb | '06 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar |

### CHASE BANK USA NA #549104345009****

PO BOX 15298
WILMINGTON, DE 19850
(800) 955-9900

**Balance:** $0
**Date Updated:** 12/05/2005
**High Balance:** $6,015
**Credit Limit:** $6,000
**Last Payment:** 06/19/2005

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 08/17/2000
**Date Closed:** 06/17/2004
**Date Paid:** 06/19/2005

**Loan Type:** CREDIT CARD
**Remarks:** ACCOUNT CLOSED BY CONSUMER

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '04 | dec |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '03 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '02 | dec |

### CHASE/BANK ONE CARD SERV #436612000846****

PO BOX 15298
WILMINGTON, DE 19850
(800) 945-2006

**Balance:** $0
**Date Updated:** 06/18/2010
**High Balance:** $470
**Credit Limit:** $300
**Last Payment:** 06/04/2008

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 05/06/1996
**Date Closed:** 03/24/2010
**Date Paid:** 06/04/2008

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| may | apr | mar | feb | '10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '09 | dec | nov | oct | sep | aug | jul | jun |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| may | apr | mar | feb | '08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '07 | dec | nov | oct | sep | aug | jul | jun |

Exhibit 6

### CHASE/BANK ONE CARD SERV #426685104319****

PO BOX 15298
WILMINGTON, DE 19850
(800) 945-2006

**Balance:** $0
**Date Updated:** 01/13/2008
**High Balance:** $217
**Credit Limit:** $250
**Last Payment:** 06/22/2006

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Authorized Account
**Date Opened:** 02/16/2003
**Date Closed:** 10/30/2007
**Date Paid:** 06/22/2006

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '06 |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '04 |

### CHASE/BANK ONE CARD SERV #426651302672****

PO BOX 15298
WILMINGTON, DE 19850
(800) 945-2006

**Balance:** $0
**Date Updated:** 01/25/2005
**High Balance:** $2,015
**Credit Limit:** $2,000
**Last Payment:** 04/07/2004

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 02/12/2001
**Date Closed:** 07/06/2004
**Date Paid:** 04/07/2004

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (44 months)

0 0 0

**Last 44 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '04 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '03 |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | | | | |
| dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '02 | dec | nov | oct | sep | aug | jul | jun | may | | | | |

### CITICARDS CBNA #401804001093****

PO BOX 6497
SIOUX FALLS, SD 57117
(800) 950-5114

**Balance:** $0
**Date Updated:** 03/09/2005
**Credit Limit:** $7,400
**Last Payment:** 12/22/2004

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 05/24/1988
**Date Closed:** 12/01/2002
**Date Paid:** 12/22/2004

**Loan Type:** CREDIT CARD
**Remarks:** ACCOUNT CLOSED BY CONSUMER

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| feb | '05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '04 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| feb | '03 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '02 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar |

### FIRST NATIONAL BANK #5051****

535 BENT AVE
POB 270
LAS ANIMAS, CO 81054
(719) 456-1512

**Balance:** $9,905
**Date Updated:** 07/26/2012
**High Balance:** $16,415
**Last Payment:** 07/10/2012

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Mortgage Account
**Responsibility:** Joint Account
**Terms:** $101 per month, paid Monthly for 120 months
**Date Opened:** 07/15/2002

**Loan Type:** REAL ESTATE-JUNIOR LIENS

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| jun | may | apr | mar | feb | '12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '11 | dec | nov | oct | sep | aug | jul |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| jun | may | apr | mar | feb | '10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '09 | dec | nov | oct | sep | aug | jul |

Exhibit 6

### FLEET CREDIT CARD SVCS #410416000031****

201 N TRYON ST
CHARLOTTE, NC 28255
Phone number not available

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 06/02/2005 | | |
| **High Balance:** | $3,094 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $3,000 | **Responsibility:** | Individual Account |
| **Last Payment:** | 10/01/2004 | **Date Opened:** | 02/10/2003 |
| | | **Date Closed:** | 06/02/2005 |
| | | **Date Paid:** | 10/01/2004 |

**Loan Type:** CREDIT CARD
**Remarks:** PURCHASED BY ANOTHER LENDER

**Late Payments** (27 months)
0 0 0

**Last 27 months**

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
may apr mar feb '05 dec nov oct sep aug jul jun may apr mar feb '04 dec nov oct sep aug jul jun
OK OK OK
may apr mar

### FURNITURE ROW/CBNA #601154010089****

PO BOX 6497
SIOUX FALLS, SD 57117
Phone number not available

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 09/01/2003 | | |
| **High Balance:** | $595 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $3,500 | **Responsibility:** | Individual Account |
| **Last Payment:** | 04/01/2000 | **Date Opened:** | 06/01/1999 |
| | | **Date Closed:** | 06/01/2003 |

**Loan Type:** COMBINED CREDIT PLAN
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (41 months)
0 0 0

**Last 41 months**

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
aug jul jun may apr mar feb '03 dec nov oct sep aug jul jun may apr mar feb '02 dec nov oct sep
X X X X X X X X X X X X X X OK OK OK
aug jul jun may apr mar feb '01 dec nov oct sep aug jul jun may apr

### GECRB/DILLARDS #604587215306****

PO BOX 965005
ORLANDO, FL 32896
(800) 643-8278

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/24/2012 | | |
| **High Balance:** | $382 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $124 | **Responsibility:** | Individual Account |
| **Last Payment:** | 01/12/2007 | **Date Opened:** | 01/01/2006 |
| | | **Date Closed:** | 05/21/2009 |
| | | **Date Paid:** | 01/12/2007 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
jul jun may apr mar feb '12 dec nov oct sep aug jul jun may apr mar feb '11 dec nov oct sep aug
OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
jul jun may apr mar feb '10 dec nov oct sep aug jul jun may apr mar feb '09 dec nov oct sep aug

### GECRB/JC PENNEY #600889585765****

PO BOX 965001
ORLANDO, FL 32896
(800) 542-0800

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/19/2012 | | |
| **High Balance:** | $92 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $124 | **Responsibility:** | Joint Account |
| **Last Payment:** | 01/01/2000 | **Date Opened:** | 12/04/1999 |
| | | **Date Closed:** | 06/24/2010 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
jul jun may apr mar feb '12 dec nov oct sep aug jul jun may apr mar feb '11 dec nov oct sep aug
OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
jul jun may apr mar feb '10 dec nov oct sep aug jul jun may apr mar feb '09 dec nov oct sep aug

Exhibit 6

### GECRB/LOWES #798192406170****

PO BOX 965005
ORLANDO, FL 32896
(800) 444-1408

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/06/2012 | | |
| **High Balance:** | $1,300 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $224 | **Responsibility:** | Individual Account |
| **Last Payment:** | 04/18/2007 | **Date Opened:** | 04/21/2006 |
| | | **Date Closed:** | 06/24/2010 |
| | | **Date Paid:** | 04/18/2007 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

### GECRB/MERVYN'S #604589104780****

PO BOX 965005
ORLANDO, FL 32896
(800) 480-5014

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/28/2012 | | |
| **High Balance:** | $0 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $200 | **Responsibility:** | Individual Account |
| **Last Payment:** | 01/21/2005 | **Date Opened:** | 11/06/1998 |
| | | **Date Closed:** | 10/23/2008 |
| | | **Date Paid:** | 01/21/2005 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

### GECRB/MERVYN'S #604589113505****

PO BOX 965005
ORLANDO, FL 32896
(800) 480-5014

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/16/2012 | | |
| **High Balance:** | $0 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $500 | **Responsibility:** | Individual Account |
| | | **Date Opened:** | 01/26/2003 |
| | | **Date Closed:** | 10/23/2008 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

### GECRB/SAMS #771410026252****

PO BOX 965005
ORLANDO, FL 32896
(800) 964-1917

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/02/2012 | | |
| **High Balance:** | $1,235 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $1,150 | **Responsibility:** | Individual Account |
| **Last Payment:** | 08/05/2009 | **Date Opened:** | 10/16/2003 |
| | | **Date Closed:** | 06/24/2010 |
| | | **Date Paid:** | 08/05/2009 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

Exhibit 6

## GORDON'S/CBNA #603525300880****

PO BOX 6497
SIOUX FALLS, SD 57117
Phone number not available

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 07/06/2005 | | |
| **High Balance:** | $1,229 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $5,300 | **Responsibility:** | Individual Account |
| **Last Payment:** | 03/29/2005 | **Date Opened:** | 10/17/1998 |
| | | **Date Paid:** | 03/29/2005 |

**Loan Type:** CHARGE ACCOUNT

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| jun | may | apr | mar | feb | 05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 04 | dec | nov | oct | sep | aug | jul |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| jun | may | apr | mar | feb | 03 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 02 | dec | nov | oct | sep | aug | jul |

## HSBC BANK #549107001361****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 02/28/2007 | | |
| **High Balance:** | $1,038 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $2,000 | **Responsibility:** | Individual Account |
| **Last Payment:** | 09/12/2006 | **Date Opened:** | 09/27/2005 |
| | | **Date Closed:** | 02/12/2007 |
| | | **Date Paid:** | 06/10/2006 |

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED

**Late Payments** (17 months)

0 0 0

**Last 17 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 06 | dec | nov | oct | sep |

## HSBC FURNITURE ROW #59360110484****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 06/24/2010 | | |
| **High Balance:** | $3,342 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $4,500 | **Responsibility:** | Joint Account |
| **Last Payment:** | 05/09/2007 | **Date Opened:** | 04/20/2006 |
| | | **Date Closed:** | 12/16/2008 |
| | | **Date Paid:** | 05/09/2007 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug | jul | jun |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| may | apr | mar | feb | 08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 07 | dec | nov | oct | sep | aug | jul | jun |

