# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 20th day of April, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to IndyMac Bank, F.S.B., a federally chartered savings bank (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

### Villages of Parker

*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,



hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.  Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.  Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i)  the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii)  any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii)  termination of professional management and assumption of self-management of the Owners Association; or (iv)  any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.**  If Borrower does not pay PUD dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

———————————————[Signatures on Following Page]———————————————

Loan No: 123247031

Multistate PUD Rider — Single Family — **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 2 of 3
Form 3150 01/01
14501MU 08/00 Rev. 11/04
©2004, The Compliance Source, Inc.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Mark S Miller                                -Borrower

_____ (Seal)
Jamileh Miller                               -Borrower

_____ (Seal)
                                             -Borrower

_____ (Seal)
                                             -Borrower

*[Sign Original Only]*

Loan No: 123247031

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 3 of 3                    14501MU 08/00 Rev. 11/04
www.compliancesource.com                                                      ©2004, The Compliance Source, Inc.

## FIXED/ADJUSTABLE RATE RIDER
## INTEREST ONLY FIXED PERIOD
### (LIBOR 1 Year Index (As Published In The Wall Street Journal)- Rate Caps)

Loan #       123247031                                    MIN:       100055401232470312

THIS FIXED/ADJUSTABLE RATE RIDER is made this 20th  day of April,  2006       ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
IndyMac Bank, F.S.B., a federally chartered savings bank

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of          6.625   %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of May,  2016          , and the adjustable interest rate I will pay may change
on that day every 12th  month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate
could change, is called a "Change Date."
(B) The Index
Beginning with the first Interest Change Date, my interest rate will be based on an Index.
The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of
interbank offered rates for one-year U.S. dollar-denominated deposits in the London market,
as published in The Wall Street Journal. The most recent Index figure available as of the date
45 days before each Interest Change Date is called the "Current Index."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - 1 Year LIBOR - Single Family
(Fixed and Interest Only Periods are the same)

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                             percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.625 % or less than 2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two          percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment due after the first Change Date.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No: 123247031                                                          Form 5603
8480833 (0506)                          Page 2 of 4                              6/05

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____(Seal)          _____(Seal)
Mark S Miller                   -Borrower        Jamileh Miller              -Borrower


_____(Seal)          _____(Seal)
                                -Borrower                                     -Borrower


_____(Seal)          _____(Seal)
                                -Borrower                                     -Borrower


_____(Seal)          _____(Seal)
                                -Borrower                                     -Borrower


Loan No: 123247031                                              Form 5603
8480833 (0506)                  Page 4 of 4                        6/05

# ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #:    123247031

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this  20th  day of
April,  2006     , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument")
and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower")
to secure Borrower's Note to   IndyMac Bank, F.S.B., a federally chartered
savings bank

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

ADDITIONAL COVENANTS. In Addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than
11.625      % or less than       2.750       %. Thereafter, my interest rate
will never be increased or decreased on any single change Date by more than
two and NO/1000ths              percentage point(s) (     2.000       %)
from the rate of interest I have been paying for the preceding    12     months. My interest
rate will never be greater than       11.625      % or less than      2.750      %.

**IndyMac Bank**
**ARM Addendum to Fixed/Adjustable Rate Rider**
**Multistate**



Page 1 of 2
VMP Mortgage Solutions, Inc.

8480345 (0602)

I075
2/06

2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and effect.

Dated: _____

_____ (Seal)          _____ (Seal)
Mark S Miller                    -Borrower        Jamileh Miller                  -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower

8480345 (0602)              Page 2 of 2                              I075
                                                                    2/06

EXh, t 2

# FIXED/ADJUSTABLE RATE NOTE
## INTEREST ONLY FIXED PERIOD
### (1 Year LIBOR Index (As Published In *The Wall Street Journal*)-Rate Caps)

Loan #   123247031

MIN: 100055401232470312

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

April 20, 2006                    Denver                         Colorado
    [Date]                         [City]                          [State]

19733 E Union Dr, Centennial, CO 80015

[Property Address]

### 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 216,236.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is          IndyMac Bank, F.S.B., a federally chartered savings bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.625          %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.   PAYMENTS

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on   June,  2006          . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on    May 1, 2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at        IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My monthly payment will be in the amount of U.S. $   1,193.80          before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**MULTISTATE FIXED/ADJUSTABLE RATE NOTE - 1 YEAR LIBOR INDEX - Single Family**
**(Fixed and Interest Only Periods are the same)**

Initials:

8480832 (0506)                          Page 1 of 5                          Form 5602
                          VMP Mortgage Solutions, Inc. (800)521-7291                          6/05

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May,   2016   , and the adjustable interest rate I will pay may change on that day every   12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding        two and 750/1000ths        percentage points (     2.750     %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than        11.625 % or less than     2.750    %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than  2.000 percentage points from the rate of interest I have been paying for the preceding 12   months. My interest rate will never be greater than         11.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my monthly payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

Loan No: 123247031                                                                                                            Form 5602
8480832 (0306)                                    Page 2 of 5                                                                  6/05

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of     15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000          % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter.  I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Loan No.: 123247031
9480692 (0506)

Page 3 of 5

Form 5602
6/05



(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan No: 123247031
8480832 (0606)

Page 4 of 5

Form 5602
6/05

39

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Mark S Miller              -Borrower

_____ (Seal)
Jamileh Miller             -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Pay To The Order Of                                    [*Sign Original Only*]

Without Recourse
IndyMac Bank, F.S.B.
By: 

Sam Lindstrom
Vice President

Loan No:  123247031

8480932 (0505)                    Page 5 of 6

Form 5602
6/05

## ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: 123247031

THIS ADDENDUM is made this     20th     day of     April, 2006     , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than     11.625     % or less than     2.750     %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than  two and NO/1000ths     percentage point(s) (     2.000     %) from the rate of interest I have been paying for the preceding     12     months. My interest rate will never be greater than     11.625     % or less than     2.750     %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated:   4/20/06

_____ (Seal)
Mark S Miller                    -Borrower

_____ (Seal)
Jamileh Miller                   -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

IndyMac Bank
ARM Note Addendum - Multistate
8480344 (0602)



VMP Mortgage Solutions, Inc.

I074
(2/06)

## ADDENDUM TO ADJUSTABLE RATE NOTE
### (Prepayment)

Loan #: 123247031

THIS ADDENDUM is made this   20th   day of   April,   2006   , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

1.   Section 5 of the Adjustable Rate Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of all of the unpaid principal is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first   three   ( 3   ) year(s) I make a Partial Prepayment or Partial Prepayment(s) of less than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first   three   ( 3   ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.   All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated:   4/20/06

_____(Seal)
Mark S Miller          -Borrower

_____(Seal)
Jamileh Miller          -Borrower

_____(Seal)
                       -Borrower

_____(Seal)
                       -Borrower

_____(Seal)
                       -Borrower

_____(Seal)
                       -Borrower

_____(Seal)
                       -Borrower

_____(Seal)
                       -Borrower

IndyMac Bank and Federally Exempted Seller Use Only
Hard Prepayment Addendum (1-3 yrs) - ARM
First Mortgages - Multistate, Arkansas (loans over $150,000)

8480279 (0407)                    VMP Mortgage Solutions, Inc. (800)521-7291

SPD #084
(08/04)

45

116

EXHIBIT 3

Arapahoe County Clerk & Recorder, Nancy A. Doty
**Reception #: B7034459**
Receipt #: 5176703                    Recording Fee: $116.00
Pages Recorded: 23
Date Recorded: 1/19/2007  3:47:20 PM

After recording please return to:
IndyMac Bank, F.S.B. c/o Document Management

*[Company Name]*

R $116.00
D $0.00
2006048620                TO
04/25/2006    02:53:33 PM   23 Page(s)
Jefferson County, Colorado

*[Name of Natural Person]*

901 E. 104th Street Building B Suite 400/500
*[Street Address]*

Kansas City, MO 64131
*[City, State Zip Code]*

*CPE 06-500*                    *[Space Above This Line For Recording Data]*

# DEED OF TRUST

**DEFINITIONS**                                          MIN

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "**Security Instrument**" means this document, which is dated                  April 20, 2006 together with all Riders to this document.

(B)    "**Borrower**" is Mark S Miller and Jamileh Miller

. Borrower is the trustor under this Security Instrument.

(C)    "**Lender**" is   IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a        Federal Savings Bank                  organized and existing under the laws of
United States of America                      . Lender's address is  155 North Lake Avenue,
Pasadena, CA 91101

(D)    "**Trustee**" is the Public Trustee of          Arapahoe          County, Colorado.

Loan No: _____
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials
—THE COMPLIANCE SOURCE, INC.—                                           MERS Modified Form 3006 01/01
www.compliancesource.com            Page 1 of 13                          14301CD 08/00
                                                                © 2000, The Compliance Source, Inc.

RECEIVED IN THIS CONDITION

CLERK AND RECORDER OF JEFFERSON COUNTY CERTIFIED TO BE FULL TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT IN MY CUSTODY. DATE _____
J.M. ANDERSON, JEFFERSON COUNTY CLERK AND RECORDER
_____ DEPUTY CLERK

(E)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

(F)     "Note" means the promissory note signed by Borrower and dated          April 20, 2006
The Note states that Borrower owes Lender        two hundred sixteen thousand two hundred thirty
six and NO/100ths                                                              Dollars (U.S. $ 216,236.00 )
plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than      May  1, 2036

(G)     "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)     "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)     "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower *(check box as applicable)*:

- ☒ Adjustable Rate Rider      ☐ Condominium Rider             ☐ Second Home Rider
- ☐ Balloon Rider              ☒ Planned Unit Development Rider  ☐ Biweekly Payment Rider
- ☐ 1-4 Family Rider           ☐ Revocable Trust Rider
- ☐ Other(s) *[specify]*

(J)     "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)     "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)     "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)     "Escrow Items" means those items that are described in Section 3.

(N)     "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)     "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)     "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No:                                                                          Initials: _____
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                       Page 2 of 13                                           1401CO 08/00
www.compliancesource.com                                                                          © 2000, The Compliance Source, Inc.

(Q)     "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)     "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
           County              of              Arapahoe              :
   [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
     See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of                          19733 E Union Dr
                                                                    [Street]
Centennial                         , Colorado        80015            ("Property Address"):
     [City]                                            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants

and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items.  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and

Loan No:

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Initials: _____
—THE COMPLIANCE SOURCE, INC.—   Page 4 of 13   MERS Modified Form 3006 01/01
www.compliancesource.com   14301CO 8500
© 2008, The Compliance Source, Inc.

Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

Loan No:

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 5 of 13

Initials: [initials]

MERS Modified Form 3006 01/01

14301CO 08/00
© 2000, The Compliance Source, Inc.

50

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may

<u>Loan No:</u>

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 6 of 13
MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.

Initials _____

use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

Loan No:

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 7 of 13

Initials

MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.

shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Loan No:

Initials

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 8 of 13
MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security

Loan No: _____

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                    Page 9 of 13
www.compliancesource.com

Initials _____

MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.

Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Loan No:
Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—The Compliance Source, Inc.—
www.compliancesource.com
Page 10 of 13

Initials _____

MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  **Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  **Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  **Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                         Page 11 of 13
www.compliancesource.com

Initials _____

MERS Modified Form 3006 01/01
1430CO 08/00
© 2000, The Compliance Source, Inc.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

Loan No:

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                    Page 12 of 13
www.compliancesource.com

Initials:

MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc

24. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          Mark S Miller                   -Borrower

                                          Mailing Address: 16255 Highway 50, Rocky Ford, CO 81067

_____          _____ (Seal)
                                          Jamileh Miller                  -Borrower

                                          Mailing Address: 16255 Highway 50, Rocky Ford, CO 81067

                                          _____ (Seal)
                                                                          -Borrower

                                          Mailing Address:

                                          _____ (Seal)
                                                                          -Borrower

                                          Mailing Address:

                                          [Space Below This Line For Acknowledgment]

State of Colorado                                §
                                                 §
County of Denver                                 §

Before me the undersigned authority, on this day personally appeared    Mark S Miller and Jamileh Miller

known to me (or proved to me through an identity card or other document) to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal on this  20  day of  April  2006

                                          _____
                                          Notary Public
                                          My Commission Expires: 1-3-09

CAROLYN BREWER
NOTARY PUBLIC
STATE OF COLORADO

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                           Page 13 of 13                                      1401CO 04/00
        www.compliancesource.com                                                                   © 2000, The Compliance Source, Inc.

EXHIBIT "A"

LOT 7, BLOCK 4,

FOX HILL FILING NO. 4,

COUNTY OF ARAPAHOE,

STATE OF COLORADO

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 20th day of April, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to    IndyMac Bank, F.S.B., a federally chartered savings bank
                                                                    (the "Lender")  of the same date and covering the Property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

Villages of Parker

*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  PUD Obligations.  Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B.  Property Insurance.  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No:
MIN:

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 1 of 3
Form 3150 01/01
14912MU 8608 Rev. 11/04
©2004, The Compliance Source, Inc.

hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. Remedies. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

---

*[Signatures on Following Page]*

---

Loan No: _____

Multistate PUD Rider — Single Family —Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                           Form 3150 01/01
www.compliancesource.com                          Page 2 of 3                1403MU 10/00 Rev. 11/04
                                                                        ©2004, The Compliance Source, Inc.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Mark S Miller                        -Borrower

_____ (Seal)
Jamileh Miller                        -Borrower

_____ (Seal)
                                      -Borrower

_____ (Seal)
                                      -Borrower

*[Sign Original Only]*

Loan No: _____

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                      Form 3150 01/01
www.compliancesource.com                Page 3 of 3              14021MU 08/00 Rev. 11/04
                                                              ©2004, The Compliance Source, Inc.

## FIXED/ADJUSTABLE RATE RIDER
### INTEREST ONLY FIXED PERIOD
(LIBOR 1 Year Index (As Published In The Wall Street Journal)- Rate Caps)

Loan #                                          MIN:

THIS FIXED/ADJUSTABLE RATE RIDER is made this 20th day of April, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to IndyMac Bank, F.S.B., a federally chartered savings bank

("Lender") of the same date and covering the property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of 6.625 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May, 2016 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
(B) The Index
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - 1 Year LIBOR - Single Family
(Fixed and Interest Only Periods are the same)
Page 1 of 4
VMP Mortgage Solutions, Inc. (800)521-7291
Form 5603
6/06

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                                                                                     percentage points
(    2.750       %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.625       % or less than 2.750                       %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two         percentage points from the rate of interest I have been paying for the preceding 12       months. My interest rate will never be greater than               11.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment due after the first Change Date.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Page 2 of 4

Form 5603
8/06

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

Page 3 of 4                                          Form 5803
                                                     6/05

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)  
Mark S Miller                -Borrower

_____ (Seal)  
Jamileh Miller                -Borrower

_____ (Seal)  
                              -Borrower

_____ (Seal)  
                              -Borrower

_____ (Seal)  
                              -Borrower

_____ (Seal)  
                              -Borrower

_____ (Seal)  
                              -Borrower

_____ (Seal)  
                              -Borrower

Page 4 of 4

Form 5803  
6/05

## ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #:

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this 20th day of April, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

19733 E Union Dr, Centennial, CO 80015

[Property Address]

ADDITIONAL COVENANTS. In Addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than 11.625 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than two and NO/1000ths percentage point(s) ( · 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.625 % or less than 2.750 %.

IndyMac Bank
ARM Addendum to Fixed/Adjustable Rate Rider
Multistate

Page 1 of 2
VMP Mortgage Solutions, Inc.

I075
2/06

**2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and affect.**

Dated: 4/20/06

_____ (Seal)
Mark S Miller                          -Borrower

_____ (Seal)
Jamileh Miller                          -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

Page 2 of 2

I075
2/06

| | |
|---|---|
| DISTRICT COURT, ARAPAHOE COUNTY, COLORADO<br>Court Address:7325 S. Potomac St. Centennial, CO 80112 | |
| IN THE MATTER OF THE APPLICATION OF DEUTSCHE BANK<br>NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC<br>INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-<br>THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE<br>POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006,<br>FOR AN ORDER AUTHORIZING THE PUBLIC TRUSTEE FOR<br>ARAPAHOE COUNTY, STATE OF COLORADO, TO SELL CERTAIN<br>REAL ESTATE CONTAINED IN A DEED OF TRUST. | ▲ COURT USE ONLY ▲<br><br>Case Number:<br>2010 CV |
| Attorney or Party Without Attorney:<br>Name: Robert J. Aronowitz, Esq.    Reg. No. 5673<br>        Joel T. Mecklenburg, Esq.   Reg. No. 36291<br>        Stacey L. Aronowitz, Esq.   Reg. No. 36290<br>        Joan Olson, Esq.            Reg. No. 28078<br>        Monica Kadrmas, Esq.        Reg. No. 34904<br>        Andrea Rickles-Jordan, Esq. Reg. No. 39005<br>        Randall M. Chin, Esq.       Reg. No. 31149<br>Address:   1199 Bannock Street<br>          Denver, Colorado  80204<br>Phone Number:    (303) 813-1177<br>Fax Number:      (303) 813-1107<br>E-mail:    R120@amlawco.com | Div.:        Ctrm: |
| NOTICE OF HEARING April 19, 2010 | |

TO:    THE PEOPLE OF THE STATE OF COLORADO, TO THE GRANTOR(S) IN THE
       DEED OF TRUST DESCRIBED HEREIN, AND TO THOSE PERSONS WHO
       APPEAR TO HAVE ACQUIRED A RECORD INTEREST IN THE REAL ESTATE
       THEREIN DESCRIBED, SUBSEQUENT TO THE RECORDING OF SUCH DEED OF
       TRUST, GREETINGS:

       WHEREAS, Mark S Miller and Jamileh Miller, Grantor(s) by Deed of Trust dated April
20, 2006, and recorded March 19, 2007 as Reception No. B7034459, in the records of the County
of Arapahoe, Colorado, to secure to Mortgage Electronic Registration Systems, Inc., acting solely
as nominee for IndyMac Bank, F.S.B., the payment of a Negotiable Instrument of even date
therewith for the principal sum of $216,236.00, as provided in said Deed of Trust, conveyed to
the Arapahoe County Public Trustee, on the terms set forth in said Negotiable Instrument and
Deed of Trust, the following described real property ("Property") situate in said County to-wit:

LOT 7, BLOCK 4, FOX HILL FILING NO. 4, COUNTY OF ARAPAHOE, STATE OF
COLORADO

WHICH HAS THE ADDRESS OF : 19733 E Union Dr, Centennial, CO 80015

Mark S Miller and Jamileh Miller 3500.00832

NOTICE is hereby given that Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 under the Pooling and Servicing Agreement dated May 1, 2006, Petitioner herein, has filed its Motion with this Court seeking an Order of this Court authorizing a Public Trustee's sale under the power of sale contained in said Deed of Trust on the grounds that the indebtedness secured by said Deed of Trust is in default in that among other events of default the current Mortgagor has failed to pay monthly installments of principal and/or interest, and/or if applicable, taxes and insurance together with applicable late charges as provided in the subject Deed of Trust and Negotiable Instrument.

NOTICE is also given that any interested party who disputes the existence of such default under the terms of said Deed of Trust and Negotiable Instrument secured thereby, or who otherwise disputes the existence of circumstances authorizing the exercise of the power of sale contained in said Deed of Trust, or who desires to raise such other grounds for the objection to the issuance of an Order Authorizing Sale which may exist pursuant to the Servicemembers Civil Relief Act, as amended, must file a response to Petitioner's Motion for Order Authorizing Sale, verified by the oath of such person, setting forth the facts upon which he relies and attaching copies of all documents which support his position. Said response must be in writing and filed with the Clerk of the District Court in and for the County of Arapahoe, State of Colorado, at the address set forth below, and shall be served upon the Petitioner pursuant to Rule 5(b) of the Colorado Rules of Civil Procedure at the office of Aronowitz & Mecklenburg, LLP, 1199 Bannock Street, Denver, Colorado 80204, telephone (303)813-1177, not less than five (5) days prior to the date set for hearing on Petitioner's Motion for Order Authorizing Sale.

**If this case is not filed in the County where your property is located, you have the right to ask the Court to move the Case to that County. Your request may be made as a part of your response or any paper you file with the Court at least five days before the hearing.**

Mark S Miller and Jamileh Miller 3360.00832

Be advised that the Clerk of this Court has set the hearing at the time and place set forth below when and where any interested person may appear if they so desire, with or without an attorney.

Time of Hearing and Date:   **08:30 a.m. on April 19, 2010**
Place of Hearing:            **District Court of Arapahoe County**
                            **7325 S. Potomac St., Centennial, CO 80112**

**IF NO RESPONSE IS FILED BY APRIL 14, 2010, THE COURT MAY WITHOUT ANY HEARING AUTHORIZE THE FORECLOSURE AND PUBLIC TRUSTEE'S SALE WITHOUT FURTHER NOTICE.**

DATED: 3/22, 2010.