## SEARS/CBNA #512107974726****

PO BOX 6282
SIOUX FALLS, SD 57117
(800) 917-7700

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/21/2012 | | |
| **High Balance:** | $1,455 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $1,456 | **Responsibility:** | Individual Account |
| **Last Payment:** | 12/05/2007 | **Date Opened:** | 04/08/2006 |
| | | **Date Closed:** | 09/02/2008 |

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| jul | jun | may | apr | mar | feb | 12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 11 | dec | nov | oct | sep | aug |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| jul | jun | may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug |

Exhibit 6

### SEARS/CBNA #504994100772****

PO BOX 6282
SIOUX FALLS, SD 57117
(800) 917-7700

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 07/31/2012 | **Account Type:** | Revolving Account |
| **High Balance:** | $1,913 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $250 | **Date Opened:** | 04/08/2006 |
| **Last Payment:** | 12/05/2007 | **Date Closed:** | 09/22/2008 |
| | | **Date Paid:** | 12/05/2007 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months) 0 0 0 — **Last 48 months**

| jun | may | apr | mar | feb | 12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 11 | dec | nov | oct | sep | aug | jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| jun | may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug | jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

### THE HOME DEPOT/CBNA #603532006519****

PO BOX 6497
SIOUX FALLS, SD 57117
(800) 677-0232

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/01/2003 | **Account Type:** | Revolving Account |
| **High Balance:** | $0 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $800 | **Date Opened:** | 02/01/2002 |

**Loan Type:** CHARGE ACCOUNT

**Late Payments** (11 months) 0 0 0 — **Last 11 months**

| jul | jun | may | apr | mar | feb | 03 | dec | nov | oct | sep |
|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

### US BANK #51005****

425 WALNUT ST
CINCINNATI, OH 45202
(800) 879-1397

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 05/30/2005 | **Account Type:** | Installment Account |
| **High Balance:** | $9,050 | **Responsibility:** | Joint Account |
| **Last Payment:** | 05/19/2005 | **Terms:** | $179 per month, paid Monthly for 60 months |
| | | **Date Opened:** | 04/09/2002 |
| | | **Date Closed:** | 05/30/2005 |

**Loan Type:** AUTOMOBILE
**Remarks:** CLOSED

**Late Payments** (36 months) 0 0 0 — **Last 36 months**

| apr | mar | feb | 05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 04 | dec | nov | oct | sep | aug | jul | jun | may |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| apr | mar | feb | 03 | dec | nov | oct | sep | aug | jul | jun | may |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

### WELLS FARGO #10624037626****

SUP RE SVC GRPMACN0008010
4143 121 ST ST
URBANDALE, IA 50323
(877) 401-5414

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 04/30/2009 | **Account Type:** | Revolving Account |
| **High Balance:** | $1,534 | **Responsibility:** | Joint Account |
| **Credit Limit:** | $1,500 | **Date Opened:** | 06/24/2003 |
| **Last Payment:** | 02/08/2008 | **Date Closed:** | 04/30/2009 |
| | | **Date Paid:** | 02/08/2008 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (48 months) 0 0 0 — **Last 48 months**

| mar | feb | 09 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 08 | dec | nov | oct | sep | aug | jul | jun | may | apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | X | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| mar | feb | 07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 06 | dec | nov | oct | sep | aug | jul | jun | may | apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | X | OK | OK | OK | OK | OK |

Exhibit 6

## WELLS FARGO #11202023554****

SUP RE SVC GRPMACN0008010
4143 121 ST ST
URBANDALE, IA 50323
(877) 401-5414

**Balance:** $0
**Date Updated:** 06/01/2003
**High Balance:** $1,000
**Credit Limit:** $1,000
**Last Payment:** 04/01/2003

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Joint Account
**Date Opened:** 12/01/2002
**Date Closed:** 06/01/2003

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (6 months)
0 0 0

**Last 6 months**
X OK OK OK OK OK
may apr mar feb 03 dec

## WFFNB/TIGER DIRECT #728013****

CSCL DSP TM MAC N8235-04M
PO BOX 14517
DES MOINES, IA 50306
(800) 231-5089

**Balance:** $0
**Date Updated:** 02/28/2009
**High Balance:** $1,600
**Credit Limit:** $3,500
**Last Payment:** 02/08/2008

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Participant on Account
**Date Opened:** 01/02/2005
**Date Closed:** 02/28/2009
**Date Paid:** 02/08/2008

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

## ZALE/CBNA #603525101674****

PO BOX 6497
SIOUX FALLS, SD 57117
(800) 586-6923

**Balance:** $0
**Date Updated:** 02/02/2005
**High Balance:** $667
**Credit Limit:** $5,000
**Last Payment:** 10/19/2004

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 11/06/1998
**Date Paid:** 10/19/2004

**Loan Type:** CHARGE ACCOUNT

**Late Payments** (36 months)
0 0 0

**Last 36 months**
OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
05 dec nov oct sep aug jul jun may apr mar feb 04 dec nov oct sep aug jul jun may apr mar feb
OK OK OK OK OK OK OK OK OK OK OK OK
03 dec nov oct sep aug jul jun may apr mar feb

Exhibit 6

## Promotional Inquiries

The companies listed below received your name, address and other limited information about you so they could make a firm offer of credit or insurance. They did not receive your full credit report. These inquiries are not seen by anyone but you and do not affect your score.

**HSBC BANK NV FKA HHLB**
POB 19360
PORTLAND, OR 97280
(800) 477-6000
**Requested On:** 02/22/2012, 11/18/2011, 09/09/2011

**ALLSTATE INSURANCE**
2775 SANDERS RD
NORTHBROOK, IL 60062
Phone number not available
**Requested On:** 06/15/2011

**METLIFE AUTO DIRECT/DRM**
211 QUAKER LN
WEST WARWICK, RI 02893
Phone number not available
**Requested On:** 05/15/2011, 09/15/2010

## Account Review Inquiries

The companies listed below obtained information from your consumer report for the purpose of an account review or other business transaction with you. These inquiries are not displayed to anyone but you and will not affect any creditor's decision or any credit score (except insurance companies may have access to other insurance company inquiries and users of a report for employment purposes may have access to other employment inquiries, where permitted by law).

**M M via KARMA/TRANSUNION INTERAC**
100 CROSS STREET
SAN LUIS OBISP, CA 93401
(805) 782-8282
**Requested On:** 09/04/2012, 09/04/2012, 09/04/2012, 09/04/2012, 09/02/2012, 09/02/2012, 09/02/2012, 09/02/2012, 09/01/2012
**Permissible Purpose:** CONSUMER REQUEST

**CHECK FREE**
6000 PERIMETER DR
DUBLIN, OH 43017
Phone number not available
**Requested On:** 07/10/2012

**-End of Credit Report-**

## Should you wish to contact TransUnion, you may do so,

**Online:**
To learn about dispute process, please click here.
For answers to general questions, please visit: www.transunion.com

**By Mail:**
TransUnion Consumer Relations
P.O. Box 2000
Chester, PA 19022-2000

**By Phone:**
(800) 916-8800
You may contact us between the hours of 8:00 a.m. and 11:00 p.m. Eastern Time, Monday through Friday, except major holidays.

For all correspondence, please have your TransUnion file number available (located at the top of this report).

## Consumer Rights

***Para informacion en espanol, visite www.ftc.gov/credit o escribe a la FTC Consumer Response Center, Room 130-A, 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.***

### A Summary of Your Rights Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA. **For more information, including information about additional rights, go to www.ftc.gov/credit, or write to Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave., N.W., Washington. D.C. 20580.**

**You must be told if information in your file has been used against you.**
Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment -- or to take another adverse action against you -- must tell you, and must give you the name, address, and phone number of the agency that provided the information.

**You have the right to know what is in your file.**
You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security Number. In many cases, the disclosure will be free. You are

Exhibit 6

entitled to a free file disclosure if:

- a person has taken adverse action against you because of information in your credit report;
- you are the victim of identity theft and place a fraud alert in your file;
- your file contains inaccurate information as a result of fraud;
- you are on public assistance;
- you are unemployed but expect to apply for employment within 60 days.

In addition, by September 2005 all consumers will be entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.ftc.gov/credit for more information.

**You have the right to ask for a credit score.**
Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.

**You have the right to dispute incomplete or inaccurate information.**
If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.ftc.gov/credit for an explanation of dispute procedures.

**Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.**
Inaccurate, incomplete, or unverifiable information must be removed or corrected, usually within 30 days. However, the consumer reporting agency is not required to remove accurate derogatory information from your file unless it is outdated (as described below) or cannot be verified. A consumer reporting agency may continue to report information it has verified as accurate.

**Consumer reporting agencies may not report outdated negative information.**
In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.

**Access to your file is limited.**
A consumer reporting agency may provide information about you only to people with a valid need -- usually to consider an application with a creditor, insurer, employer, landlord, or other business. The FCRA specifies those with a valid need for access.

**You must give your consent for reports to be provided to employers.**
A consumer reporting agency may not give out information about you to your employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.ftc.gov/credit.

**You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.**
Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt-out with the nationwide credit bureaus at 1-888-567-8688 (888-5OPTOUT).

**You may seek damages from violators.**
If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.

**Identity theft victims and active duty military personnel have additional rights.**
For more information, visit www.ftc.gov/credit.