ARONOWITZ & MECKLENBURG, LLP

Attorney for Applicant
By: _Susan Hindrich  #33191_

Robert J. Aronowitz, Esq.   Reg. No. 5673
Joel T. Mecklenburg, Esq.   Reg. No. 36291
Stacey L. Aronowitz, Esq.   Reg. No. 36290
Joan Olson, Esq.            Reg. No. 28078
Monica Kadrmas, Esq.       Reg. No. 34904
Andrea Rickles-Jordan, Esq. Reg. No. 39005
Randall M. Chin, Esq        Reg. No. 31149

Applicants Address:
c/o Aronowitz & Mecklenburg, LLP
1199 Bannock Street
Denver, CO 80204

**IMPORTANT NOTICE**

**THE NOTICE AND NOTION IN THIS MATTER ARE BEING FILED SIMULTANEOUSLY WITH THE MAILING OF THIS NOTICE. YOU MAY OBTAIN THE COURT'S CASE/CIVIL ACTION NUMBER BY CONTACTING THE COURT OR OUR OFFICE.**

**This is an attempt to collect a debt. Any information obtained may be used for that purpose.**

Mark S Miller and Jaunileh Miller 3500.00832



| DISTRICT COURT, ARAPAHOE COUNTY, COLORADO | EFILED Document |
|---|---|
| Court Address:7325 S. Potomac St. Centennial, CO 80112 | CO Arapahoe County District Court 18th JD |
| IN THE MATTER OF THE APPLICATION OF DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR13 UNDER THE POOLING AND SERVICING AGREEMENT DATED MAY 1, 2006, FOR AN ORDER AUTHORIZING THE PUBLIC TRUSTEE FOR ARAPAHOE COUNTY, STATE OF COLORADO, TO SELL CERTAIN REAL ESTATE CONTAINED IN A DEED OF TRUST. | Filing Date: Mar 22 2010 11:35PM MDT Filing ID: 30187689 Review Clerk: Rob Chase ▲ COURT USE ONLY ▲ Case Number: 2010 CV 201323 |
| Attorney or Party Without Attorney: Name: Robert J. Aronowitz, Esq.    Reg. No. 5673 Joel T. Mecklenburg, Esq.    Reg. No. 36291 Stacey L. Aronowitz, Esq.    Reg. No. 36290 Joan Olson, Esq.    Reg. No. 28078 Monica Kadrmas, Esq.    Reg. No. 34904 Andrea Rickies-Jordan, Esq.   Reg. No. 39005 Randall M.Chin, Esq.    Reg. No. 31149 Address:   1199 Bannock Street Denver, Colorado  80204 Phone Number:   (303) 813-1177 Fax Number:   (303) 813-1107 E-mail:   R120@amlawco.com | Div.: 202   Ctrm: |
| RULE 120 MOTION FOR ORDER AUTHORIZING SALE | |

WHEREAS, Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 under the Pooling and Servicing Agreement dated May 1, 2006, ("Petitioner") the legal holder of a negotiable instrument dated April 20, 2006 in the original principal amount of $216,236.00 ("Negotiable Instrument"), which indebtedness is secured by a Deed of Trust from Mark S Miller and Jamileh Miller ("Grantor(s)") originally for the benefit of Mortgage Electronic Registration Systems, Inc., acting solely as nominee for IndyMac Bank, F.S.B., which Deed of Trust is dated April 20, 2006 and was recorded in Arapahoe County, Colorado on  March 19, 2007 as Reception No. B7034459, ("Deed of Trust") with the following described real property ("Property") situate in said County to-wit:

LOT 7, BLOCK 4, FOX HILL FILING NO. 4, COUNTY OF ARAPAHOE, STATE OF COLORADO

WHICH HAS THE ADDRESS OF : 19733 E Union Dr, Centennial, CO 80015

Mark S Miller and Jamileh Miller 3500.00832

WHEREAS, the Petitioner, represents that: i) it is the current holder of the Negotiable Instrument and the beneficiary of the Deed of Trust, ii) said Deed of Trust grants Power of Sale to the Public Trustee of the County in which the Property is located; iii) Negotiable Instrument is in **default** in that the borrower has failed to pay the monthly installments of principal and/or interest and/or if applicable, taxes and insurance, together with applicable late charges as provided in the Negotiable Instrument and is in **default** under the terms of the Deed of Trust. The Petitioner desires to foreclose the same and has filed the Notice of Election and Demand for Sale with the appropriate Public Trustee pursuant to Colorado statutes.

. WHEREAS, an Order of the Court authorizing a sale is required for default of the Negotiable Instrument under the Power of Sale contained in the Deed of Trust.

WHEREAS, the venue in this Court is proper, because this matter involves either: (i) a consumer obligation secured by a deed of trust that is encumbering real property all, or a substantial part, located in the County where this action is occurring, or (b) a non-consumer obligation secured by a deed of trust that is encumbering real property, which may be heard in any county under Rule 120(f) C.R.C.P.

WHEREAS, the Petitioner, through its undersigned counsel, represents to this Court, that: i) counsel has performed a search of the Department of Defense Manpower Data Center ("DMDC") records; and ii) the DMDC's records indicate that the current owner of the Property and those persons obligated to pay the indebtedness evidenced by the Negotiable Instrument are not entitled to the protections afforded under the Servicemembers Civil Relief Act (50 U.S.C. § 501, *et. seq.*). In support of Petitioner's position, Petitioner deposes and states that at the time of filing this Motion, the Property is not owned by a person who:

(a)  is in the military service as that term is defined in 50 U.S.C. § 511; nor

(b)  is extended protections for serving with forces of any nation with which the United States is allied in the prosecution of war or military action pursuant to 50 U.S.C. § 514; nor

(c)  has been ordered for induction into the military service within three (3) months prior to the filing of this Motion 50 U.S.C § 533; nor

(d)  is entitled to the protections afforded under 50 U.S.C. § 501, *et. seq.* due to the fact that such person was a member of the military service when the subject Negotiable Instrument and Deed of Trust were executed pursuant to 50 U.S.C. § 533(a).

Therefore, the court is not restricted by the Servicemembers Civil Relief Act in issuing an Order authorizing the Public Trustee to sell the Property under the Power of Sale contained in the Deed of Trust.as a result of the borrower's default of the terms in the Negotiable Instrument.

WHEREAS, the names of all persons who were the Grantor or Grantors in such Deed of Trust, and those persons who appear to have acquired a record interest in the Property subsequent to the recording of such Deed of Trust and prior to the recording of the Notice of Election and Demand thereunder, whether by deed, mortgage, judgment or any other instrument of record, and the address of each such person as such address appears in the recorded instruments of writing, are listed on Exhibit B hereof.

Mark S Miller and Jamileh Miller 3500.00832

WHEREAS, the names and last known address(es) (as shown by the records of the Petitioner) of the Grantor or Grantors of said Deed of Trust, the current record owner or owners, and of any person or persons known or believed by Petitioner to be personally liable on the indebtedness secured by said Deed of Trust, are also listed on Exhibit B hereof.

WHEREFORE, Petitioner prays that the Clerk of the Court fix a time and place for the hearing of this Motion, and that the Court examine this Motion and response(s) thereto, if any, and summarily grant the Motion by entering an Order authorizing a Public Trustee's Sale under the Power of Sale contained in said Deed of Trust.

ARONOWITZ & MECKLENBURG, LLP
Attorney for Petitioner
By _____ #33010f
Robert J. Aronowitz, Esq.    Reg. No. 5673
Joel T. Mecklenburg, Esq.    Reg. No. 36291
Stacey L. Aronowitz, Esq.    Reg. No. 36290
Joan Olson, Esq.             Reg. No. 28078
Monica Kadrmas, Esq.         Reg. No. 34904
Andrea Rickles-Jordan, Esq.  Reg. No. 39005
Randall M.Chin               Reg. No. 31149

Petitioner's Address:
c/o Aronowitz & Mecklenburg, LLP
1199 Bannock Street
Denver, CO  80204

STATE OF COLORADO )
                  ) ss.
COUNTY OF DENVER  )

The undersigned, on behalf of the Petitioner, being first duly sworn, says that the facts set forth in this Motion are true.

By _____ #33010f
Robert J. Aronowitz, Esq.    Reg. No. 5673
Joel T. Mecklenburg, Esq.    Reg. No. 36291
Stacey L. Aronowitz, Esq.    Reg. No. 36290
Joan Olson, Esq.             Reg. No. 28078
Monica Kadrmas, Esq.         Reg. No. 34904
Andrea Rickles-Jordan, Esq.  Reg. No. 39005
Randall M.Chin               Reg. No. 31149

The foregoing instrument was subscribed and sworn to before me on March 18, 2010, by the attorney named above, as the Attorney for Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 under the Pooling and Servicing Agreement dated May 1, 2006.

My commission expires: _____
(SEAL)                    Notary Public

Mark S Miller and Jamileh Miller 3500.00832

Home Loan Servicing
6900 Beartice Drive
Kalamazoo, MI 49009


July 10, 2010


MARK MILLER
19733E E UNION DR
CENTENNIAL, CO 80015


RE:   Loan No:                    1007505843
      Property Address:           19733E UNION DR
                                  CENTENNIAL, CO 80015
      Bankruptcy Case Number:     10-25453


Dear Mark Miller,

We are aware of your pending Chapter 13 proceeding, Case No. 10-25453. The purpose of this letter is to explore the possibility of engaging in loss mitigation efforts, notwithstanding the pending bankruptcy.

These options may include loan modification, discounted payoff, short sale, or deed in lieu of foreclosure; all necessarily contingent upon any requisite order of the Bankruptcy Court.

If you wish to discuss these options further please do not hesitate to contact us at 1-866-354-5947. We look forward to working with you.


Sincerely,

IndyMac Mortgage Services, a Division of OneWest Bank, FSB
Loan Resolution

**This company is a debt collector and any information obtained will be used for that purpose. However, if you have filed a bankruptcy petition and there is either an "automatic stay" in effect in your bankruptcy case, or your debt has been discharged pursuant to the bankruptcy laws of the United States, this communication is intended solely for informational purposes.**



OneWest Bank

2237000063

## ARONOWITZ & MECKLENBURG,LLP

Attorneys At Law

1199 Bannock Street, Denver, Colorado 80204

Telephone (303) 813-1177 ● Telecopier (303) 813-1107

Robert J Aronowitz

February 15, 2010

Mark S Miller
19733 E Union Dr
Centennial, CO 80015

### Notice under Fair Debt Collection Practices Act
### 15 U.S.C. Section 1692, et seq.

| | |
|---|---|
| Property: | 19733 E Union Dr, Centennial, CO 80015 |
| Amount of Debt: | **$214,302.28** |
| Interest Paid to: | March 31, 2009 |
| Loan Due Date: | May 01, 2009 |
| Original Creditor: | Mortgage Electronic Registration Systems, Inc., acting solely as nominee for IndyMac Bank, F.S.B. |
| Current Creditor: | Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2006-AR13, Mortgage Pass-Through Certificates, Series 2006-AR13 under the Pooling and Servicing Agreement dated May 1, 2006 |

Dear Sir/Madam:

As of the date of this letter, you owe **$214,302.28** plus monthly payments due from and including May 01, 2009. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your payment, in which event we will inform you before depositing the payment for collection. For further information, write to: Aronowitz and Mecklenburg, LLP, 1199 Bannock, Street, Denver, Colorado 80204 or call (303) 813-1177.