**States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General. Federal enforcers are:**

| TYPE OF BUSINESS: | CONTACT: |
|---|---|
| Consumer reporting agencies, creditors and others not listed below. | Federal Trade Commission<br>Consumer Response Center - FCRA<br>Washington, DC 20580<br>1-877-382-4357 |
| National banks, federal branches/agencies of foreign banks (word "National" or initials "N.A." appear in or after bank's name) | Office of the Comptroller of the Currency<br>Compliance Management, Mail Stop 6-6<br>Washington, DC 20219<br>1-800-613-6743 |
| Federal Reserve System member banks (except national banks, and federal branches/agencies of foreign banks) | Federal Reserve Consumer Help<br>PO Box 1200<br>Minneapolis, MN 55480<br>1-888-851-1920<br>Website Address: www.federalreserveconsumerhelp.gov<br>Email Address: ConsumerHelp@FederalReserve.gov |
| Savings associations and federally chartered savings banks (word "Federal" or initials "F.S.B." appear in federal institution's name) | Office of Thrift Supervision<br>Consumer Complaints<br>Washington, DC 20552<br>1-800-842-6929 |
| Federal credit unions (words "Federal Credit Union" appear in institution's name) | National Credit Union Administration<br>1775 Duke Street<br>Alexandria, VA 22314<br>1-703-519-4600 |
| State-chartered banks that are not members of the Federal Reserve System | Federal Deposit Insurance Corporation<br>Consumer Response Center<br>2345 Grand Avenue, Suite 100<br>Kansas City, Missouri 64108-2638<br>1-877-275-3342 |
| Air, surface, or rail common carriers regulated by former Civil Aeronautics Board or Interstate Commerce Commission | Department of Transportation<br>Office of Financial Management<br>Washington, DC 20590<br>1-202-366-1306 |
| Activities subject to the Packers and Stockyards Act, 1921 | Department of Agriculture<br>Office of Deputy Administrator - GIPSA<br>Washington, DC 20250<br>1-202-720-7051 |

**Information Regarding State Laws**
**Colorado Residents**
If a CRA investigates the information in your report at your request, you will receive an updated credit report, and another copy of this notice, to indicate that the investigation is completed. The results of the investigation will be shown in that report. In addition to all the other rights listed, you may bring an action to enforce any obligation imposed on the CRA under Colorado Law in any court of competent jurisdiction or submitted to binding arbitration, after you have followed all dispute procedures in the Colorado law and have received this notice, in the manner set forth in the rules of the American Arbitration Association to determine whether the CRA has met its obligations under law. No decision of an arbitrator pursuant to this provision shall affect the validity of any obligation or debt. A successful party to any such arbitration shall be compensated for the costs and attorney fees of the proceeding as determined by the court or arbitration. No consumer may submit more than one action to arbitration against any consumer reporting agency during any 120 day period. The results of any arbitration action brought against a consumer reporting agency doing business in this state shall be communicated in a timely manner to all other consumer reporting agencies doing business in this state. If, as a result of an arbitration a determination is made in favor of the consumer, any adverse information in such consumer's file or record shall be removed or stricken in a timely manner, or the consumer may bring an action against the non-complying agency pursuant to this section, in spite of the 120 day waiting period. In addition to the rights discussed above, you also have a right to receive a credit score developed by the consumer reporting agency.

State Consumers Have the Right to Obtain a Security Freeze

Exhibit 6

Effective July 1, 2006 you may obtain a security freeze on your consumer report to protect your privacy and ensure that credit is not granted in your name without your knowledge, except as provided by law. You have a right to place a security freeze on your consumer report to prohibit a consumer reporting agency from releasing any information in your consumer report without your express authorization or approval, except as the law allows.

You will not be initially charged a fee to place a security freeze on your consumer report. However, you will be charged a fee of no more than ten dollars to temporarily lift the freeze for a period of time, to permanently remove the freeze from your consumer report, or when you make a subsequent request for a freeze to be placed on your consumer report. As well, you may be charged a fee of no more than twelve dollars to temporarily lift the freeze for a specific party.

The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. When you place a security freeze on your consumer report, you will be provided procedures for the temporary release of your consumer report to a specific party or parties or for a period of time after the security freeze is in place. To provide that authorization, you must contact the consumer reporting agency and provide the proper information regarding the third party or parties who are to receive the consumer report or the period of time for which the report shall be available to users of the consumer report.

A consumer reporting agency that receives a request from a consumer to temporarily lift a security freeze on a consumer report shall comply with the request no later than three business days after receiving the request.

A security freeze does not apply to circumstances where you have an existing account relationship, and a copy of your report is requested by your existing creditor or its agents or affiliates for certain types of account review, collection, fraud control, or similar activities.

You should be aware that using a security freeze to take control over who gains access to the personal and financial information in your consumer report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding new loans, credit, mortgage, insurance, government services or payments, rental housing, employment, investment, license, cellular phone, utilities, digital signature, internet credit card transactions, or other services, including an extension of credit at the point of sale. You should plan ahead and lift a security freeze either completely if you are shopping around, or specifically for a certain creditor a few days before actually applying for new credit.

You have the right to bring a civil action or submit to binding arbitration against a consumer reporting agency to enforce an obligation under the security freeze law after following specified dispute procedures and having received the necessary notice.

Exhibit 6

**-Begin Credit Report-**

Personal Information

**File Number:** 325446264

**Name:** JAMILEH S. MILLER

You have been on our files since 10/01/1999

**SSN:** XXX-XX-8678
**Date of Birth:** 02/11/1975
**Telephone:** 325-3981
Your SSN is partially abbreviated for your protection.

## CURRENT ADDRESS

**Address:** 16225 HY 50
ROCKY FORD, CO 81067

## OTHER ADDRESSES

**Address:** 16255 HWY 50
ROCKY FORD, CO 81067

**Reported:** 11/30/2006

**Address:** 16255 US HIGHWAY 50
ROCKY FORD, CO 81067

## EMPLOYMENT DATA REPORTED

**Employer Name:** COLORADO DEPT OF PUBLIC HEALT
**Position:** WHITE COLLAR
**Date Verified:** 02/11/2008

**Employer Name:** ILLUSION STUDIO
**Date Verified:** 02/04/2008

Special Notes: The display of your Social Security number has been abbreviated and your account numbers have been modified in this report for your protection. You may request disclosure of your full Social Security number by writing to us at the address found at the end of this report. Also, if any item on your credit report begins with 'MEDICAL-', it includes medical information and the data following 'MEDICAL-' is not displayed to anyone but you except where permitted by law.

Exhibit 6

## Public Records

The following items obtained from public records appear on your report. You may be required to explain public record items to potential creditors. Any bankruptcy information will remain on your report for 10 years from the date of the filing. Most other public record information, including discharged chapter 13 bankruptcy, remains for up to 7 years. The amount listed on the public record is not a balance. The amount reflects the original amount of the public record item.

### COLORADO FEDERAL COURT - Docket# 1025453

721 19TH STREET
US CUSTOM HOUSE RO
DENVER, CO 80202
(720) 904-7300

**Type:** CHAPTER 13 BANKRUPTCY FILING

**Court Type:** Federal District

**Date Filed:** 06/22/2010

**Responsibility:** Contractually Liable Debt

**Plaintiff Attorney:** PRO SE

**Liabilities:** $0

**Assets:** $0

**Estimated month and year that this item will be removed:** 05/2020

Exhibit 6

Adjustable Rate Mortgage Information

The following information concerning adjustable rate mortgages was obtained from public records and appears on your report. The information was obtained from the Recorder's Office in the jurisdiction and State specified below. None of these items contain adverse information; they are simply a listing of the information filed in the Recorder's Office concerning your adjustable rate mortgage.

## PUBLIC RECORD MORTAGAGE DETAILS

| Recorder's Office: | | | | |
|---|---|---|---|---|
| ARAPAHOE, CO | Origination Date: | 04/2006 | Loan Amount: | $216,236 |
| | Initial Rate Adjustment: | 05/2016 | Initial Interest Rate: | 6.625% |
| | Next Rate Change Date: | 05/2016 | Rate Calculation Change: | 2.75% |
| | Rate Change Frequency: | Monthly | Change Percent Limit: | 2.0% |
| | Rate Change Interval: | 12 | First Rate Change Cap: | 11.625% |
| | Index Type: | libor | Maximum Rate: | 11.625% |
| | Look Back Period (days): | 45 | Combined Loan to Value: | 91.70% |
| | | | Interest Only: | Yes |

Exhibit 6

The key to the right helps explain the payment history information contained in some of the accounts below. Not all accounts will contain payment history information, but some creditors report how you make payments each month in relation to your agreement with them.

| NA | X | OK | 30 | 60 | 90 | 120 |
|---|---|---|---|---|---|---|
| Not Applicable | Unknown | Current | 30 days late | 60 days late | 90 days late | 120 days late |

The following accounts contain information which some creditors may consider to be adverse. Adverse account information may generally be reported for 7 years from the date of the first delinquency, depending on your state of residence. The adverse information in these accounts has been printed in >brackets< or is shaded for your convenience, to help you understand your report. They are not bracketed or shaded this way for creditors.

**BANK OF AMERICA #431351499083****

P O BOX 982238
EL PASO, TX 79998
(800) 421-2110

**Balance:** $0
**Date Updated:** 07/21/2009
**High Balance:** $7,743
**Credit Limit:** $8,000
**Last Payment:** 01/28/2008

**Pay Status:** >Charged Off<
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 07/05/2000
**Date Closed:** 09/30/2008
**Date Paid:** 01/28/2008

**Loan Type:** CREDIT CARD
**Remarks:** ACCOUNT CLOSED BY CONSUMER
**Estimated month and year that this item will be removed:** 03/2015

**BANK OF AMERICA #488893799538****

P O BOX 982238
EL PASO, TX 79998
(800) 421-2110

**Balance:** $0
**Date Updated:** 07/21/2009
**High Balance:** $11,778
**Credit Limit:** $9,200
**Last Payment:** 01/23/2008

**Pay Status:** >Charged Off<
**Account Type:** Revolving Account
**Responsibility:** Authorized Account
**Date Opened:** 02/16/2000
**Date Closed:** 09/30/2008
**Date Paid:** 01/23/2008

**Loan Type:** CREDIT CARD
**Remarks:** PURCHASED BY ANOTHER LENDER
**Estimated month and year that this item will be removed:** 03/2015

**CAPITAL ONE BANK USA NA #430572174081****

PO BOX 30281
SALT LAKE CITY, UT 84130
(800) 258-9319

**Balance:** $0
**Date Updated:** 08/05/2012
**High Balance:** $10,603
**Credit Limit:** $10,000
**Last Payment:** 01/25/2008