Your mortgage loan, with the above-referenced creditor, has been referred to the law firm of Aronowitz & Mecklenburg, L.L.P. for institution of foreclosure proceedings against the above-referenced property based on a default under the terms of the subject promissory note and deed of trust. We are delivering this notice to you in compliance with the Federal Fair Debt Collection Practices Act and the Colorado Fair Debt Collection Practices Act. **FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.AGO.STATE.CO.US/CAB.HTM.**

**UNLESS YOU, AS A CONSUMER, WITHIN THIRTY (30) DAYS AFTER RECEIPT OF THIS NOTICE, DISPUTE THE VALIDITY OF THE ABOVE-REFERENCED DEBT OR A PORTION THEREOF, THE DEBT WILL BE ASSUMED VALID.**

**IF YOU NOTIFY US IN WRITING WITHIN THIRTY (30) DAYS AFTER RECEIPT OF THIS NOTICE, THAT THE DEBT OR ANY PORTION THEREOF IS DISPUTED, WE WILL OBTAIN VERIFICATION OF THE DEBT AND A COPY OF SUCH VERIFICATION WILL BE MAILED TO YOU BY US.**

**UPON YOUR WRITTEN REQUEST WITHIN THIRTY (30) DAYS OF THE DATE YOU RECEIVE THIS NOTICE, WE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IF THE ORIGINAL CREDITOR IS DIFFERENT FROM THE CURRENT CREDITOR NAMED ABOVE.**

The Colorado Fair Debt Collection Practices Act requires that we advise you that: **THE LAW FIRM OF ARONOWITZ & MECKLENBURG, L.L.P. IS ACTING AS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WHICH YOU PROVIDE WILL BE USED FOR THAT PURPOSE.**

We are also required to notify you that:

(A)    A default has occurred under the Promissory Note and Deed of Trust. The default exists because you have failed to make the installments of principal and interest which became due on March 31, 2009. The total amount now due is **$214,302.28**.

(B)    If you notify this office in writing that you want this office to cease contact by telephone at your residence or place of employment, then no such further contact by telephone shall be made.

(C)    If you notify this office in writing that you refuse to pay this debt and you want this office to cease further communication with you, then this office shall not communicate further with you with respect to such debt, except for a written communication:
    (1)    To advise you that this office is terminating further efforts to collect the debt;
    (2)    To notify you that this office may invoke specified remedies ordinarily invoked;
    (3)    Where applicable, to notify you that this office intends to invoke a specific remedy permitted by law.

(D)    If you orally inform this office of either of the matters specified in paragraphs A and/or B above, you will be advised that such communication must be made in writing. If such notice is made by mail, notification shall be complete upon receipt by this office.

(E)    Your failure to cure the default on or before the date specified in this notice may result in acceleration of the sums which are secured by the Deed of Trust or security interests and the sale of your property. You are also informed that you have a right as a borrower to reinstate your loan after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense which you as a borrower may have to acceleration and sale. If the default is not cured on or before the date specified in this notice, the creditor at its option may require immediate payment in full of all sums secured by the Deed of Trust or security instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. The creditor shall be entitled to collect all expenses incurred in pursuing the remedies provided in the Deed of Trust including, but not limited to, reasonable attorneys fees and costs of title evidence.

You have various rights and duties under Colorado law which may include the right to reinstate the loan or redeem the property from the foreclosure sale. This letter is not intended to and does not advise you of what those rights are, and you should seek independent advice with respect to those rights and your obligations under this debt.

By:_____

Aronowitz & Mecklenburg, LLP
1199 Bannock Street
Denver, Colorado 80204
(303) 813-1177

**IMPORTANT RIGHTS ARE CONTAINED WITHIN THIS LETTER.**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

```
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                :
In Re.                          :
                                :
MARK STANLEY MILLER AND         :      10-25453-MER
JAMILEH MILLER,                 :
                                :
            Debtors.            :
                                :      Chapter 13
DEUTSCHE BANK NATIONAL          :
TRUST COMPANY,                  :
                                :
            Movant,             :
      vs.                       :
                                :
MARK STANLEY MILLER AND         :
JAMILEH MILLER,                 :
                                :
            Respondents.        :
                                :
Evidentiary hearing regarding   :
Deutsche Bank's motion for      :
relief from stay and debtors'   :
objection thereto, and          :
debtors' motion for summary     :
judgment and Deutsche Bank's    :
objection thereto               :      Courtroom D
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:      October 5, 2012
```

BEFORE THE HONORABLE MICHAEL E. ROMERO, Judge

APPEARANCES:

        For the Movant:        Susan J. Hendrick, Esq.
                               Lissa Calt, Esq.

        For the Defendants:    Pro Se

            Proceedings electronically recorded and
        produced by Federal Reporting Service, Inc.

                        Requested by Jamileh Miller
                        Ordered:  December 7, 2012
                        Delivered:  January 8, 2012
                        Time:  30 day
                        $2.50 per page; $272.50

1              P R O C E E D I N G S

2          THE COURT:  Please be seated.  Good morning, everyone.

3              All right.  We're here in Case Number 10-25453,

4    Mark Stanley Miller and Jamileh Miller.  We are here for a

5    motion for relief from stay filed by Deutsche Bank and

6    debtors' objection thereto.  As part of this as well, we have

7    a debtor's motion for summary judgment and a response to that

8    as well.

9              Could I get appearances, please?

10         MS. HENDRICK:  Good morning, Your Honor.  Susan Hendrick

11   appearing on behalf Deutsche Bank, and with me at counsel

12   table is also from our office Lissa Calt (phonetic).

13         THE COURT:  All right, thank you.

14             Good morning.

15         MR. MILLER:  Good morning, Your Honor.  Mark Miller

16   appearing pro se for myself.

17         MS. MILLER:  Good morning, Your Honor.  Jamileh Miller

18   appearing pro se.

19         THE COURT:  All right, thank you.

20             Before we get to the two motions which I

21   referenced, are there any preliminary matters we need to deal

22   with?

23         MS. HENDRICK:  Not that I'm aware of, Your Honor.

24         THE COURT:  All right.  Any preliminary matters that you

25   are aware of before we start (inaudible)?

3

1       MR. MILLER:  Not that I'm aware of?

2       THE COURT:  All right, thank you.

3           Let's take up first the motion for summary judgment

4   which was filed.  I have had the opportunity to review them

5   several times, reviewed the authorities cited in them, and is

6   there anything the parties wish to add?  I don't need to hear

7   the arguments.  I know the arguments very well.  Is there

8   anything the parties wish to add to either the motion or to

9   the responses?  Mr. Miller.

10      MR. MILLER:  I have nothing to add at this time.

11      THE COURT:  All right, thank you.

12          Ms. Hendrick?

13      MS. HENDRICK:  Your Honor, I have nothing to add at this

14  time.

15      THE COURT:  All right.  That being the case, having

16  reviewed the motion for summary judgment, the primary thrust

17  of the motion for summary judgment relates to the issue of

18  standing, which is the primary issue for which the Tenth

19  Circuit originally sent this back to us on.  There are

20  questions with respect to--even during the course of the

21  motion for summary judgment as to the authenticity of the

22  note.  There are allegations all relating to whether or not

23  Deutsche Bank has the proper standing to bring the motion for

24  relief from stay.  Issues with respect to standing are mixed

25  issues of fact and law.  The arguments raised in the motion

4

1    for summary judgment do raise several issues of fact.  The

2    issue in questioning the authenticity of the note itself is a

3    classic fact issue.  That's why we're here today.

4           That being the case, since I believe that the whole

5    issue of standing is something which we will be taking up and

6    we will be taking factual evidence on, that I am going to

7    deny the motion for summary judgment for purposes of those

8    genuine issues.  I'm not saying I'm making a ruling on what

9    those issues may be.  It's just that we need to take evidence

10   on them.

11          So, as such, the motion for summary judgment is

12   denied.  We'll take all the evidence we need to, and then I

13   can have everything I need in front of me to make the

14   standing issue ruling.  And, for that reason, the motion for

15   summary judgment is denied.

16          All right.  Let's go to the motion for relief from

17   stay.  I am extremely aware of the issues in this case, and I

18   don't think opening statements are going to be helpful to me.

19   So, for that reason, I want to take evidence, and then I want

20   to hear the closing arguments, which I think are going to be

21   the most important.  So, that being the case, let's just get

22   right to the evidence, and we will then hear closings and go

23   from there.

24          All right, Ms. Hendrick, it's your motion.

25      MS. HENDRICK:  Good morning, Your Honor, may it please

5

```
 1    the Court.  Your Honor, our Exhibit 1 and Exhibit 2 that we

 2    have presented to the Court are copies of the note and the

 3    deed of trust.  I do have the original note and deed of trust

 4    with me here this morning.  I am now going to show Mr. and

 5    Mrs. Miller the original note and deed of trust.

 6              (Pause.)

 7              Your Honor, I'd like the record to reflect that I

 8    am showing Mr. and Mrs. Miller page 1 of the fixed adjustable

 9    rate note interest-only fixed period, which does have their

10    blue ink initials down at the bottom.  I'm showing them

11    page 2 of the said note, which does note that it's page 2 of

12    5 down at the bottom, again with blue ink initials down at

13    the bottom.  Your Honor, I'd like the record to reflect that

14    I am showing Mr. and Mrs. Miller page 3 of the note that's 3

15    of 5 with their blue ink initials down at the bottom.  Your

16    Honor, I am now showing Mr. and Mrs. Miller page 4 of 5 of

17    the original note, which does have their blue ink initials

18    down at the bottom.  Your Honor, I'd like the record to

19    reflect that I am showing them page 5 of 5 of the original

20    note, which does have their blue ink signatures and the blue

21    ink open endorsement of the note.  Let the record reflect

22    that I am showing them the addendum to the adjustable rate

23    note and page 2 to the addendum of the adjustable rate note

24    with their blue ink signatures.

25              Your Honor, at this time I am now showing them the
```

6

1   deed of trust, which is 13 pages and has blue ink as well.

2           (Pause.)

3           And, Your Honor, I am now showing them page 13 of

4   13 of their deed of trust with the blue ink signatures as

5   notarized by, it appears, Carolyn Carter (phonetic).

6           (Pause.)

7           Your Honor, the note had to be rerecorded.  It is a

8   copy.  It was certified.  It was rerecorded in Arapahoe

9   County.  I am now showing that deed of trust as well to Mr.

10  and Mrs. Miller.

11          (Pause.)

12          Your Honor, I'll let the record reflect that I have

13  shown all these documents to Mr. and Mrs. Miller and that

14  they are unaltered.  And may I approach the Bench and show

15  you the exact ones?

16      THE COURT:  Please.

17          (Pause.)

18          Thank you.

19          Ms. Hendrick, in your proposed exhibit book,

20  Exhibits 1 and 2 are, as you call them, the original

21  promissory note and the deed of trust.  Is the representation

22  that the documents we have just shown the Millers and which

23  you have just presented to me, the copies in the exhibit

24  books are the exact copies of these original documents?

25      MS. HENDRICK:  That is my understanding, Your Honor.

7

1       THE COURT:  I don't want your understanding.  I just

2   want your representation.

3       MS. HENDRICK:  Yes, Your Honor.

4           (Pause.)

5       THE COURT:  All right.  Let the record reflect that the

6   documents handed to the Court appear to be those as

7   identified by Ms. Hendrick, the majority of which do appear

8   to have wet blue pen signatures and initials on them.  There

9   may be some questions as to authenticity, as I mentioned in

10  the motion for summary judgment comments.  We'll deal with

11  those if it comes up.  There is an original deed of trust.