**Pay Status:** >Account Included in Ch 13 Bankruptcy<
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 06/22/2000
**Date Closed:** 07/06/2008

**Loan Type:** CREDIT CARD
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 07/2014

**CITIMORTGAGE INC #77094****

PO BOX 6243
SIOUX FALLS, SD 57117
(800) 283-7918

**Balance:** $0
**Date Updated:** 11/28/2009
**High Balance:** $54,060
**Last Payment:** 04/07/2009

**Pay Status:** >Charged Off<
**Account Type:** Mortgage Account
**Responsibility:** Joint Account
**Terms:** $449 per month, paid Monthly for 180 months
**Date Opened:** 04/20/2006
**Date Closed:** 11/28/2009

**Loan Type:** SECOND MORTGAGE
**Remarks:** CONTACT SUBSCRIBER
**Estimated month and year that this item will be removed:** 04/2016

Exhibit 6

## DISCOVER FINCL SVC LLC #601100993065****

PO BOX 15316
WILMINGTON, DE 19850
(800) 347-2683

**Balance:** $0
**Date Updated:** 07/22/2010
**High Balance:** $7,422
**Credit Limit:** $5,750
**Last Payment:** 01/07/2008

**Pay Status:** >Account Included in Ch 13 Bankruptcy<
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 04/18/2001
**Date Closed:** 07/31/2008
**Date Paid:** 01/07/2008

**Loan Type:** CREDIT CARD
**Remarks:** >CH 13 BKRPT/ACCT IN DISPUTE<
**Estimated month and year that this item will be removed:** 06/2014

## HSBC BANK #545800451321****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

**Balance:** $6,872
**Date Updated:** 08/31/2008
**High Balance:** $6,872
**Credit Limit:** $6,000
**Past Due:** >$1,579<
**Last Payment:** 01/07/2008

**Pay Status:** >Charged Off<
**Account Type:** Revolving Account
**Responsibility:** Authorized Account
**Date Opened:** 03/29/2000
**Date Closed:** 04/17/2008

**Loan Type:** CREDIT CARD
**Remarks:** >UNPAID BALANCE CHARGED OFF<
**Estimated month and year that this item will be removed:** 01/2015

## HSBC BEST BUY #702127130734****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

**Balance:** $0
**Date Updated:** 07/10/2010
**High Balance:** $1,856
**Credit Limit:** $100
**Last Payment:** 09/05/2008

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Authorized Account
**Date Opened:** 09/24/2005
**Date Paid:** 09/05/2008

**Loan Type:** CHARGE ACCOUNT

**Late Payments** (48 months)

| | | |
|---|---|---|
| 1 | 0 | 0 |

**Last 48 months**

| jun | may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug | jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| jun | may | apr | mar | feb | 08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 07 | dec | nov | oct | sep | aug | jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## ONEWEST BANK #668100750****

6900 BEATRICE DR
KALAMAZOO, MI 49009
(800) 781-7399

**Balance:** $0
**Date Updated:** 08/06/2012
**High Balance:** $216,236
**Last Payment:** 04/07/2009

**Pay Status:** >Account Included in Ch 13 Bankruptcy<
**Account Type:** Mortgage Account
**Responsibility:** Joint Account
**Terms:** $1440 per month, paid Monthly for 360 months
**Date Opened:** 04/20/2006

**Loan Type:** CONVENTIONAL REAL ESTATE MTG
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 03/2016

Exhibit 6

**US BANK #10367397******

MAIL LOCATION CN-WN-15
425 WALNUT ST
CINCINNATI, OH 45202
(800) 331-4738

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | >Account Included in Ch 13 Bankruptcy< |
| **Date Updated:** | 08/05/2012 | **Account Type:** | Line of Credit Account |
| **High Balance:** | $1,357 | **Responsibility:** | Individual Account |
| **Credit Limit:** | $2,500 | **Terms:** | $386 per month |
| **Last Payment:** | 04/28/2008 | **Date Opened:** | 05/21/2004 |
| | | **Date Closed:** | 11/28/2008 |

**Loan Type:** LINE OF CREDIT
**Remarks:** >CHAPTER 13 BANKRUPTCY<
**Estimated month and year that this item will be removed:** 04/2015

**US BANK #10367186******

MAIL LOCATION CN-WN-15
425 WALNUT ST
CINCINNATI, OH 45202
(800) 331-4738

| | | | |
|---|---|---|---|
| **Balance:** | $2,366 | **Pay Status:** | >Charged Off< |
| **Date Updated:** | 10/03/2010 | **Account Type:** | Line of Credit Account |
| **High Balance:** | $1,476 | **Responsibility:** | Co-Signor on Account |
| **Credit Limit:** | $1,500 | **Date Opened:** | 05/07/2001 |
| **Last Payment:** | 06/03/2008 | **Date Closed:** | 01/30/2009 |

**Loan Type:** LINE OF CREDIT
**Remarks:** >UNPAID BALANCE CHARGED OFF<
**Estimated month and year that this item will be removed:** 05/2015

**US BANK RMS CC #419008087975******

205 W 4TH ST
CINCINNATI, OH 45202
(866) 234-4750

| | | | |
|---|---|---|---|
| **Balance:** | $12,537 | **Pay Status:** | >Charged Off< |
| **Date Updated:** | 06/07/2009 | **Account Type:** | Revolving Account |
| **High Balance:** | $11,821 | **Responsibility:** | Co-Signor on Account |
| **Credit Limit:** | $10,000 | **Date Opened:** | 04/01/2002 |
| **Last Payment:** | 09/15/2008 | **Date Closed:** | 02/01/2009 |

**Loan Type:** LINE OF CREDIT
**Remarks:** TRANSFERRED TO ANOTHER LENDER
**Estimated month and year that this item will be removed:** 07/2015

**A1 COLLECTIONS LLC #1H9****

PO BOX 1929
GRAND JCT, CO 81502
(800) 437-2831

| | | | |
|---|---|---|---|
| **Balance:** | $760 | **Pay Status:** | >In Collection< |
| **Date Updated:** | 07/06/2012 | **Account Type:** | Open Account |
| **Original Amount:** | $710 | **Responsibility:** | Individual Account |
| **Original Creditor:** | MEDICAL-VALLEY VIEW HOSPITAL (Medical/Health Care) | | |

**Loan Type:** COLLECTION AGENCY/ATTORNEY
**Date Placed for Collection:** 12/05/2011
**Remarks:** >PLACED FOR COLLECTION<
**Estimated month and year that this item will be removed:** 06/2018

**NCO FINANCIAL #4291******

POB 15537
WILMINGTON, DE 19850
(888) 853-6950

| | | | |
|---|---|---|---|
| **Balance:** | $50 | **Pay Status:** | >In Collection< |
| **Date Updated:** | 05/17/2012 | **Account Type:** | Open Account |
| **Original Amount:** | $59 | **Responsibility:** | Individual Account |
| **Original Creditor:** | MEDICAL-PEDIATRIX MEDICAL GROUP MOUN (Medical/Health Care) | | |
| **Past Due:** | >$50< | | |
| **Last Payment:** | 05/10/2012 | | |

**Loan Type:** COLLECTION AGENCY/ATTORNEY
**Date Placed for Collection:** 04/13/2011
**Remarks:** >PLACED FOR COLLECTION<
**Estimated month and year that this item will be removed:** 09/2017

**NCO FINANCIAL #4291******

POB 15537
WILMINGTON, DE 19850
(888) 853-6950

| | | | |
|---|---|---|---|
| **Balance:** | $25 | **Pay Status:** | >In Collection< |
| **Date Updated:** | 04/19/2012 | **Account Type:** | Open Account |
| **Original Amount:** | $301 | **Responsibility:** | Individual Account |
| **Original Creditor:** | MEDICAL-PEDIATRIX MEDICAL GROUP MOUN (Medical/Health Care) | | |
| **Past Due:** | >$25< | | |
| **Last Payment:** | 04/12/2012 | | |

**Loan Type:** COLLECTION AGENCY/ATTORNEY
**Date Placed for Collection:** 04/13/2011
**Remarks:** >PLACED FOR COLLECTION<
**Estimated month and year that this item will be removed:** 07/2017

Exhibit 6

## Satisfactory Accounts

The following accounts are reported with no adverse information.

### CHASE BANK USA NA #549104345009****

PO BOX 15298
WILMINGTON, DE 19850
(800) 955-9900

**Balance:** $0
**Date Updated:** 12/05/2005
**High Balance:** $6,015
**Credit Limit:** $6,000
**Last Payment:** 06/19/2005

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Authorized Account
**Date Opened:** 08/17/2000
**Date Closed:** 06/17/2004
**Date Paid:** 06/19/2005

**Loan Type:** CREDIT CARD
**Remarks:** ACCOUNT CLOSED BY CONSUMER

**Late Payments** (48 months)
0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '04 | dec |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '03 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '02 | dec |

### CHASE/BANK ONE CARD SERV #426685104319****

PO BOX 15298
WILMINGTON, DE 19850
(800) 945-2006

**Balance:** $0
**Date Updated:** 01/13/2008
**High Balance:** $217
**Credit Limit:** $250
**Last Payment:** 06/22/2006

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 02/16/2003
**Date Closed:** 10/30/2007
**Date Paid:** 06/22/2006

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '06 |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '04 |

### CITICARDS CBNA #541931093310****

PO BOX 6497
SIOUX FALLS, SD 57117
(800) 950-5114

**Balance:** $0
**Date Updated:** 09/23/2008
**Credit Limit:** $300
**Last Payment:** 08/14/2006

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 06/27/2000
**Date Closed:** 08/17/2008
**Date Paid:** 08/14/2006

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| aug | jul | jun | may | apr | mar | feb | '08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '07 | dec | nov | oct | sep |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| aug | jul | jun | may | apr | mar | feb | '06 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '05 | dec | nov | oct | sep |