12  There is a certified copy of a deed of trust that was

13  certified by the Jefferson County District Court--or

14  Jefferson County Clerk of the Court--excuse me.  And the

15  representation was that the documents attached to the

16  proposed exhibits as 1 and 2 are exact copies of the

17  originals which were just handed to me, which I am handing

18  now back to Ms. Hendrick.

19      MS. HENDRICK:  Your Honor, may I approach the Bench?

20      THE COURT:  By all means, please.  Thank you.

21      MS. HENDRICK:  Your Honor, Exhibit 1 is the original

22  note, a copy of which has been provided as a courtesy to the

23  Court and to Mr. and Mrs. Miller and Judge's exhibit

24  notebook, which was also presented to Mr. and Mrs. Miller

25  prior to this hearing.

1          Exhibit 1 is self-authenticating pursuant to
2    Federal Rule of Evidence 9029.  As a note, it is considered
3    commercial paper, and as commercial paper it is self-
4    authenticating.  The contents therein are admissible pursuant
5    to Federal Rule of Evidence 803(15).  Your Honor, I'd move
6    for admission of this exhibit.
7          MR. MILLER:  Objection, Your Honor.
8          THE COURT:  All right, sir.
9          MR. MILLER:  I object on two grounds.  I first object on
10   authenticity.  There is no grounds to believe these are
11   authentic.  They look like they're altered.  And I also
12   object on the grounds that they are not true and correct
13   copies of what Ms. Hendrick handed us today.  These are
14   obviously not the same.  As well as, the Court required
15   exchange of documents prior to this hearing.  These are the
16   documents that were exchanged, clearly not true and correct
17   copies of the document she is providing.  I also object on a
18   third ground.  There is no chain of custody established in
19   this document.
20         THE COURT:  Well, with respect to chain of custody, as
21   long as they've got the original, that's all the chain they
22   need under Colorado law.  At least we're holding the
23   originals.  But let's deal with the other objections as well.
24         MR. MILLER:  Thank you.
25         THE COURT:  Ms. Hendrick, how do you want to respond?

9

1      MS. HENDRICK:  Your Honor, they have not indicated how

2   they are different from the original.  We've been copying the

3   original and producing it to them.  Additionally, under 1003

4   it allows a duplicate to be admissible to the same extent as

5   the original unless a genuine question is raised about the

6   original's authenticity or the circumstances that make it

7   unfair to admit the duplicate.

8           Again, we have the originals here in the courtroom,

9   and Mr. and Mrs. Miller have been invited to our office since

10  April of 2012 of this year to come into our office and view

11  the original.  The rules do not require us to produce the

12  original note and deed of trust to the Millers in the hopes

13  that they will return it to our office.  Again, we've

14  exchanged copies of this document, and there is no

15  requirement that we have to provide them with the original

16  notes.

17     THE COURT:  All right.  Well, let's do this.  Since

18  authenticity is an issue we need to deal with right away, Mr.

19  Miller, if I can have you come up and be sworn in.

20          (Pause.)

21          Please raise your right hand.

22          (Whereupon, Mr. Miller was sworn.)

23     THE COURT:  All right, Ms. Hendrick, the issue of--

24  actually, let's do this.

25          Sir, you were representing the three grounds that

10

1  you had for challenging the authenticity of the exhibits.

2  The first was that you didn't believe it was the original,

3  and there were evidence of it being tampered with, I guess,

4  was the word.  I'm not sure exactly what the word was but--

5        THE WITNESS:  Altered.

6        THE COURT:  Altered.  Would you please explain to the

7  Court the basis for that belief?

8                         MARK STANLEY MILLER

9  having been first duly sworn, was examined and testified as

10 follows:

11                         DIRECT TESTIMONY

12        Well, obviously Ms. Hendrick didn't give us a very

13 good opportunity to view it, but the bright blue ink marks

14 clearly are not pen marks, and it clearly appears to me to be

15 some kind of fabrication.

16        THE COURT:  By "clearly", how do you mean--how did you

17 come to that conclusion?  It looked like pen marks to the

18 Court.

19        THE WITNESS:  It doesn't look like pen marks.  I have--

20 the modern-day photocopiers, scanners, and printers can

21 duplicate things with impeccable likeness; but when you

22 review those items, they have an unrealistic appearance.

23 They appear almost too real.

24        THE COURT:  Okay.

25        THE WITNESS:  And this is what the appearance of this

M. Miller - Direct                          11

1    document is to me.

2          THE COURT:  Okay.  Any additional grounds with respect

3    to the appearance?  The representations you are making, I

4    just want to make sure I flesh out what they are.

5          THE WITNESS:  Sure.

6          MS. MILLER:  Your Honor.

7          THE COURT:  Yes, ma'am.

8          MS. MILLER:  May I speak?

9          THE COURT:  He's testifying, not you.

10         MS. MILLER:  No.  Okay.

11         THE COURT:  If you want to testify, we can put you up on

12   the stand as well.

13         MS. MILLER:  I'm not testifying.  I'm--

14         THE COURT:  Well, we're not arguing right now.  We're

15   taking his testimony just to see what the basis for his

16   arguments are.  Then Ms. Hendrick will have a chance to ask

17   questions.  Then, if you want to, you can ask questions of

18   him.

19         MS. MILLER:  Sure.

20         THE COURT:  Okay, sir.

21         THE WITNESS:  As well, there are a lot of markations

22   (phonetic) on there that are obvious altercations (phonetic).

23         THE COURT:  Such as?

24         THE WITNESS:  I don't have the document in front of me.

25         THE COURT:  There are the exhibits right there is what

M. Miller - Direct                    12

1    she claimed are identical.

2         THE WITNESS:  Well, this is essentially no good to me.

3    This is what is in this book, reduced copy there, a blank

4    page.  This isn't what she showed us.  It's obvious.  It's

5    not what she showed us.

6         THE COURT:  In what way?  Copies are allowed by the

7    Rules of Evidence, I mean, they're technically modified.  I'm

8    just--

9         THE WITNESS:  Well, Your Honor--

10        THE COURT:  A blank piece of paper is not a

11   substantive--

12        THE WITNESS:  This is the first page.  This is an

13   obvious representation of the second page, which is not the

14   second page she showed.  This is a representation of the

15   third page, not a representation of what she's shown me.

16   This--

17        THE COURT:  I'm at a loss as to what's not the

18   representation she showed.  They appeared to be the same

19   documents.

20        THE WITNESS:  This is the same document as she showed

21   you, Your Honor?

22        THE COURT:  It's a blank piece of paper.

23        THE WITNESS:  It is not.

24        THE COURT:  Is it just a blank piece of paper with a fax

25   number--

M. Miller - Direct                    13

1       THE WITNESS:  It's a blank piece of--well, it's got
2   some--
3       THE COURT:  A fax number on the top?
4       THE WITNESS:  Something on the top.
5       THE COURT:  Okay.  With the exception of the blank piece
6   of paper, tell me, you know, of these documents that have
7   substance on them--
8       THE WITNESS:  Your Honor, I can't make a judgment based
9   on a copy when the claim is that that's not an original and
10  I'm looking at a copy.  I can't base assertions on that
11  original, looking at a copy that is obviously reduced in
12  size.  It's not the same.
13      THE COURT:  Well, part of the problem is that the Rules
14  of Evidence give copies--unless there is a clear, provable
15  challenge to the authenticity of the original, copies can be
16  used, reduced or otherwise, copies of an original document,
17  and are deemed admissible as evidence.  Now, if you'd like to
18  go through the originals right now and look at it and tell me
19  on the originals where you think there are problems, fine,
20  I'll be glad to let you do that.  But, as of right now, the
21  fact that there's a copy in there and there may be a blank
22  piece of paper in there isn't sufficient grounds to challenge
23  the Rules of Evidence.
24          So, Counsel, why don't you give him the originals?
25      MS. HENDRICK:  Your Honor, may I approach the witness?

M. Miller - Direct                    14

1      THE COURT:  By all means.

2           (Pause.)

3           And answer me one question.  Ms. Hendrick

4  represented that they had offered for you and your wife to

5  view the original at their offices since last spring; is that

6  accurate?

7      THE WITNESS:  She did send a letter to that.  I work--

8      THE COURT:  Did you take--and I understand, sir, but did

9  you take advantage of that opportunity before today?

10     THE WITNESS:  I did not.  I work.  I have a lot of

11  federally-mandated deadlines in my work.  I can't just take

12  off work at any time.  Actually, being here today is a

13  challenge to my employment and is a challenge that I am going

14  to have to address with my employer when I get back next

15  week.

16     THE COURT:  Did you contact Ms. Hendrick's office in an

17  opportunity to try to arrange a time that you possibly could

18  view it?

19     THE WITNESS:  Her document said during business hours by

20  appointment.

21     THE COURT:  That's not my question, sir.

22     THE WITNESS:  I did not contact her.

23     THE COURT:  That's what I asked.  Thank you.

24     THE WITNESS:  However, we have made attempts to review

25  this document with Deutsche Bank since they've claimed

M. Miller - Direct                      15

 1  they've had it for almost four years now.  I have documents

 2  in our evidence that will attest to that.

 3      THE COURT:  I understand, but it looks like the last

 4  eight months the opportunity has been there, which you have

 5  not availed yourself of with her either.

 6      THE WITNESS:  And, as well, as you know, we had an

 7  extension of this hearing because of my wife's health

 8  condition, and it just was not a possibility.

 9      THE COURT:  Okay, that's fine.  Go ahead now and take a

10  look at the documents and tell me where you think that's been

11  altered.

12          (Pause.)

13      THE WITNESS:  On page 6--

14      THE COURT:  Of which document, sir?

15      THE WITNESS:  Of the fixed adjustable rate note, Exhibit

16  1.

17      THE COURT:  Okay.

18      THE WITNESS:  There are multi-colors in ink on the

19  alleged endorsements, which appear to be traced over with a

20  pen.

21          (Pause.)

22          There have been stamps put on this document.  The

23  last page of the document has a loan number stamped on the

24  top.  I believe, actually, all of them do--not all of them.

25  They have a loan number stamped somewhere on them, just a

M. Miller - Direct                          16

1   clear alteration.

2           (Pause.)

3           There does not appear to be any pen depressions on

4   the alleged blue ink.

5       THE COURT:  Ms. Hendrick, you can take your document

6   back.

7       MS. HENDRICK:  May I approach the witness, Your Honor?

8       THE COURT:  Yes, you may.

9           (Pause.)

10          Okay.  I'm trying to remember the other arguments

11  you had in connection with challenging the authenticity of

12  exhibits other--okay, you just identified where you thought

13  it was altered.

14      THE WITNESS:  Correct.

15      THE COURT:  And the chain of title, the bank has the

16  original, which takes care of the problem under Colorado law

17  in that aspect.  I apologize.  What was the other ground?

18      THE WITNESS:  That a true and correct copy had not been

19  provided.

20      THE COURT:  Okay.  And did you compare--we can give you

21  the documents again; and if you want to compare the--I'll

22  call them originals--that you were just viewing against the

23  copies to see whether or not they are altered other than the

24  couple of blank pages which you identified?  If you want to

25  do it, I'll give you the opportunity to do so.