### FIRST NATIONAL BANK #5051****

535 BENT AVE
POB 270
LAS ANIMAS, CO 81054
(719) 456-1512

**Balance:** $9,905
**Date Updated:** 07/26/2012
**High Balance:** $16,415
**Last Payment:** 07/10/2012

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Mortgage Account
**Responsibility:** Joint Account
**Terms:** $101 per month, paid Monthly for 120 months
**Date Opened:** 07/15/2002

**Loan Type:** REAL ESTATE-JUNIOR LIENS

**Late Payments** (48 months)
0 0 0

**Last 48 months**

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| jun | may | apr | mar | feb | 12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 11 | dec | nov | oct | sep | aug | jul |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| jun | may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug | jul |

Exhibit 6

## GECRB/JC PENNEY #600889585765****

PO BOX 965001
ORLANDO, FL 32896
(800) 542-0800

**Balance:** $0
**Date Updated:** 08/19/2012
**High Balance:** $92
**Credit Limit:** $124
**Last Payment:** 01/01/2000

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Joint Account
**Date Opened:** 12/04/1999
**Date Closed:** 06/24/2010

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

## GECRB/MERVYN'S #604589113866****

PO BOX 965005
ORLANDO, FL 32896
(800) 480-5014

**Balance:** $0
**Date Updated:** 08/17/2012
**High Balance:** $0
**Credit Limit:** $200
**Last Payment:** 06/06/2003

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 04/16/2003
**Date Closed:** 10/23/2008
**Date Paid:** 06/06/2003

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

## GECRB/MERVYN'S #604589306004****

PO BOX 965005
ORLANDO, FL 32896
(800) 480-5014

**Balance:** $0
**Date Updated:** 08/02/2012
**High Balance:** $73
**Credit Limit:** $200
**Last Payment:** 05/19/2005

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Individual Account
**Date Opened:** 04/11/2005
**Date Closed:** 10/23/2008
**Date Paid:** 05/19/2005

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)
0 0 0

**Last 48 months**

## HSBC FURNITURE ROW #59360110484****

PO BOX 5253
CAROL STREAM, IL 60197
(800) 695-6950

**Balance:** $0
**Date Updated:** 06/24/2010
**High Balance:** $3,342
**Credit Limit:** $4,500
**Last Payment:** 05/09/2007

**Pay Status:** Current; Paid or Paying as Agreed
**Account Type:** Revolving Account
**Responsibility:** Joint Account
**Date Opened:** 04/20/2006
**Date Closed:** 12/16/2008
**Date Paid:** 05/09/2007

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (48 months)
0 0 0

**Last 48 months**

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
may apr mar feb 10 dec nov oct sep aug jul jun may apr mar feb 09 dec nov oct sep aug jul jun
OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
may apr mar feb 08 dec nov oct sep aug jul jun may apr mar feb 07 dec nov oct sep aug jul jun

Exhibit 6

## SEARS/CBNA #512107974726****

PO BOX 6282
SIOUX FALLS, SD 57117
(800) 917-7700

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/21/2012 | | |
| **High Balance:** | $1,455 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $1,456 | **Responsibility:** | Authorized Account |
| **Last Payment:** | 12/05/2007 | **Date Opened:** | 04/08/2006 |
| | | **Date Closed:** | 09/02/2008 |

**Loan Type:** CREDIT CARD
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| jul | jun | may | apr | mar | feb | 12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 11 | dec | nov | oct | sep | aug |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| jul | jun | may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## SEARS/CBNA #504994100772****

PO BOX 6282
SIOUX FALLS, SD 57117
(800) 917-7700

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 07/31/2012 | | |
| **High Balance:** | $1,913 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $250 | **Responsibility:** | Authorized Account |
| **Last Payment:** | 12/05/2007 | **Date Opened:** | 04/08/2006 |
| | | **Date Closed:** | 09/22/2008 |
| | | **Date Paid:** | 12/05/2007 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| jun | may | apr | mar | feb | 12 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 11 | dec | nov | oct | sep | aug | jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| jun | may | apr | mar | feb | 10 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 09 | dec | nov | oct | sep | aug | jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## THE HOME DEPOT/CBNA #603532006519****

PO BOX 6497
SIOUX FALLS, SD 57117
(800) 677-0232

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 08/01/2003 | | |
| **High Balance:** | $0 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $200 | **Responsibility:** | Individual Account |
| | | **Date Opened:** | 02/01/2002 |

**Loan Type:** CHARGE ACCOUNT

**Late Payments** (11 months)

0 0 0

**Last 11 months**

| jul | jun | may | apr | mar | feb | 03 | dec | nov | oct | sep |
|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

## US BANK #51005****

425 WALNUT ST
CINCINNATI, OH 45202
(800) 879-1397

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 05/30/2005 | | |
| **High Balance:** | $9,050 | **Account Type:** | Installment Account |
| **Last Payment:** | 05/19/2005 | **Responsibility:** | Joint Account |
| | | **Terms:** | $179 per month, paid Monthly for 60 months |
| | | **Date Opened:** | 04/09/2002 |
| | | **Date Closed:** | 05/30/2005 |

**Loan Type:** AUTOMOBILE
**Remarks:** CLOSED

**Late Payments** (38 months)

0 0 0

**Last 38 months**

| apr | mar | feb | 05 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 04 | dec | nov | oct | sep | aug | jul | jun | may |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| apr | mar | feb | 03 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

Exhibit 6

**WELLS FARGO #10624037626******

SUP RE SVC GRPMACN0008010
4143 121 ST ST
URBANDALE, IA 50323
(877) 401-5414

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 04/30/2009 | | |
| **High Balance:** | $1,534 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $1,500 | **Responsibility:** | Joint Account |
| **Last Payment:** | 02/08/2008 | **Date Opened:** | 06/24/2003 |
| | | **Date Closed:** | 04/30/2009 |
| | | **Date Paid:** | 02/08/2008 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| mar | feb | '09 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '08 | dec | nov | oct | sep | aug | jul | jun | may | apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | X | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| mar | feb | '07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '06 | dec | nov | oct | sep | aug | jul | jun | may | apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | X | OK | OK | OK | OK | OK |

**WELLS FARGO #11202023554******

SUP RE SVC GRPMACN0008010
4143 121 ST ST
URBANDALE, IA 50323
(877) 401-5414

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 06/01/2003 | | |
| **High Balance:** | $1,000 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $1,000 | **Responsibility:** | Joint Account |
| **Last Payment:** | 04/01/2003 | **Date Opened:** | 12/01/2002 |
| | | **Date Closed:** | 06/01/2003 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED

**Late Payments** (6 months)

0 0 0

**Last 6 months**

| may | apr | mar | feb | 03 | dec |
|---|---|---|---|---|---|
| X | OK | OK | OK | OK | OK |

**WFFNB/TIGER DIRECT #728013******

CSCL DSP TM MAC N8235-04M
PO BOX 14517
DES MOINES, IA 50306
(800) 231-5089

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | Current; Paid or Paying as Agreed |
| **Date Updated:** | 02/28/2009 | | |
| **High Balance:** | $1,600 | **Account Type:** | Revolving Account |
| **Credit Limit:** | $3,500 | **Responsibility:** | Participant on Account |
| **Last Payment:** | 02/08/2008 | **Date Opened:** | 01/02/2005 |
| | | **Date Closed:** | 02/28/2009 |
| | | **Date Paid:** | 02/08/2008 |

**Loan Type:** CHARGE ACCOUNT
**Remarks:** CLOSED BY CREDIT GRANTOR

**Late Payments** (48 months)

0 0 0

**Last 48 months**

| '09 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '08 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X | X | X | X | X | X | X | X | X | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | X | OK |

| '07 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '06 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | X | X | OK | OK | OK | OK | OK | OK | OK | OK | OK |

Exhibit 6

The following companies have received your credit report. Their inquiries remain on your credit report for two years.

**PROFESSIONAL FINANCE via PROFESSIONAL FINANCE COM**
5754 W 11TH ST #10
GREELEY, CO 80634
(970) 352-5000
**Requested On:** 04/05/2012
**InquiryType:** Individual
**Permissible Purpose:** COLLECTION

The companies listed below received your name, address and other limited information about you so they could make a firm offer of credit or insurance. They did not receive your full credit report. These inquiries are not seen by anyone but you and do not affect your score.

**HSBC BANK NV FKA HHLB**
POB 19360
PORTLAND, OR 97280
(800) 477-6000
**Requested On:** 02/22/2012, 10/17/2011, 09/09/2011, 08/12/2011, 07/18/2011, 06/15/2011

The companies listed below obtained information from your consumer report for the purpose of an account review or other business transaction with you. These inquiries are not displayed to anyone but you and will not affect any creditor's decision or any credit score (except insurance companies may have access to other insurance company inquiries and users of a report for employment purposes may have access to other employment inquiries, where permitted by law).

**J M via KARMA/TRANSUNION INTERAC**
100 CROSS STREET
SAN LUIS OBISP, CA 93401
(805) 782-8282
**Requested On:** 09/04/2012, 09/04/2012, 09/04/2012, 09/04/2012, 09/02/2012, 09/02/2012, 09/02/2012, 09/02/2012
**Permissible Purpose:** CONSUMER REQUEST

**PROFESSIONAL FINANCE via PROFESSIONAL FINANCE COM**
5754 W 11TH ST #10
GREELEY, CO 80634
(970) 352-5000
**Requested On:** 01/12/2012, 01/10/2012
**Permissible Purpose:** COLLECTION

**PARKER ADV HOSPITAL-TPFS**
PO BOX #1923
DEPT 1923
DENVER, CO 80271
Phone number not available
**Requested On:** 05/29/2012

**NCO FINANCIAL SYSTEMS**
507 PRUDENTIAL RD
HORSHAM, PA 19044
Phone number not available
**Requested On:** 04/13/2011

**-End of Credit Report-**

## Should you wish to contact TransUnion, you may do so,

**Online:**
For answers to general questions, please visit:

**By Mail:**
TransUnion Consumer Relations
P.O. Box 2000
Chester, PA 19022-2000

**By Phone:**
(800) 916-8800
You may contact us between the hours of 8:00 a.m. and 11:00 p.m. Eastern Time, Monday through Friday, except major holidays.