1       THE WITNESS:  Yes, Your Honor.

2       THE COURT:  All right.  Ms. Hendrick, would you bring

3  the document back to him again?

4       MS. HENDRICK:  Yes, Your Honor.

5            (Pause.)

6       THE COURT:  Recognizing there is a reduction in size

7  perhaps.

8       MS. HENDRICK:  Your Honor, I'd also let the record

9  reflect that we copied both the front and back of those

10  pages, so those blank pages are actually the copies of the

11  back of each page of the note.

12       THE COURT:  All right.

13            (Pause.)

14       THE WITNESS:  Your Honor, I'll state that it's almost

15  impossible to make a fair comparison of these documents based

16  on the size reduction.

17       THE COURT:  And why is that?

18       THE WITNESS:  Because they--you know, if you take--

19       THE COURT:  I'm looking at the document itself.  I'm

20  having a hard time understanding your argument.

21       THE WITNESS:  If you take this document and line it up

22  with this document--

23       THE COURT:  That's why it would be a reduction.  The

24  intention is you look at the content, not the fact that they

25  don't match up because the--if it's a reduced copy, they are

M. Miller - Direct                          18

1   not going to match up by holding them up against the light,

2   just as a matter of course.  The bottom line is, is the

3   content on the document the same?

4        THE WITNESS:  Well, I can type this document out and the

5   content will be the same.

6        THE COURT:  That's not what I'm asking, sir.  Is the

7   content of the document--does it look like a photocopy just

8   reduced?

9        THE WITNESS:  I will have to say it does not.

10       THE COURT:  Okay.  Then tell me why it does not.

11       THE WITNESS:  Because I cannot compare these two

12  documents.  They're not the same.

13       THE COURT:  That I don't understand, sir.

14           Ms. Hendrick, would you hand me that document,

15  please?

16       MS. HENDRICK:  Your Honor, may I approach the witness

17  and the Bench?

18       THE COURT:  Please.

19       MS. HENDRICK:  Thank you.

20           (Pause.)

21           Ms. Hendrick, you may have these back.

22       MS. HENDRICK:  May I approach?

23       THE COURT:  Yes, you may.

24           (Pause.)

25           All right.  It's your turn to ask questions of Mr.

1   Miller on the authenticity question only.

2                    CROSS-EXAMINATION

3   BY MS. HENDRICK:

4   Q    Mr. Miller, on April 20, 2006, did you execute a

5   promissory note in the amount of $216,236 to IndyMac Bank

6   FSB?

7   A    I can't say that that is accurate.  I don't have the

8   information to confirm or deny that.

9        MS. HENDRICK:  Your Honor, may I approach the witness?

10       THE COURT:  Yes, you may.

11  Q    (by Ms. Hendrick)  Mr. Miller, if you'd look at page 5

12  of 5 of the note--

13       THE COURT:  That's Exhibit 1?

14       MS. HENDRICK:  Yes, Your Honor, Exhibit 1.

15            (Pause.)

16  Q    (by Ms. Hendrick)  Are you looking at that page 5 of 5?

17  A    I am looking at that page.

18  Q    Is that your signature?

19       MS. MILLER:  Objection, Your Honor.

20       THE COURT:  And what is the objection?

21       MS. MILLER:  Based on trying to authenticate--trying to

22  ask witness questions on an unauthenticated instrument.

23       THE COURT:  Overruled.

24       THE WITNESS:  Your Honor, I can't say that that's my

25  signature.  I can't say that that is my signature.

1  Q    (by Mr. Hendrick)  Mr. Miller, let me ask you this then.

2  When did you purchase 19733 East Union in Centennial,

3  Colorado?

4  A    I don't have the information with me to make that exact

5  determination.  It was sometime in 2006.

6  Q    At the time you purchased the property in 2006, did you

7  pay for it in cash?

8       THE WITNESS:  Objection, Your Honor.  It's irrelevant.

9       THE COURT:  It's not your turn to object.  You have to

10  answer the question.

11      THE WITNESS:  I am representing myself.

12      THE COURT:  It doesn't matter.  Your wife can make an

13  objection.  You as the witness--

14      MS. MILLER:  Objection, Your Honor.

15      THE COURT:  Overruled.  Answer the question.

16      THE WITNESS:  Can you repeat the question, please?

17  Q    (by Ms. Hendrick)  Mr. Miller, in 2006 when you

18  purchased the subject real property, did you pay for it in

19  cash?

20      MS. MILLER:  Objection, Your Honor.  Whether he paid for

21  it in cash or not is not relevant here.

22      THE COURT:  Overruled.

23          (Pause.)

24      THE WITNESS:  You know, obviously cash did change hands,

25  yes.

M. Miller - Cross                              21

1   Q    (by Ms. Hendrick)  Mr. Miller, that wasn't the question.

2   The question was:  Did you pay cash for the house?

3   A    What else would I have paid with?

4   Q    Mr. Miller, did you take out a loan to purchase the

5   house?

6   A    That would be correct.

7   Q    Did you take out a loan from IndyMac Bank FSB to

8   purchase the house?

9   A    I don't have the information to confirm or deny who I

10  got that loan with originally?

11  Q    Did you sign a note, a promissory note, to evidence that

12  loan?

13       MS. MILLER:  Objection, Your Honor.  Deutsche has no

14  standing in asking that question since they were not the

15  originator of the loan.

16       THE COURT:  Overruled.

17       THE WITNESS:  Can you repeat the question?

18  Q    (by Ms. Hendrick)  Did you take out a loan from IndyMac

19  Bank FSB in the amount of $216,236 to purchase the property?

20       MS. MILLER:  Objection, Your Honor.  The--sorry--I'm not

21  sure why Deutsche has any standing in asking that question

22  when the originator--they are purporting the originator to be

23  IndyMac.

24       THE WITNESS:  Asked and answered.

25       MS. HENDRICK:  Your Honor, if she's going to make that

M. Miller - Cross                                    22

1    argument, I am going to ask, is that an admission that they

2    executed a promissory note on behalf of IndyMac Bank FSB?

3         THE COURT:  Well, first, the issue is--you know, the

4    whole issue of standing--the reason we're going through this

5    process right now is to determine the issue of standing.  So

6    right now the argument is a big circular that the bank does

7    not have the right to question whether or not they have--or

8    to prove that they have standing because of the

9    representation that they don't.  That's the whole reason

10   we're doing this is to get the questions out to find out

11   whether or not there is sufficient grounds for them to have

12   standing.  So that's not a legitimate objection.  I will

13   overrule it.

14        So go ahead and answer the question.

15        THE WITNESS:  Your Honor, I asked for the question to be

16   repeated.  I didn't remember the question, but I know that

17   wasn't the question she asked.  That question was asked and

18   answered.

19        THE COURT:  Well, you answer only the question that she

20   asked last.  If she didn't want to ask the question before

21   then, that's her choice.

22        THE WITNESS:  Ask the question again now that you want

23   the answer to, Ms. Hendrick.

24   Q    (by Ms. Hendrick)  Mr. Miller, did you execute a

25   promissory note in the amount of $216,236 for the benefit of

M. Miller - Cross                    23

1   IndyMac Bank FSB in order to purchase the subject real

2   property?

3   A    I don't know what the amount was on that?

4        MS. HENDRICK:  That wasn't the--Your Honor, would you

5   direct him to answer the question as to--

6        THE COURT:  Well, your question did ask the specific

7   amount which he had raised a question on.  Reask the

8   question.

9        MS. MILLER:  Asked and answered, Your Honor.

10       THE COURT:  It has not been answered at all yet, ma'am.

11  Overruled.

12            Ask the question again, Ms. Hendrick.

13  Q    (by Ms. Hendrick)  Mr. Miller, did you execute a

14  promissory note evidencing the loan in order to purchase the

15  subject real property?

16  A    I can say that is probably correct.

17  Q    You purchased the house?

18  A    Yes.

19  Q    And you had to take out a loan to do it?

20  A    Yes.

21  Q    And this loan--you went to a closing to purchase the

22  property?

23       MS. MILLER:  Objection, Your Honor.  Why is she asking

24  about closing?

25       THE COURT:  Overruled.

M. Miller - Cross                 24

1       THE WITNESS:  Your Honor, that's not a question.  That's

2   a statement.

3       MS. MILLER:  What's she getting at when she's talking

4   about a closing?

5       THE COURT:  There's no question pending, ma'am.

6   Q   (by Ms. Hendrick)  Mr. Miller, when you purchased the

7   subject real property and took out the loan in order to do

8   so, did you attend a closing?

9   A   I would say that's correct.

10  Q   And at that closing, did you sign documentation?

11          (Pause.)

12          Mr. Miller, please--

13      THE COURT:  Give him the opportunity to answer.

14      MS. HENDRICK:  He was talking to his wife, Your Honor.

15  And I apologize.  You couldn't see that.  They're whispering

16  back and forth.

17      THE WITNESS:  I'm not talking--

18      MS. MILLER:  Unless I have big ears, I can't hear him.

19      THE COURT:  Whoa, whoa, whoa.  Sir, when there's

20  questions being asked, I would ask you not to attempt to

21  communicate with your wife at counsel table.  Answer the

22  question.  I didn't see whether you were or not, so I'm not

23  saying you did.  During the course of this examination, if

24  you are inclined or thinking about doing so, please don't.

25          So, other than that, what was the question, Ms.

M. Miller - Cross                                        25

1    Hendrick?  And let's start this again.

2    Q    (by Ms. Hendrick)  Mr. Miller, when you purchased the

3    subject real property and had to take out a loan in order to

4    purchase the subject real property, did you attend a closing

5    and execute documents at that closing?

6         MS. MILLER:  Objection, Your Honor, relevance.

7         THE COURT:  Overruled.

8         THE WITNESS:  I would say that's correct.

9    Q    (by Ms. Hendrick)  And at that closing, did you sign a

10   promissory note promising to make payments on that loan?

11   A    I can't recall if I signed a document like that or not.

12        MS. HENDRICK:  Your Honor, then at this time I'm going

13   to move for the admission of the note, because Mr. Miller

14   doesn't recall if he signed it or not and cannot question the

15   authenticity.

16        MS. MILLER:  Objection, Your Honor.

17        THE COURT:  Let her finish her points.

18        MS. MILLER:  I'm sorry, yes.

19        THE COURT:  Go ahead, Ms. Hendrick.  I'm sorry.

20        MS. HENDRICK:  If he cannot recall the documents that he

21   signed, then he cannot recall whether or not he specifically

22   signed this one, and he cannot object to the authenticity of

23   this particular document.

24        THE COURT:  All right.  Well, they get a chance to ask

25   questions themselves.

M. Miller - Direct                    26

1           Ms. Miller, you get a chance to ask questions of

2     Mr. Miller at this time on the authenticity issue only.   So

3     go ahead.

4                        DIRECT EXAMINATION

5     BY MS. MILLER:

6     Q    Mr. Miller, do these documents look authentic to you in

7     any way?

8           MS. HENDRICK:  Objection, Your Honor.  He's not an

9     expert.

10          THE COURT:  Overruled.

11          THE WITNESS:  They do not.

12    Q    (by Ms. Miller)  Did you receive any true and correct

13    copies of the purported original note that was shown to you

14    today by Ms. Hendrick?