For all correspondence, please have your TransUnion file number available (located at the top of this report).

Exhibit 6

***Para informacion en espanol, visite www.ftc.gov/credit o escribe a la FTC Consumer Response Center, Room 130-A, 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.***

## A Summary of Your Rights Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA. **For more information, including information about additional rights, go to www.ftc.gov/credit, or write to Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave., N.W., Washington. D.C. 20580.**

**You must be told if information in your file has been used against you.**
Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment -- or to take another adverse action against you -- must tell you, and must give you the name, address, and phone number of the agency that provided the information.

**You have the right to know what is in your file.**
You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security Number. In many cases, the disclosure will be free. You are entitled to a free file disclosure if:

- a person has taken adverse action against you because of information in your credit report;
- you are the victim of identity theft and place a fraud alert in your file;
- your file contains inaccurate information as a result of fraud;
- you are on public assistance;
- you are unemployed but expect to apply for employment within 60 days.

In addition, by September 2005 all consumers will be entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.ftc.gov/credit for more information.

**You have the right to ask for a credit score.**
Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.

**You have the right to dispute incomplete or inaccurate information.**
If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.ftc.gov/credit for an explanation of dispute procedures.

**Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.**
Inaccurate, incomplete, or unverifiable information must be removed or corrected, usually within 30 days. However, the consumer reporting agency is not required to remove accurate derogatory information from your file unless it is outdated (as described below) or cannot be verified. A consumer reporting agency may continue to report information it has verified as accurate.

**Consumer reporting agencies may not report outdated negative information.**
In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.

**Access to your file is limited.**
A consumer reporting agency may provide information about you only to people with a valid need -- usually to consider an application with a creditor, insurer, employer, landlord, or other business. The FCRA specifies those with a valid need for access.

**You must give your consent for reports to be provided to employers.**
A consumer reporting agency may not give out information about you to your employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.ftc.gov/credit.

**You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.**
Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt-out with the nationwide credit bureaus at 1-888-567-8688 (888-5OPTOUT).

**You may seek damages from violators.**
If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.

**Identity theft victims and active duty military personnel have additional rights.**
For more information, visit www.ftc.gov/credit.

**States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General. Federal enforcers are:**

| TYPE OF BUSINESS: | CONTACT: |
|---|---|
| Consumer reporting agencies, creditors and others not listed below. | Federal Trade Commission<br>Consumer Response Center - FCRA<br>Washington, DC 20580<br>1-877-382-4357 |
| National banks, federal branches/agencies of foreign banks (word "National" or initials "N.A." appear in or after bank's name) | Office of the Comptroller of the Currency<br>Compliance Management, Mail Stop 6-6<br>Washington, DC 20219<br>1-800-613-6743 |
| Federal Reserve System member banks (except national banks, and federal branches/agencies of foreign banks) | Federal Reserve Consumer Help<br>PO Box 1200<br>Minneapolis, MN 55480<br>1-888-851-1920<br>Website Address: www.federalreserveconsumerhelp.gov<br>Email Address: ConsumerHelp@FederalReserve.gov |
| Savings associations and federally chartered savings banks (word "Federal" or initials "F.S.B." appear in federal institution's name) | Office of Thrift Supervision<br>Consumer Complaints<br>Washington, DC 20552<br>1-800-842-6929 |
| Federal credit unions (words "Federal Credit Union" appear in institution's name) | National Credit Union Administration<br>1775 Duke Street<br>Alexandria, VA 22314<br>1-703-519-4600 |
| State-chartered banks that are not members of the Federal Reserve System | Federal Deposit Insurance Corporation<br>Consumer Response Center<br>2345 Grand Avenue, Suite 100<br>Kansas City, Missouri 64108-2638<br>1-877-275-3342 |
| Air, surface, or rail common carriers regulated by former Civil Aeronautics Board or Interstate Commerce Commission | Department of Transportation<br>Office of Financial Management<br>Washington, DC 20590<br>1-202-366-1306 |

Exhibit 6

| Activities subject to the Packers and Stockyards Act, 1921 | Department of Agriculture<br>Office of Deputy Administrator - GIPSA<br>Washington, DC 20250<br>1-202-720-7051 |
|---|---|

**Information Regarding State Laws**
**Colorado Residents**

If a CRA investigates the information in your report at your request, you will receive an updated credit report, and another copy of this notice, to indicate that the investigation is completed. The results of the investigation will be shown in that report. In addition to all the other rights listed, you may bring an action to enforce any obligation imposed on the CRA under Colorado Law in any court of competent jurisdiction or submitted to binding arbitration, after you have followed all dispute procedures in the Colorado law and have received this notice, in the manner set forth in the rules of the American Arbitration Association to determine whether the CRA has met its obligations under law. No decision of an arbitrator pursuant to this provision shall affect the validity of any obligation or debt. A successful party to any such arbitration shall be compensated for the costs and attorney fees of the proceeding as determined by the court or arbitration. No consumer may submit more than one action to arbitration against any consumer reporting agency during any 120 day period. The results of any arbitration action brought against a consumer reporting agency doing business in this state shall be communicated in a timely manner to all other consumer reporting agencies doing business in this state. If, as a result of an arbitration a determination is made in favor of the consumer, any adverse information in such consumer's file or record shall be removed or stricken in a timely manner, or the consumer may bring an action against the non-complying agency pursuant to this section, in spite of the 120 day waiting period. In addition to the rights discussed above, you also have a right to receive a credit score developed by the consumer reporting agency.

State Consumers Have the Right to Obtain a Security Freeze

Effective July 1, 2006 you may obtain a security freeze on your consumer report to protect your privacy and ensure that credit is not granted in your name without your knowledge, except as provided by law. You have a right to place a security freeze on your consumer report to prohibit a consumer reporting agency from releasing any information in your consumer report without your express authorization or approval, except as the law allows.

You will not be initially charged a fee to place a security freeze on your consumer report. However, you will be charged a fee of no more than ten dollars to temporarily lift the freeze for a period of time, to permanently remove the freeze from your consumer report, or when you make a subsequent request for a freeze to be placed on your consumer report. As well, you may be charged a fee of no more than twelve dollars to temporarily lift the freeze for a specific party.

The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. When you place a security freeze on your consumer report, you will be provided procedures for the temporary release of your consumer report to a specific party or parties or for a period of time after the security freeze is in place. To provide that authorization, you must contact the consumer reporting agency and provide the proper information regarding the third party or parties who are to receive the consumer report or the period of time for which the report shall be available to users of the consumer report.

A consumer reporting agency that receives a request from a consumer to temporarily lift a security freeze on a consumer report shall comply with the request no later than three business days after receiving the request.

A security freeze does not apply to circumstances where you have an existing account relationship, and a copy of your report is requested by your existing creditor or its agents or affiliates for certain types of account review, collection, fraud control, or similar activities.

You should be aware that using a security freeze to take control over who gains access to the personal and financial information in your consumer report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding new loans, credit, mortgage, insurance, government services or payments, rental housing, employment, investment, license, cellular phone, utilities, digital signature, internet credit card transactions, or other services, including an extension of credit at the point of sale. You should plan ahead and lift a security freeze either completely if you are shopping around, or specifically for a certain creditor a few days before actually applying for new credit.

You have the right to bring a civil action or submit to binding arbitration against a consumer reporting agency to enforce an obligation under the security freeze law after following specified dispute procedures and having received the necessary notice.

Case 1:07-cv-02282-CAB Document 11 Filed 10/31/2007 Page 1 of 6
Exhibit 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **IN RE FORECLOSURE CASES** | ) | **CASE NO. NO.1:07CV2282** |
| | ) | **07CV2532** |
| | ) | **07CV2560** |
| | ) | **07CV2602** |
| | ) | **07CV2631** |
| | ) | **07CV2638** |
| | ) | **07CV2681** |
| | ) | **07CV2695** |
| | ) | **07CV2920** |
| | ) | **07CV2930** |
| | ) | **07CV2949** |
| | ) | **07CV2950** |
| | ) | **07CV3000** |
| | ) | **07CV3029** |
| | ) | |
| | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| | ) | |
| | ) | |
| | ) | **OPINION AND ORDER** |
| | ) | |
| | ) | |

**CHRISTOPHER A. BOYKO, J.**:

On October 10, 2007, this Court issued an Order requiring Plaintiff-Lenders in a number of pending foreclosure cases to file a copy of the executed Assignment demonstrating Plaintiff was the holder and owner of the Note and Mortgage ***as of the date the Complaint was filed***, or the Court would enter a dismissal. After considering the submissions, along with all the documents filed of record, the Court dismisses the captioned cases without prejudice. The Court has reached today's determination after a thorough review of all the relevant law and the briefs and arguments recently presented by the parties, including oral

arguments heard on Plaintiff Deutsche Bank's Motion for Reconsideration. The decision, therefore, is applicable from this date forward, and shall not have retroactive effect.

## LAW AND ANALYSIS

A party seeking to bring a case into federal court on grounds of diversity carries the burden of establishing diversity jurisdiction. *Coyne v. American Tobacco Company*, 183 F. 3d 488 (6th Cir. 1999). Further, the plaintiff "bears the burden of demonstrating standing and must plead its components with specificity." *Coyne*, 183 F. 3d at 494; *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982). The minimum constitutional requirements for standing are: proof of injury in fact, causation, and redressability. *Valley Forge*, 454 U.S. at 472. In addition, "the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Coyne*, 183 F. 3d at 494 (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F. 2d 573, 576 (6th Cir. 1991)). To satisfy the requirements of Article III of the United States Constitution, the plaintiff must show he has ***personally suffered some actual injury*** as a result of the illegal conduct of the defendant. (Emphasis added). *Coyne*, 183 F. 3d at 494; *Valley Forge*, 454 U.S. at 472.