15          MS. HENDRICK:  Objection--

16          THE WITNESS:  I did not.

17          MS. HENDRICK:  --Your Honor.

18          THE COURT:  Just a second, just a second.  Before you

19    answer, what's the objection?

20          MS. HENDRICK:  The objection is, Your Honor, we're not

21    discussing whether or not they received true and correct

22    copies of the original note.  We're asking today whether or--

23    this is an authenticity question specifically with respect to

24    the note and whether or not that's his signature on that

25    document, and he doesn't recall, not whether or not they've

M. Miller - Direct                    27

1   been provided copies of the original note and deed of trust.

2        THE COURT:  But one of the bases for his objecting to

3   the authenticity initially, as he originally expressed, was a

4   lack of receiving true and authentic copies.  You can make a

5   representation after we're done here that that was sent, but

6   that's a legitimate question, and I will overrule the

7   objection.

8            Go ahead and answer, sir.

9        THE WITNESS:  Can you repeat the question, please?

10  Q    (by Ms. Miller)  Did you receive true and correct copies

11  of the purported original note showed to you today by Ms.

12  Hendrick?

13  A    I have not.

14           (Pause.)

15  Q    So can you compare the purported original with what you

16  received for content when it's reduced in size?

17  A    For content, yes, I can compare it.  But, as I had said

18  before, anybody with a word processor can reproduce the

19  content.

20  Q    Mr. Miller, can you read this to compare?  This is what

21  you received originally; isn't that right?

22       THE COURT:  What is "this," ma'am?

23       MS. MILLER:  This is the original--the copy of the

24  original that we received initially for discovery.  There's

25  four pages to a sheet.

1      THE COURT:  Okay, I just wanted you to--when you use the

2  word "this," the record can't (inaudible).

3      MS. MILLER:  I'm sorry, yes.

4      THE COURT:  All right, go ahead and answer, sir.

5      THE WITNESS:  I'm sorry, can you repeat the question?

6  Q    (by Ms. Miller)  Can you compare with the initial

7  evidence we received, the copy of the purported original

8  note, when it's reduced to four pages per page--can you

9  compare the content with what you saw today, the purported

10 original note shown to you by Ms. Hendrick?

11 A    With all due respect, my eyesight isn't what it used to

12 be, but I can't even read what was provided to us let alone

13 compare it.

14 Q    Mr. Miller, is that your signature on the purported

15 original note shown to you today by Ms. Hendrick and that's

16 in front of you at the moment?

17 A    It does not appear to be my signature.

18     MS. MILLER:  No further questions, Your Honor.

19     THE COURT:  All right.  Any redirect?

20     MS. HENDRICK:  No, Your Honor, not at this time.

21     THE COURT:  All right.  Thank you, sir.  You may step

22 down.

23          Is there any other--

24     MR. MILLER:  Who do I return this to?  Ms. Hendrick?

25     THE COURT:  By all means, please.

105

M. Miller - Direct                        29

1          You keep the originals, Ms. Hendrick.

2          Thank you, sir.

3          All right.  Is there any other evidence you wish to

4   present, Mr. and Mrs. Miller, on the issue of the

5   authenticity of the note?

6          MR. MILLER:  No, we--

7          THE COURT:  Is there any other evidence you wish to

8   present on the authenticity?  Do you have a witness?  Do you

9   want Mrs. Miller to testify?  I'm just asking you, what other

10  evidence do you want me to consider before making a ruling on

11  authenticity?

12         MR. MILLER:  Yes, I would like Mrs. Miller to testify.

13         THE COURT:  All right.

14         MR. MILLER:  I would also like Barbara Campbell

15  (phonetic) to testify.

16         THE COURT:  Okay, well, let's put Mrs. Miller on first.

17             Mrs. Miller, please raise your right hand.

18             (Whereupon, Ms. Miller was sworn.)

19         THE COURT:  Mr. Miller.

20         MR. MILLER:  May I approach (inaudible)?

21         THE COURT:  Oh, by all means, please.  That's where I

22  prefer you to be at anyway.

23             (Pause.)

24             This is on the authenticity issue only, Mr. Miller.

25         MR. MILLER:  Thank you.  I would like to ask that the

J. Miller - Direct                              30

1   witness be provided the copy of the alleged original

2   promissory note.

3        THE COURT:  All right.

4            (Pause.)

5        MS. HENDRICK:  Your Honor, is he asking for a copy or

6   the original note?

7        THE COURT:  Do the original.

8        MS. HENDRICK:  Your Honor, may I approach the witness

9   then?

10       THE COURT:  Yes, you may.

11           I assume that's what you're asking for, sir?

12       MR. MILLER:  Yes, sir.

13       THE COURT:  All right.

14                       JAMILEH MILLER

15  having been first duly sworn, was examined and testified as

16  follows:

17                    DIRECT EXAMINATION

18  BY MR. MILLER:

19  Q    Ms. Miller, can you take a few minutes to review that

20  document?

21  A    Yes, I will.

22           (Pause.)

23           Okay.

24  Q    Have you had a chance to review that document to your

25  satisfaction?

167

J. Miller - Direct                          31

1   A     Well, I can't say that it's to my satisfaction in terms

2   of content.

3   Q     Have you ever seen this document before?

4   A     The only document I've seen of this nature is the copy

5   that Ms. Hendrick says--keeps sending us over the years, and

6   we can't authenticate that it's a copy of this, something

7   that looks like it.

8   Q     So you've never seen this document before?

9   A     Oh, no, I've never seen this document before, no.

10         THE COURT:  Are you done with it, ma'am?

11              Are you done with questions so she can get the

12   original back?

13         MR. MILLER:  I am not done.  I would like her to have it

14   to reference.

15         THE COURT:  That's fine.

16   Q     (by Mr. Miller)  Looking through that document, on the

17   bottom there appears to be what are initials.  Do those

18   appear to be initials that you affixed to that document?

19   A     No, they do not.

20   Q     What do you base that on?

21   A     That's not my initials.

22   Q     Does that appear to you to be wet ink on that paper?

23   A     Absolutely not wet ink.  It is very obvious.

24   Q     When you say obvious, what is obvious about it?

25   A     Well, you can tell it's copied and altered, and any blue

J. Miller - Direct                    32

1   ink that is showing is not an actual signature since there is
2   no indentation from a pen.
3   Q    You say indentation from a pen.  Can you clarify what
4   you mean by that?
5   A    When you write, indentations of your pen go through the
6   page so they're on the back of the page, and you can feel it.
7   You can feel the impression of the pen.
8   Q    And you do not see any indication of that on this?
9   A    No, not at all.  And there's a big stamp on the back
10  that's obviously--or page--sorry--page--on the third from
11  last.  That's definitely not an original signature.  Paid to
12  the order, Sam someone, that's not an original signature.
13  That one definitely cannot be--it's obvious on that one.
14  Q    So does there appear to be any endorsement seal from a
15  corporation on this document?
16  A    No, there isn't any seal.
17       MS. HENDRICK:  Objection, Your Honor.  The document
18  speaks for itself, and there is an endorsement on it.  I'd
19  like to remind the witness she is under oath.
20       MR. MILLER:  Your Honor, I did not say endorsement.  I
21  said corporate seal for the endorsement in relation to the
22  endorsement seal.
23       THE WITNESS:  No, there is no endorsement seal.
24       MR. MILLER:  Sorry if I was unclear about that question.
25       THE COURT:  Which is it, endorsement or seal, ma'am?

109

J. Miller - Direct                              33

1    You said both.

2           THE WITNESS:  Endorsement seal.

3           THE COURT:  Both of them, so you're combining the two?

4    Okay.

5           THE WITNESS:  There's no seal.  Sorry--I'm sorry.  I

6    used endorsement.  There is no seal from any corporation.

7    Q     (by Mr. Miller)  Ms. Miller, if you would look at page 5

8    of 5, there appears to be three signatures on this page.

9    A     Yeah.

10   Q     Which one of those signatures is yours?

11   A     None of them.

12   Q     Would you look at page--I believe this is page 6 of 6,

13   but there's no page number on it.  The top of it says,

14   "Addendum to Adjustable Rate Mortgage."  Did you affix your

15   signature to that document?

16   A     No, that's not my signature.  And it's Addendum to

17   Adjustable Rate Note; is that what you're referring to?

18   Q     It is.

19   A     Yeah, that's not my signature.

20   Q     So would you say that this document is an original?

21   A     It's absolutely not an original.

22   Q     Could it be an original that was produced for a reason

23   other than what Deutsche Bank (inaudible)?

24          MS. HENDRICK:  Objection, Your Honor.

25          THE COURT:  That's not a proper question of

J. Miller - Direct                                34

1   authenticity.  I'm looking just on the authenticity issues.

2   Q    (by Mr. Miller)  Could that document be a fake?

3        MS. HENDRICK:  Objection, Your Honor.  She has not been

4   qualified as a witness--or an expert witness.

5        THE COURT:  Overruled.  It's a statement of your

6   opinion, ma'am.

7        THE WITNESS:  I'm sorry, repeat the question.

8   Q    (by Mr. Miller)  Could that document be a fake?

9   A    Yes, it could be a fake.

10  Q    Could that document have been manufactured for the

11  purpose of this trial?

12       MS. HENDRICK:  Objection, Your Honor--

13       THE WITNESS:  Yes, it could have.

14       MS. HENDRICK:  --calls for speculation.

15       THE COURT:  It's the same, but I'll allow the question

16  anyway.  Overruled.

17       THE WITNESS:   Yes, it could have been manufactured.

18  Q    (by Ms. Miller)  Ms. Miller, what do you do for a

19  living?

20  A    I stay at home.

21  Q    Do you also--

22  A    (Inaudible) photographer.

23  Q    In your photography business, what kind of things do you

24  have the opportunity to do?

25  A    I have extensive knowledge in manipulation of photos and

J. Miller - Direct                          35

1    documents.

2    Q    Would you say this makes you an expert in photographic

3    manipulation of documents?

4    A    Yes, it is.  Yes, I am.

5    Q    Are you here today to testify as an expert witness?

6    A    Yes, I am.

7         MS. HENDRICK:  Objection, Your Honor.  She has not been

8    qualified (inaudible) the authenticity.  It's simply whether

9    that's her signature on that document.

10        THE COURT:  All right.  Well, we'll give you a chance

11   to--are you offering her as an expert?

12        MR. MILLER:  I am not.

13        THE COURT:  All right.

14        MR. MILLER:  I am--

15        THE COURT:  Then she's not going to testify on any

16   expert matters then.  You can't have it both ways.

17   Q    (by Mr. Miller)  So, Ms. Miller, would you say that you

18   have more knowledge than the average individual?

19        THE COURT:  You're trying to qualify her as a quasi-

20   expert.  That doesn't work either, sir.  Do you have any more

21   factual evidence in connection with this issue?

22        MR. MILLER:  Not at this time, Your Honor, but I'd like

23   to reserve--

24        THE COURT:  Oh, you'll get a chance to do another set of

25   questions in a moment.