In each of the above-captioned Complaints, the named Plaintiff alleges it is the holder and owner of the Note and Mortgage. However, the attached Note and Mortgage identify the mortgagee and promisee as the original lending institution — one other than the named Plaintiff. Further, the Preliminary Judicial Report attached as an exhibit to the Complaint makes no reference to the named Plaintiff in the recorded chain of title/interest. The Court's Amended General Order No. 2006-16 requires Plaintiff to submit an affidavit along with the Complaint, which identifies Plaintiff either as the original mortgage holder, or as an assignee,

trustee or successor-in-interest. Once again, the affidavits submitted in all these cases recite the averment that Plaintiff is the owner of the Note and Mortgage, without any mention of an assignment or trust or successor interest. Consequently, the very filings and submissions of the Plaintiff create a conflict. In every instance, then, Plaintiff has not satisfied its burden of demonstrating standing at the time of the filing of the Complaint.

Understandably, the Court requested clarification by requiring each Plaintiff to submit a copy of the Assignment of the Note and Mortgage, executed as of the date of the Foreclosure Complaint. In the above-captioned cases, ***none*** of the Assignments show the named Plaintiff to be the owner of the rights, title and interest under the Mortgage at issue as of the date of the Foreclosure Complaint. The Assignments, in every instance, express a present intent to convey all rights, title and interest in the Mortgage and the accompanying Note to the Plaintiff named in the caption of the Foreclosure Complaint upon receipt of sufficient consideration on the date the Assignment was signed and notarized. Further, the Assignment documents are all prepared by counsel for the named Plaintiffs. These proffered documents belie Plaintiffs' assertion they own the Note and Mortgage by means of a purchase which pre-dated the Complaint by days, months or years.

Plaintiff-Lenders shall take note, furthermore, that prior to the issuance of its October 10, 2007 Order, the Court considered the principles of "real party in interest," and examined Fed. R. Civ. P. 17 — "Parties Plaintiff and Defendant; Capacity" and its associated Commentary. The Rule is not *apropos* to the situation raised by these Foreclosure Complaints. The Rule's Commentary offers this explanation: "The provision should not be misunderstood or distorted. It is intended to prevent forfeiture when determination of the

proper party to sue is difficult or when an understandable mistake has been made. ... It is, in cases of this sort, intended to insure against forfeiture and injustice ..." Plaintiff-Lenders do not allege mistake or that a party cannot be identified. Nor will Plaintiff-Lenders suffer forfeiture or injustice by the dismissal of these defective complaints otherwise than on the merits.

Moreover, this Court is obligated to carefully scrutinize all filings and pleadings in foreclosure actions, since the unique nature of real property requires contracts and transactions concerning real property to be in writing. R.C. § 1335.04. Ohio law holds that when a mortgage is assigned, moreover, the assignment is subject to the recording requirements of R.C. § 5301.25. *Creager v. Anderson* (1934), 16 Ohio Law Abs. 400 (interpreting the former statute, G.C. § 8543). "Thus, with regards to real property, before an entity assigned an interest in that property would be entitled to receive a distribution from the sale of the property, their interest therein must have been recorded in accordance with Ohio law." *In re Ochmanek*, 266 B.R. 114, 120 (Bkrtcy.N.D. Ohio 2000) (citing *Pinney v. Merchants' National Bank of Defiance*, 71 Ohio St. 173, 177 (1904).[1]

This Court acknowledges the right of banks, holding valid mortgages, to receive timely payments. And, if they do not receive timely payments, banks have the right to properly file actions on the defaulted notes — seeking foreclosure on the property securing the notes. Yet, this Court possesses the independent obligations to preserve the judicial integrity of the federal court and to jealously guard federal jurisdiction. Neither the fluidity of

[1] Astoundingly, counsel at oral argument stated that his client, the purchaser from the original mortgagee, acquired complete legal and equitable interest in land when money changed hands, even before the purchase agreement, let alone a proper assignment, made its way into his client's possession.

the secondary mortgage market, nor monetary or economic considerations of the parties, nor the convenience of the litigants supersede those obligations.

Despite Plaintiffs' counsel's belief that "there appears to be some level of disagreement and/or misunderstanding amongst professionals, borrowers, attorneys and members of the judiciary," the Court does not require instruction and is not operating under any misapprehension. The "real party in interest" rule, to which the Plaintiff-Lenders continually refer in their responses or motions, is clearly comprehended by the Court and is not intended to assist banks in avoiding traditional federal diversity requirements.[2] Unlike Ohio State law and procedure, as Plaintiffs perceive it, the federal judicial system need not, and will not, be "forgiving in this regard."[3]

---

2

Plaintiff's reliance on Ohio's "real party in interest rule" (ORCP 17) and on any Ohio case citations is misplaced. Although Ohio law guides federal courts on substantive issues, state procedural law cannot be used to explain, modify or contradict a federal rule of procedure, which purpose is clearly spelled out in the Commentary. "In federal diversity actions, state law governs substantive issues and federal law governs procedural issues." *Erie R.R. Co. v. Tompkins*, 304 U.S. 63 (1938); *Legg v. Chopra*, 286 F. 3d 286, 289 (6th Cir. 2002); *Gafford v. General Electric Company*, 997 F. 2d 150, 165-6 (6th Cir. 1993).

3

Plaintiff's, "Judge, you just don't understand how things work," argument reveals a condescending mindset and quasi-monopolistic system where financial institutions have traditionally controlled, and still control, the foreclosure process. Typically, the homeowner who finds himself/herself in financial straits, fails to make the required mortgage payments and faces a foreclosure suit, is not interested in testing state or federal jurisdictional requirements, either *pro se* or through counsel. Their focus is either, "how do I save my home," or "if I have to give it up, I'll simply leave and find somewhere else to live."

In the meantime, the financial institutions or successors/assignees rush to foreclose, obtain a default judgment and then sit on the deed, avoiding responsibility for maintaining the property while reaping the financial benefits of interest running on a judgment. The financial institutions know the law charges the one with title (still the homeowner) with maintaining the property.

There is no doubt every decision made by a financial institution in the foreclosure process is driven by money. And the legal work which flows from winning the financial institution's favor is highly lucrative. There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary , they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through. Counsel for the institutions are not without legal argument to support their position, but their arguments fall woefully short of justifying their premature filings, and utterly fail to satisfy their standing

Exhibit 7

## CONCLUSION

For all the foregoing reasons, the above-captioned Foreclosure Complaints are dismissed without prejudice.

**IT IS SO ORDERED.**

**DATE: October 31, 2007**

**S/Christopher A. Boyko**
**CHRISTOPHER A. BOYKO**
**United States District Judge**

---

and jurisdictional burdens. The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate.

The Court will illustrate in simple terms its decision: "Fluidity of the market" — "X" dollars, "contractual arrangements between institutions and counsel" — "X" dollars, "purchasing mortgages in bulk and securitizing" — "X" dollars, "rush to file, slow to record after judgment" — "X" dollars, "the jurisdictional integrity of United States District Court" — "Priceless."

Exhibit 8

Search Results

Showing **1 - 20** of **34** **(0.875 seconds)**

Searched for Legal Description that **Contains**

**You must login to purchase documents.** Click Here to Login.

**U = Unreleased**

2

| [row] | Status | Consideration | Full Name | CrossPartyName | Record Date | Doc Type | Book Type | Book | Page | Doc Legal | Remarks | Reception # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | $0.00 | BANK ONE COLORADO NA | BANK ONE NA | 3/4/2003 | SUBORDINATION AGREEMENT | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B3047768 |
| 2 | | $0.00 | BANK ONE NA | PRINCIPAL RESIDENTIAL MORTGAGE | 5/22/2001 | SUBORDINATION AGREEMENT | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B1080010 |
| 3 | | $0.00 | CASTILLO CAMILO | PEREZ STACEY | 8/31/2005 | QUIT CLAIM DEED | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B5130612 |
| 4 | | $0.00 | CASTILLO CAMILO JR | BANK ONE NA | 2/1/2002 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B2021742 |
| 5 | | $0.00 | CASTILLO MARGO R | PRINCIPAL RESIDENTIAL MORTGAGE | 5/7/2001 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | B3097134 RTD | B1070183 |
| 6 | | $0.00 | CASTILLO MARGO R | PRINCIPAL RESIDENTIAL MORTGAGE | 3/4/2003 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B3047767 |
| 7 | | $0.00 | CITIMORTGAGE INC | PUBLIC TRUSTEE ARAPAHOE COUNTY | 8/5/2005 | NOTICE OF ELECTION AND DEMAND SALE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B5116115 |
| 8 | | $0.00 | COX MARGO R | NORWEST MORTGAGE INC | 12/7/1999 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | B1123572 RTD | A9192083 |
| 9 | | $0.00 | COX MARGO R | BANK ONE NA | 10/3/2000 | DEED OF TRUST & SECURITY AGREEMENT | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | B2058906 RTD | B0126737 |
| 10 | | $0.00 | COX MARGO R | CASTILLO MARGO R | 5/7/2001 | QUIT CLAIM DEED | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B1070182 |
| 11 | | $0.00 | DEUTSCHE BANK NATIONAL TRUST COMPANY | MILLER MARK S | 7/11/2011 | LIS PENDENS | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | D1064901 |
| 12 | | $0.00 | DEUTSCHE BANK NATIONAL TRUST COMPANY TRUSTEE | PUBLIC TRUSTEE ARAPAHOE COUNTY | 2/24/2010 | NOTICE OF ELECTION AND DEMAND SALE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | D0017969 |
| 13 | | $0.00 | DEUTSCHE BANK NATIONAL TRUST COMPANY TRUSTEE | PUBLIC TRUSTEE ARAPAHOE COUNTY | 3/2/2012 | NOTICE OF ELECTION AND DEMAND SALE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | D2023941 |
| 14 | | $0.00 | DIPALMA DANIEL | NORWEST MTG INC | 3/3/1994 | DEED OF TRUST | OR | 7440 | 612 | FOX HILL 4TH FLG LOT 7 BLK 4 | | 94033730 |
| 15 | | $0.00 | DIPALMA DANIEL | NORWEST BANK COLO NA | 8/29/1995 | DEED OF TRUST | OR | 8085 | 266 | FOX HILL 4TH FLG LOT 7 BLK 4 | | 95088758 |
| 16 | | $0.00 | DIPALMA DANIEL | NORWEST BANK COLO NA | 10/2/1996 | DEED OF TRUST AMENDMENT/MODIFICATION | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | A6126907 |
| 17 | | $0.00 | DIPALMA DANIEL | FIRSTBANK AURORA NA | 9/19/1997 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | A9030480 RTD | A7118309 |