1      MR. MILLER:  Thank you.

2      THE COURT:  Ms. Hendrick.

3                         CROSS-EXAMINATION

4  BY MS. HENDRICK:

5  Q    Ms. Miller, in 2006 when you purchased this property,

6  did you pay for the property in cash?

7  A    I do not recall that.

8  Q    At the time you purchased the subject real property, did

9  you attend a closing?

10 A    I don't recall any closing.

11 Q    At the time you attended the subject real--I'm sorry.

12 At the time you purchased the subject real property, did you

13 execute a promissory note?

14 A    I don't recall any of that.

15 Q    Ms. Miller, I'd like to remind you at this time that you

16 are under oath.  Do you remember purchasing the property?

17 A    I don't remember the day, actually.

18 Q    Do you remember purchasing the property?  I didn't ask

19 for the date.

20 A    I don't remember purchasing the property.  I know we

21 have it.

22 Q    And how long have you had the property?

23 A    I can't recall.

24 Q    Did you pay for it in cash?

25 A    I can't recall that.

J. Miller - Cross                    37

1   Q    Ms. Miller, you said that that's not your signature on

2   that document.  How do you know it's not your signature on

3   that document if you don't recall?

4   A    That has nothing to do with that.  I can tell that's not

5   my signature.

6   Q    How can you tell that's not your signature?

7   A    Memory doesn't require knowledge of one's own signature.

8        MR. MILLER:  Objection, Your Honor.

9        THE COURT:  Whoa, whoa, let her finish her answer first

10  before you object.

11       THE WITNESS:  Memory does not require knowledge of one's

12  own signature or familiarity with one's own signature.

13  Q    (by Ms. Hendrick)  And you are now suggesting to this

14  Court under oath that that is not your signature on that

15  document?

16  A    I am.

17  Q    And you are suggesting to this Court that you've never

18  taken out a loan in order to purchase this property?

19       MR. MILLER:  Objection, Your Honor.  The witness already

20  was asked and answered that question.

21       THE COURT:  Overruled.  Go ahead and answer the

22  question.

23       THE WITNESS:  I stated I do not recall.

24  Q    (by Ms. Hendrick)  Did you ever make mortgage payments

25  for this property?

J. Miller - Cross/Redirect                    38

1   A    I do not recall.

2        MS. HENDRICK:  Your Honor, I have no further questions

3   of this witness.

4        THE COURT:  All right.  Mr. Miller, redirect?

5                         REDIRECT EXAMINATION

6   BY MR. MILLER:

7   Q    Ms. Miller, you say you don't recall signing this

8   document; is that correct?

9   A    That's correct.

10  Q    And you say you don't recall purchasing the property?

11  A    That's correct.

12  Q    Is it that you don't recall purchasing the property, or

13  is it that you don't recall when and how you purchased the

14  property?

15  A    I don't recall when or how.

16  Q    Now, you say that that's not your signature on there.

17  Ms. Hendrick asked that if you don't recall signing the

18  document, then how do you know it's not your signature?  So

19  if you didn't sign the document, would you know that that's

20  not your signature?

21  A    One's signature is familiar to oneself.  It doesn't

22  matter on what piece of paper it was ever written on.

23       MR. MILLER:  Thank you.

24           No further questions, Your Honor.

25       THE COURT:  Thank you, ma'am.  You may step down.

Campbell - Direct                         39

1              Ms. Hendrick, you may go and get the original

2     documents from the witness stand.

3          MS. HENDRICK:  Thank you, Your Honor.

4          THE COURT:  All right, Mr. Miller, any other witnesses?

5     I think you indicated there was one other individual you

6     wanted to take testimony from on this issue.  Again, just on

7     the authenticity issue.

8          MR. MILLER:  Yes, I would like to call Barbara Campbell

9     to the stand.

10              (Pause.)

11          THE COURT:  Please raise your right hand.

12              (Whereupon, Ms. Campbell was sworn.)

13          THE COURT:  All right, Mr. Miller, your witness.

14          MR. MILLER:  Thank you, Your Honor.

15                      BARBARA CAMPBELL

16     having been first duly sworn, was examined and testified as

17     follows:

18                      DIRECT EXAMINATION

19     BY MR. MILLER:

20     Q    How are you this morning, Ms. Campbell?

21     A    Fine, thank you.

22          THE COURT:  Mr. Miller, if I could ask you just one

23     favor, please.

24          MR. MILLER:  Yes.

25          THE COURT:  You've got a soft voice.

Campbell - Direct                              40

1       MR. MILLER:  Yes, I do.

2       THE COURT:  And occasionally--

3       MR. MILLER:  I'll speak into the microphone.

4       THE COURT:  Occasionally at the end of the sentence, you

5   drop off a little bit.

6       MR. MILLER:  Okay.

7       THE COURT:  So if you could just be cognizant of that

8   when you're asking a question, I'd appreciate it so we can

9   have a clean record for you.

10      MR. MILLER:  Okay, thank you.

11      THE COURT:  Thank you, Counsel--or Mr. Miller.

12      MR. MILLER:  I would like to ask that Ms. Hendrick

13  provide the original promissory note, Exhibit 1, to Ms.

14  Campbell.

15      THE COURT:  Please take it to the witness, Counsel.

16      MS. HENDRICK:  Thank you, Your Honor.

17          (Pause.)

18      MR. MILLER:  Ms. Campbell, can you please take a few

19  minutes to review this document?

20      (Pause.)

21      THE WITNESS:  Okay.

22      MR. MILLER:  Have you had a chance to review it to your

23  satisfaction?

24      THE WITNESS:  Yes.

25      THE COURT:  Excuse me, ma'am, if I could get you to lean

117

Campbell - Direct                                        41

1    a little closer to the mike, that would be appreciated.

2    Q    (by Mr. Miller)  Ms. Campbell, have you ever seen this

3    document before?

4    A    Yes.

5    Q    When have you seen it?

6         MS. HENDRICK:  Objection; relevance, Your Honor.

7         THE COURT:  Overruled.

8         THE WITNESS:  Prior to attending today's hearing.

9    Q    (by Mr. Miller)  Thank you.  Ms. Campbell, what is your

10   function--are you employed with Deutsche Bank National Trust

11   Company?

12   A    Yes.

13   Q    What is your position there?

14   A    Vice president.

15   Q    Vice president.  What are you vice president of?

16   A    Vice president of the Mortgage-Backed Securities

17   Division, Trust Administration.

18   Q    Mortgage-Backed Securities Division.

19   A    Yes.

20   Q    Okay.  Ms. Campbell, how long have you been employed in

21   that position?

22   A    Since 1992.

23   Q    Ms. Campbell, can you testify today to the authenticity

24   of that note?

25   A    That's not my area of expertise.

(18)

1   Q    So you have no ability to testify to the authenticity of

2   this document?

3   A    It appears to be an original.

4   Q    And what do you base that on?  You said you're not an

5   expert; correct?

6   A    Correct.

7   Q    So what background do you base that on being an

8   original?

9   A    My personal business experience.

10  Q    Were you there the day that alleged note was allegedly

11  signed?

12  A    No.

13  Q    Then you can't testify to the authenticity of those

14  signatures on that note?

15       MS. HENDRICK:  Objection, Your Honor.

16       THE COURT:  Let him finish his question first.

17            Go ahead and finish your question first, and then

18  we'll hear the objection.

19  Q    (by Mr. Miller)  Based on what you said, you do not have

20  the ability to testify to the authenticity of that signature,

21  yes or no?

22       MS. HENDRICK:  Objection, Your Honor.  That's

23  argumentative.

24       THE COURT:  Sustained.

25  Q    (by Mr. Miller)  Ms. Campbell, can you or can you not

Campbell - Direct                                    43

1   testify to the authenticity of the signatures on this

2   document?

3   A    Is that not the same question you just asked?

4   Q    It is not.

5   A    Repeat the question, please.

6   Q    Ms. Campbell, can you or can you not testify today to

7   the authenticity of the signatures on that alleged note?

8        MS. HENDRICK:  Objection, Your Honor.  It's

9   argumentative.  She's not being offered for the authenticity

10  (inaudible).

11       THE COURT:  Sustained.

12  Q    (by Mr. Miller)  Ms. Campbell, what were you told you

13  were brought here today for?

14       MS. HENDRICK:  Objection, Your Honor.  Calls for

15  attorney-client privilege.

16       THE COURT:  Sustained.  Questions with respect to the

17  authenticity only, sir.  She's your witness you called.

18  Q    (by Mr. Miller)  Ms. Campbell, do you have any personal

19  knowledge as to the authenticity of the signatures on this

20  alleged note?

21       MS. HENDRICK:  Objection, Your Honor, asked and

22  answered.  And she is not proffered for the authenticity of

23  this note.

24       THE COURT:  I'll overrule that.

25            If you can answer the question, go ahead.

Campbell - Direct                          44

1       THE WITNESS:  Will you repeat the question, please?

2   Q   (by Mr. Miller)  Ms. Campbell, can you testify today to

3   the--I'm sorry, I have a hard time remembering my own

4   questions let alone others.  Ms. Campbell, do you have any

5   personal knowledge as to the authenticity of the signatures

6   on this alleged document in front of you?

7   A   No, I do not.

8   Q   Ms. Campbell, do you know of anybody who does have

9   personal knowledge of the authenticity of the signatures on

10  this alleged document?

11      MS. HENDRICK:  Objection, Your Honor.  It calls for

12  speculation; and, in addition to that, this is not discovery.

13  This is the hearing.

14      THE COURT:  Overruled.

15      THE WITNESS:  I'm sorry, can you repeat the question

16  again?

17  Q   (by Mr. Miller)  Do you have--do you know of anybody who

18  has any personal knowledge of the authenticity of the

19  signatures on that note?

20  A   The borrowers of the note.

21  Q   So you're saying you know the borrowers of this note?

22      MS. HENDRICK:  Objection; mischaracterizes her

23  testimony.

24      THE COURT:  Sustained.

25  Q   (by Mr. Miller)  Ms. Campbell, have you ever met Ms.

121

Campbell - Direct                                      45

1  Jamileh Miller before today?

2  A    No.

3  Q    Ms. Campbell, have you ever met Mr. Mark Stanley Miller

4  before this day?

5  A    No.

6  Q    Ms. Campbell, have you ever spoken to Ms. Jamileh Miller

7  before this day?

8  A    Not to my knowledge.

9  Q    Ms. Campbell, have you ever spoken to Mr. Mark Miller

10 before this day?

11 A    Not to my knowledge.

12       (Pause.)

13 Q    So, just for clarification, when was the first time you

14 saw this document you have in front of you today?

15 A    I don't recall the exact date, but it was prior to the

16 trial today.

17 Q    Ms. Campbell, did anybody coach you on how to answer

18 questions presented to you today?

19       MS. HENDRICK:  Objection, Your Honor.

20       THE COURT:  Sustained.

21 Q    (by Mr. Miller)  Ms. Campbell, can you describe what

22 your function of your daily tasks are at Deutsche Bank as

23 vice president of--I forget what exactly you're vice

24 president of, but can you detail your daily tasks in that

25 position?