Exhibit 8 A-2

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 18 | $0.00 | DIPALMA DANIEL | FIRSTBANK AURORA NA | 11/26/1997 | DEED OF TRUST | OR | FOX HILL 4TH FLG LOT 7 BLK 4 | A8119464 RTD | A7149901 |
| 19 | $0.00 | DIPALMA DANIEL | GREATER COLORADO MORTGAGE | 11/12/1998 | DEED OF TRUST | OR | FOX HILL 4TH FLG LOT 7 BLK 4 | B0004150 RTD | A8182367 |
| 20 | $0.00 | DIPALMA DANIEL | COX MARGE R | 12/7/1999 | WARRANTY DEED | OR | FOX HILL 4TH FLG LOT 7 BLK 4 | | A9192082 |

2

Exhibit 8

**Search Results** Showing **21 - 34** of **34** **(0.875 seconds)**
Searched for Legal Description that **Contains**
**You must login to purchase documents.** Click Here to Login.

**U = Unreleased**

1 2

| [row] | Status | Consideration | Full Name | CrossPartyName | Record Date | Doc Type | Book Type | Book | Page | Doc Legal | Remarks | Reception # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | | $0.00 | FIRSTBANK AURORA NA | FIRSTBANK COLO NA | 9/19/1997 | ASSIGNMENT * | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | A7118310 |
| 22 | | $0.00 | FOX HILL FILING NO 4 HOMEOWNERS ASSOCIATION INC | MILLER MARK S | 3/6/2009 | RELEASE OF ASSESSMENT LIEN | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B9022782 |
| 23 | | $0.00 | FOX HILL FILING NO 4 HOMEOWNERS ASSOCIATION INC | PRESENT OWNER | 2/23/2012 | RELEASE OF ASSESSMENT LIEN | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | D2020091 |
| 24 | | $0.00 | JPMORGAN CHASE BANK NA | PUBLIC TRUSTEE ARAPAHOE COUNTY | 8/29/2005 | NOTICE OF ELECTION AND DEMAND SALE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B5129123 |
| 25 | | $0.00 | JPMORGAN CHASE BANK NA | MILLER MARK S | 3/19/2007 | SPECIAL WARRANTY DEED | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B7034458 |
| 26 | | $0.00 | MELODY HOMES INC | DIPALMA DANIEL | 3/3/1994 | WARRANTY DEED | OR | 7440 | 610 | FOX HILL 4TH FLG LOT 7 BLK 4 | | 94033729 |
| 27 | | $0.00 | MILLER MARK S | INDYMAC BANK FSB | 3/19/2007 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B7034459 |
| 28 | | $0.00 | MILLER MARK S | INDYMAC BANK FSB | 3/19/2007 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B7034460 |
| 29 | | $0.00 | MILLER MARK S | FOX HILL FILING NO 4 HOMEOWNERS ASSOCIATION INC | 10/20/2008 | ASSESSMENT LIEN NOTICE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B8117189 |
| 30 | | $0.00 | PEREZ STACEY | KEY NTANA B | 12/2/2005 | DEED OF TRUST | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B5181403 |
| 31 | | $0.00 | PEREZ STACEY | FOX HILL FILING NO 4 HOMEOWNERS ASSOCIATION INC | 12/5/2005 | ASSESSMENT LIEN NOTICE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B5182346 |
| 32 | | $0.00 | PUBLIC TRUSTEE ARAPAHOE COUNTY | CITIMORTGAGE INC | 10/6/2005 | PUBLIC TRUSTEE'S CERTIFICATE OF PURCHASE | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B5151456 |
| 33 | | $0.00 | PUBLIC TRUSTEE ARAPAHOE COUNTY | BANK ONE NA | 1/4/2006 | PUBLIC TRUSTEE'S CERTIFICATE OF REDEMPTION | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B6001627 |
| 34 | | $0.00 | PUBLIC TRUSTEE ARAPAHOE COUNTY | JPMORGAN CHASE BANK NA | 1/11/2006 | PUBLIC TRUSTEE'S DEED | OR | | | FOX HILL 4TH FLG LOT 7 BLK 4 | | B6004820 |

1 2

# URGENT LETTER™ Exhibit 9______

Mark S. Miller & Jamileh Miller
19733 E Union Dr
Centennial CO 80015
Phone: (303) 358-1190

## NOTICE OF PENDING ACTION

**MESSAGE DELIVERED VIA:**

- [x] U.S. First Class Mail
- [x] U.S. Express Mail
- [ ] Certified Mail/RRR
- [ ] Hand Delivered
- [x] Via Fax# ____________
- [ ] Via Email:____________

***August 27, 2012*** ***Monday***

**Aronowitz & Mecklenburg
Susan Hendrick
1199 Bannock St
Denver CO 80202**

**PAGE 1 OF 2** (Including This Cover Sheet)

**SUBJECT:** Bankruptcy Case No: 10-25453-MER - MARK STANLEY MILLER & JAMILEH MILLER
NOTICE OF DISPUTE WITH DISCOVER & REQUEST TO COOPERATE WITHOUT COURT INTERVENTION - (PLEASE RESPOND WITHIN 5 DAYS)

Dear Ms. Hendrick:

We are in receipt of your answers and objections to discovery recently sent to us and writing to inform you that there is dispute and problem with your answers to discovery.

I. REQUEST TO RESOLVE DISPUTE WITHOUT COURT INTERVENTION

We would like to resolve this dispute without court intervention and respectfully request that you respond with the requested discovery within five (5) days from the date of this letter. The Interrogatories that are in dispute are: Interrogatories #2, #3, #4 and #16. which is explained in more detailed below and on page 2. Please respond within five (5) days or by August 29, 2012.

II. NATURE OF DISPUTE

---

IMPROPER OBJECTIONS & INTERROGATORIES NOT ANSWERED

---

The nature of our dispute is that the terms "source" and other such terms that you object to as as being vague and ambiguous, is not really vague and ambiguous at all, and is well defined in black law dictionary is indicated on the following pages.

For this reason, we disagree with your objection and would like to try to resolve it without court intervention. If you disagree with anything in this communication, and do not wish to resolve it, then please let us know as soon as possible so that we make take the appropriate action.

The following page will outline our detailed problems with the discovery:

NOTICE OF CONFIDENTIALITY; The information contained in this electronic speed transmission may contain confidential information and is intended only for the person(s) or recipient (s) to which it is directed. If you have received this message in error, you are hereby notified that copying, distribution, or any unauthorized publications of this message in any manner is expressly forbidden. You are hereby notified to destroy this electronic message from your computer immediately. Please notify the sender immediately upon receipt so that we can have the information returned at our expense. Thank you for your cooperation in this matter.

Exhibit 9

Problem With Interrogatory #2:

---

We have not received a clear answer to this response due to your objection to the word "source" as being "vague and ambiguous" . We contend that the word source is NOT vague and ambiguous and is well defined in black law dictionary, 9th edition as:

source - source, n. The originator or primary agent of an act, circumstance, or result <she was the source of the information> <the side businesswas the source of income>. (citing Black Law 9th Edition)

Accordingly, this term is not vague and ambiguous at all. It refers to the originator or primary agent of where you obtained the purported original note that you have in your possession, or the possession of your firm. Please simply tell us the source of the "original note" that you presently have in your possession and which you plan to present as evidence at the scheduled hearing in this case.

Problem With Interrogatory #3:

---

Interrogatory #3 has the exact identical problem as Interrogatory #2. The word "source" is well defined and we request you send us your full answer without objections to this interrogatory.

Problem With Interrogatory #4:

---

Interrogatory #3 has the exact identical problem as Interrogatory #2, and the word "assignment" is also well defined and NOT vague and ambiguous as you purport to believe. An assignment according to Black Law dictionary (9th Edition) is defined as follows: assignment. (14c) 1. The transfer of rights or property <assignment of stock options>. [Cases: Assignments 31.] 2. The rights or property so transferred <the aunt assigned those funds to her niece, who promptly invested the assignment in mutual funds>. "An assignment is a transfer or setting over ofproperty, or of some right or interest therein, from one person to another; the term denoting not only the act of transfer, but also theinstrument by which it is effected. In these senses the word is variously applied in law." Alexander M. Burrill, A Treatise on the Lawand Practice of Voluntary Assignments for the Benefit of Creditors § 1, at 1 (James Avery Webb ed., 6th ed. 1894).

Thus, please state whether or not the assignments to Deutsch Bank National Trust Company was recorded in the county's real property records in according with state law. (The Answer should be "yes" or "no")

Problem With Interrogatory #16:

---

We cannot agree that this interrogatory seeks information related to the attorney-client and work product priviledge. We do not agree this reason for failing to answer our interrogatory. For purposes of convenience we restate the interrogatory: "Please indicate the reason the Payment History you plan to submit at the hearing to be held on May 2, 2012, is a valid debt owed to Deutsche Bank National Trust Company ?"

This information is related to basis of the claim to your client Deutsche Bank and we have a right to know that information. I wil attempt to conference with you to discuss these matter.

Thank you for your kind cooperation in these matters.

______________________________

Mark S. Miller & Jamileh Miller